UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LIFEBRITE HOSPITAL GROUP OF STOKES, LLC | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) Case No. 1:18-cv-00293-WO-LPA |
| BLUE CROSS AND BLUE SHIELD OF NC, | ) ) |
| Defendant. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S (1) MOTION TO REMAND AND
(2) MOTION TO DISMISS COUNTERCLAIMS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................iii

PRELIMINARY STATEMENT..........................................1

FACTUAL BACKGROUND.............................................6

      A.   The Parties............................................6

      B.   The Agreements.........................................7

      C.   The BlueCard Program...................................8

      D.   LifeBrite's Action.....................................9

      E.   BCBSNC's Response to the Complaint.....................9

ARGUMENT......................................................10

I.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER
THIS ACTION AND SHOULD REMAND IT TO THE SUPERIOR
COURT OF STOKES COUNTY........................................10

II.  THE COUNTERCLAIMS SHOULD BE DISMISSED FOR FAILURE TO
STATE A CLAIM AND FOR FAILURE TO SATISFY THE
PARTICULARITY REQUIREMENTS OF RULE 9(b).......................12

      A.   BCBSNC Does Not Allege A Fraudulent Scheme............14

      B.   BCBSNC Does Not Allege A Claim for Breach of
Contract..............................................18

      C.   BCBSNC's Claims Fail for Additional,
Independent Reasons...................................19

            1.   Counts I, II and VI Fail Because They Do Not
Allege Conduct that Is Independent of BCBSNC's
Contractual Claims............................20

            2.   Count IV Fails Because North Carolina Does Not
Recognize A Claim for "Breach of Contract
Accompanied by a Fraudulent Act"..............22

            3.   Count V Fails Because BCBSNC Does Not
Adequately Identify A Third-Party Contract......22

4.   BCBSNC Is Not Entitled to the Remedies Sought in Counts VII-IX...............................24

5.   Count X Does Not State A Claim For Unjust Enrichment.....................................25

CONCLUSION....................................................26

ii

**TABLE OF AUTHORITIES**

**Cases**

Ashcroft v. Iqbal,
        556 U.S. 662 (2009)...................................13, 17

Bell Atl. Corp. v. Twombly,
        550 U.S. 544 (2007)...................................13, 17

Branch Banking & Tr. Co. v. Thompson,
        418 S.E.2d 694 (N.C. Ct. App. 1992)......................21

Broussard v. Meineke Discount Muffler Shops, Inc.,
        155 F.3d 331 (4th Cir. 1998).............................21

Curtis v. Café Enters., Inc., No. 5:15-CV-0032-RLV-DSC,
        2016 WL 6916786 (W.D.N.C. Nov. 21, 2016),
        aff'd 715 F. App'x 268 (4th Cir. 2017)...................22

DaimlerChrysler Corp. v. Kirkhart,
        561 S.E.2d 276 (N.C. Ct. App. 2002)..................22, 23

Dealers Supply Co. v. Cheil Indus., Inc.,
        348 F. Supp. 2d 579 (M.D.N.C. 2004)......................14

Deltacom, Inc. v. Budget Telecom, Inc., No. 5:10-CV-38-FL,
        2011 WL 2036676 (E.D.N.C. May 22, 2011)..................25

Exact Scis. Corp. v. Blue Cross & Blue Shield of N.C.,
        No. 1:16-cv-125, 2017 WL 1155807
        (M.D.N.C. Mar. 27, 2017).................................24

Gateway Mgt. Servs., Ltd. v. Carrbridge Berkshire
        Grp., Inc., 17 CVS 5275, 2018 WL 2164992
        (N.C. Super. Ct. May 9, 2018)........................22, 23

Great-West Life & Annuity Ins. Co. v. Knudson,
        534 U.S. 204 (2002)......................................24

Johnson v. Sprint Sols., Inc., No. 3:08-CV-00054,
        2008 WL 2949253 (W.D.N.C. July 29, 2008).............20, 25

Kearney v. Blue Cross & Blue Shield of N.C.,
        233 F. Supp. 3d 496 (M.D.N.C. 2017)......................11

Case 1:18-cv-00293-WO-LPA   Document 17   Filed 06/06/18   Page 4 of 32

Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.,
     351 F. Supp. 2d 436 (M.D.N.C. 2005)...................12, 13

N.C. Farmers' Assistance Fund, Inc. v. Monsanto Co.,
     740 F. Supp. 2d 694 (M.D.N.C. 2010).......................16

Rhodes, Inc. v. Morrow,
     937 F. Supp. 1202 (M.D.N.C. 1996).........................25

Rohlik v. I-Flow Corp.,No. 7:10-CV-173-FL,
     2011 WL 2669302 (E.D.N.C. July 7, 2011)...................14

Sheridan Healthcorp, Inc. v. Aetna Health Inc.,
     161 F. Supp. 3d 1238 (S.D. Fla. 2016).....................12

Sonoco Prods. Co. v. Physicians Health Plan, Inc.,
     338 F.3d 366 (4th Cir. 2003)..............................12

Strum v. Exxon Co.,
     15 F.3d 327 (4th Cir. 1994)...............................20

Topshelf Mgmt., Inc. v. Campbell-Ewald Co.,
     117 F. Supp. 3d 722 (M.D.N.C. 2015)....................13-14

**Statutes and Rules**

Fed. R. Civ. P. 9........................................passim

Fed. R. Civ. P. 12.......................................passim

28 U.S.C. § 1447.........................................1, 12

42 U.S.C. § 1395*l*..........................................4

iv

Pursuant to 28 U.S.C. § 1447(c) and Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b), Plaintiff LifeBrite Hospital Group of Stokes, LLC ("LifeBrite") submits this memorandum of law in support of its motion to remand and its motion to dismiss the counterclaims asserted by Defendant Blue Cross and Blue Shield of North Carolina ("BCBSNC"). (See ECF 11.) For the reasons discussed herein, the motions should be granted.

## PRELIMINARY STATEMENT

This action is a contract dispute between a rural hospital, which billed for services it provided, and an insurance company that does not want to honor its obligation to pay for those services. It is not about billing for services not rendered: there is no allegation that the laboratory services at issue were not provided. It is not about a scheme to hide information from the insurance company: BCBSNC knows what laboratory services were provided and the patients who received them. It is not about fraud: Medicare allows rural hospitals to bill and be reimbursed for the very same laboratory services about which BCBSNC complains. BCBSNC's unsupported fraud allegations should be dismissed and this commercial contract dispute should be remanded to the state court where it belongs.

Across the United States, rural hospitals face an increasingly challenging healthcare environment, which has

resulted in a growing number of hospital closures. These closures deprive rural patients of access to critical healthcare services and rural economies of a vital source of income. The Stokes County hospital at the center of this litigation has firsthand knowledge of these troubles. Prior to 2017, the hospital was owned by Pioneer Health Services of Stokes County, Inc. (See CC ¶ 3.) Like many rural hospital operators, Pioneer faced significant financial challenges in operating and managing the hospital, culminating in a March 2016 bankruptcy filing. (See id.)[1]

Local leaders in Stokes were concerned that the Pioneer bankruptcy would deprive the community of much needed medical care. Consequently, Stokes County entered into an agreement with Pioneer to permit continued operation of the hospital.[2] Ultimately, however, Stokes County was unable to bear the costs of continued operations, and it ceased funding the agreement on July 8, 2016.[3]

Days before the hospital's expected closure, LifeBrite stepped in. For six months, LifeBrite funded the hospital's operations, the hospital's doors remained open, and the hospital

---

[1]  See also In re Pioneer Health Services, Inc., No. 16-0119-NPO (Bankr. S.D. Miss. Marc. 30, 2016) ("Pioneer Bankruptcy") (ECF 1) (Ex. 1). Copies of relevant excerpts from the cited bankruptcy filings are attached hereto as Exhibits 1-4.

[2]  See Pioneer Bankruptcy ECF 1501 (Ex. 2).

[3]  See id. ¶ 9.

2

continued to deliver essential medical services to the community.[4]
In January 2017, LifeBrite acquired the hospital.  (See CC ¶ 3.)[5]

Today, LifeBrite Community Hospital of Stokes (the
"Hospital") is a critical access hospital serving the healthcare
needs of patients in Danbury, where it is located, as well as in
the surrounding rural, mountainous areas where there is limited
access to medical care.  (See ECF 1-1 ¶ 6; CC ¶ 2.)  The Hospital
offers a variety of customary hospital services, including acute
care, emergency care, outpatient nursing services, laboratory,
rehabilitation, physical/occupational therapy, radiology,
echocardiogram, ultrasound, CT scan and skilled nursing
facilities.  (See Compl. ¶ 6.)  It employs more than 200
individuals from the Stokes community and performs thousands of
in-patient and out-patient procedures a year.

Like many other hospitals throughout the country, the
Hospital also operates a laboratory outreach program.  (See Compl.
¶ 6.)  Through such programs, hospitals provide laboratory services
for individuals who do not receive any other services from the
hospital.  The federal government refers to such individuals as
"non-patients" and defines them as "a beneficiary that is neither

---

[4]  See Pioneer Bankruptcy ECF 744 (Ex. 3).

[5]  See Pioneer Bankruptcy ECF 1501, 1679 (Exs. 2, 4).

an inpatient nor an outpatient of a hospital, but that has a specimen that is submitted for analysis to a hospital and the beneficiary is not physically present at the hospital."[6]    In providing laboratory outreach services, hospital laboratories may outsource high complexity testing to other laboratories known as "reference labs."   Medicare rules expressly permit rural hospitals, like the Hospital, to bill Medicare for laboratory outreach services, including services for non-patients and services performed by reference laboratories.   See 42 U.S.C. § 1395l(h)(5).[7]

Despite these federal rules that expressly permit the laboratory services at issue in this case, BCBSNC accuses LifeBrite of engaging in a "fraudulent scheme." (CC ¶ 1.) Not surprisingly, the counterclaims are devoid of any facts to support this scurrilous allegation.  Instead, the vast majority of BCBSNC's allegations are conclusory assertions pled "on information and

---

[6]  See  Medicare  Claims  Processing  Manual,  §  30.3, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/ Downloads/clm104c16.pdf.  Copies  of  the  cited  pages  of  the Medical Claims Processing Manual are attached hereto as Exhibit 5.

[7]  See also Ex. 5, Medicare Claims Processing Manual, § 30.3 (describing  claim  submission  process  for  a  "non-patient (referred)  laboratory  specimen");  id.  § 40.1  (stating  that  a referring laboratory may bill for a reference laboratory if "the referring  laboratory  is  located  in,  or  is  part  of,  a  rural hospital").

4

belief" – a far cry from the particularized facts a party must allege when accusing an entity of fraud. At bottom, BCBSNC takes issue with the laboratory outreach paradigm. The fact that BCBSNC does not like that paradigm is not a basis to assert fraud.[8]

Moreover, the counterclaims reveal that, contrary to the assertions made in BCBSNC's Notice of Removal, this action relates solely to the contractual relationship between LifeBrite and BCBSNC and does not raise any questions of federal law. This Court therefore lacks subject matter jurisdiction over this action. The counterclaims should be dismissed and LifeBrite's claims should be remanded to the North Carolina Superior Court where they belong.

---

[8] The day after BCBSNC filed its counterclaims, BCBSNC terminated its agreement with LifeBrite. See http://blog.bcbsnc.com/stokes/ (Ex. 6). Tellingly, it did not terminate for cause but rather exercised its without cause termination rights. (See id.; see also Ex. 7.) However, in communicating its decision to end its relationship with the Hospital and deprive BCBSNC members of their ability to utilize its services, BCBSNC attempted to shift the blame for this upsetting business decision by quoting extensively from its counterclaims, even though the vast majority of its allegations are alleged "on information and belief" and without any factual support. (See Ex. 6.) Although LifeBrite disagrees with BCBSNC's tactics, it remains willing to work with BCBSCNC on a business resolution that will allow the Hospital to continue to provide vitally needed healthcare services to the Stokes community.

## FACTUAL BACKGROUND

**A.    The Parties**

LifeBrite is a healthcare company organized and existing under the laws of the State of Georgia and is registered in North Carolina as a foreign company.  (Compl. ¶ 1; see also CC ¶ 30.) Its principal place of business is Danbury, Stokes County, North Carolina, where it operates the Hospital.  (Compl. ¶ 6; CC ¶ 30.)

BCBSNC is a hospital and medical services corporation formed and existing under the laws of the state of North Carolina with its principal place of business in Durham County, North Carolina. (CC ¶ 29.)  BCBSNC is a licensee of the Blue Cross Blue Shield Association (the "BCBS Association"), which is a federation of thirty-six independent health insurance organizations and companies (collectively, the "BCBS Affiliates").  (Id. ¶¶ 31-32; Answer ¶ 7.)

**B.    The Agreements**

Pioneer and BCBSNC entered into a Network Participation Agreement (the "NPA"), and a Medicare Provider Agreement (the "MPA") (collectively, the "Agreements"), pursuant to which Pioneer contracted to provide covered services to eligible BCBSNC members, as well as BCBS Affiliates' members.  (See Compl. Ex. B; CC Ex.

6

B.)[9]   BCBSNC and LifeBrite amended the Agreements, effective
January 31, 2017, to permit the novation and substitution of
LifeBrite for Pioneer.  (CC ¶ 50.)

Pursuant to the Agreements, LifeBrite agreed "to render
Medically Necessary Covered Services to Members according to
[BCBSNC] Policies and Procedures and according to the terms of
this Agreement."  (Ex. 7 § 2.1.1; CC Ex. B § 2.1.)  In turn, BCBSNC
agreed to pay to LifeBrite agreed amounts "[f]or Covered Services
provided to Members at the sites listed in the Site of Service
Exhibit."  (Ex. 7 § 4.1; see also CC Ex. B § 4.3.)  Pioneer
Community Hospital of Stokes, now the Hospital, is a site of
service listed in the Site of Service Exhibit to the NPA.  (Ex. 7
at 16.)

### C.  The BlueCard Program

Under the Agreements, LifeBrite is required to follow
procedures associated with the BlueCard Program, "which allows
members of one BCBS Association licensee's health plans to obtain
healthcare services in another BCBS Association licensee's service

---

[9]  Because the copy of the NPA attached to the Complaint contained
only odd pages, a complete copy is attached hereto as Exhibit
7.  BCBSNC attached an earlier version of the NPA to its Answer
and Counterclaims.  (See CC Ex. A.)

7

area." (CC ¶ 32.)[10] "[W]hen a provider is a participating provider with [BCBSNC], and is located in [BCBSNC's] service area, services performed and billed by that provider for any BCBS Association licensee's members are billed to [BCBSNC]." (Id. ¶ 33.) BCBSNC "would then reconcile the cost of those services with the BCBS Association licensee responsible for each member." (Id. ¶ 34.) The BlueCard program applies to "all inpatient, outpatient and professional claims, including vision and hearing exams." (Ex. 8 § 5.1.1.) It excludes only prescription drugs, stand-alone dental, stand-alone vision, and the Federal Employee Program. (Id.)

The BlueCard Program identifies "independent clinical laboratories" as "ancillary providers" and requires such laboratories to submit claims to the Blue Plan in whose service area the specimen was drawn. (Id. § 5.8.7 (emphasis added).) The same requirement, however, does not apply to hospitals. (See id.) Such providers are required to submit their claims to BCBSNC, as noted above.

---

[10] BCBSNC's Policies and Procedures are set forth in The Blue Book Provider e-Manual, BCBSNC, https://www.bluecrossnc.com/ sites/default/files/document/attachment/providers/public/pdfs/ BlueBook_Feb2018.pdf. Relevant provisions of the e-Manual are attached hereto as Exhibit 8.

### D.  LifeBrite's Action

Beginning on November 14, 2017, in a clear breach of the NPA, BCBSNC unilaterally started to deny claims on the grounds that "the claims should be sent to the State where the lab specimen was drawn." (Compl. ¶ 11.)  Following unsuccessful efforts to resolve the dispute, on March 9, 2018, LifeBrite filed suit against BCBSNC in North Carolina Superior Court, Stokes County, asserting claims for (1) breach of the NPA and (2) unjust enrichment.[11]

### E.  BCBSNC's Response to the Complaint

On April 13, 2018, BCBSNC removed the state court action to this Court. (ECF 1.)  To invoke this Court's jurisdiction, BCBSBC represented that this action involves, at least in part, coverage determinations that are made by BCBSNC in its capacity as a plan administrator.  (Id. ¶¶ 12, 25, 33.) BCBSNC thus argued that LifeBrite's claims are completely preempted by federal law and/or that BCBSNC's coverage determinations are made under color of federal office.  (Id.)  The counterclaims, however, belie the premise of BCBSNC's removal.  This case does not involve coverage decisions at all.  Rather, BCBSNC takes issue with the Hospital's laboratory outreach program, claiming that the hospital is not permitted to bill BCBSNC for these services irrespective of whether

---

[11] The MPA is neither mentioned in nor attached to the Complaint.

the services are covered services under the patients' BCBS plans. This case thus is about the parties' contractual rights under the Agreements – not coverage issues under the various healthcare plans that BCBSNC administers.

<u>**ARGUMENT**</u>

**I.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS ACTION AND SHOULD REMAND IT TO THE SUPERIOR COURT OF STOKES COUNTY.**

LifeBrite's complaint asserts only state law claims:  breach of the NPA and unjust enrichment.  (<u>See</u> Compl.)  BCBSNC nevertheless removed the action to this Court asserting, "based on a review of the claims from Plaintiff during the time period at issue, in the vast majority of instances, [BCBSNC] has been unable to determine whether the claims are 'medically necessary' or are otherwise for covered services."  (ECF 1 ¶ 12; <u>see also</u> <u>id.</u> ¶¶ 14, 25, 33.)  These supposed outstanding coverage determinations underlie, and are essential to, the two grounds for removal advanced by BCBSNC.  (<u>See</u> <u>id.</u>)

The counterclaims, however, make clear that BCBSNC's conduct in denying the claims at issue has nothing to do with outstanding coverage determinations.[12]  Rather, BCBSNC has stopped paying

---

[12] LifeBrite accepted the representations made by BCBSNC in its Notice of Removal and therefore did not seek immediate remand of this action.  The counterclaims, however, reveal those representations to be mere pretext.

10

LifeBrite's claims based on its assertion that LifeBrite's billing practices are improper. (See CC ¶ 1.) Indeed, BCBSNC asserts that a dispute exists as to "whether Blue Cross NC has the right to deny the claims implicated by LifeBrite's actions and scheme" and asks this Court to declare that "[n]o payment is due to LifeBrite on any claims that are pending, or may be submitted in the future. . . ." (Id. ¶¶ 162-63.) This dispute thus is a contractual dispute regarding the parties' obligations under the Agreements. It does not involve efforts to enforce rights under an ERISA plan, as is required for complete preemption. See, e.g., Kearney v. Blue Cross & Blue Shield of N.C., 233 F. Supp. 3d 496, 504 (M.D.N.C. 2017) (removal was proper where plaintiff "argue[d] that BCBSNC denied coverage for the claims based on an erroneous conclusion that the services were not 'medically necessary'"). Nor does it involve acts taken by BCBSNC on behalf of the federal government or in connection with its administration of any federal health plan as is required to invoke federal officer removal jurisdiction. See, e.g., Sheridan Healthcorp, Inc. v. Aetna Health Inc., 161 F. Supp. 3d 1238, 1249 (S.D. Fla. 2016) (holding that a claim for breach of independent agreements "that do not reference or incorporate [federal health] plans or terms" could not be removed).

11

Because there is no basis for federal subject matter jurisdiction, the court should remand this action to the North Carolina Superior Court.  See 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); see also Sonoco Prods. Co. v. Physicians Health Plan, Inc., 338 F.3d 366, 370 (4th Cir. 2003) (courts must "narrowly interpret removal jurisdiction because the removal of proceedings from state courts raises 'significant federalism concerns'") (citation omitted).

## II. THE COUNTERCLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AND FOR FAILURE TO SATISFY THE PARTICULARITY REQUIREMENTS OF RULE 9(b).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp., 351 F. Supp. 2d 436, 441 (M.D.N.C. 2005).  To survive dismissal, a complaint must "show[]" – not merely assert – a plaintiff's entitlement to relief.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 n.3 (2007). Factual allegations must be "enough to raise a right to relief above the speculative level" and the claims asserted must be "plausible on [their] face."  Id. at 555, 570; see also Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009) (bare and conclusory assertions do not suffice to "'nudge[] claims' . . . 'across the line from conceivable to plausible'") (quoting Twombly, 550 U.S. at 570).

12

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). Even "well-pleaded factual allegations" are insufficient to state a claim for relief if they "do not permit the court to infer more than the mere possibility of misconduct." Id. at 679.

Moreover, claims sounding in fraud must comply with Rule 9(b)'s requirement that fraud be pled with particularity. See Madison River, 351 F. Supp. 2d at 446-47 (applying Rule 9(b) to "all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud") (citations omitted).[13]  Claimants must plead the "time, place, and contents of the alleged fraudulent representation, as well as the identity of each person making the misrepresentation and what was obtained thereby." Dealers Supply Co. v. Cheil Indus., Inc., 348 F. Supp. 2d 579, 589 (M.D.N.C. 2004) (citation omitted).  In other words, the plaintiff must specify "the 'who, what, where, when, why, and how'" of the alleged fraud. Rohlik v. I-Flow Corp., No.

---

[13] See Madison River, 351 F. Supp. 2d at 447 (applying Rule 9(b) to claim for negligent misrepresentation); Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 726-27 (M.D.N.C. 2015) (applying Rule 9(b) to Unfair Trade Practices Act ("UTPA") claim).

7:10-CV-173-FL, 2011 WL 2669302, at *3 (E.D.N.C. July 7, 2011) (dismissing fraud and negligent misrepresentation claims where plaintiff alleged only that "defendant engaged in a marketing program containing misrepresentations" and failed to plead "[t]he specific allegations required by Rule 9(b) and North Carolina law").

### A. BCBSNC Does Not Allege A Fraudulent Scheme.

The gravamen of all BCBSNC's claims is that "LifeBrite has engaged in a fraudulent scheme to enrich itself at [BCBSNC's] expense by billing for laboratory services that were not payable, were fraudulent, were in violation of [BCBSNC's] contract with LifeBrite, and were otherwise unlawful." (CC ¶ 1; see also id. ¶¶ 93, 102, 111, 119-20, 128, 134, 142, 159, 168, 173.) The facts pled, however, establish only that LifeBrite provided laboratory services to BCBSNC's members – a fact LifeBrite itself alleged when it filed this action seeking payment for such services. BCBSNC offers no facts to support its fraud allegations let alone the details required by Rule 9(b).

Instead, BCBSNC alleges on "information and belief" – i.e., without any factual support – that LifeBrite engaged in a laundry list of purported misconduct. (See, e.g., CC ¶¶ 5, 6, 10, 11, 14, 15, 24, 49, 74, 78, 80, 81, 82, 83, 87.) These barren allegations,

14

however, highlight the deficiencies in BCBSNC's claims. For example:

- BCBSNC asserts that the lab tests at issue were "not ordered by providers to be performed at or by LifeBrite," (CC ¶ 5), but it fails to identify a single instance in which this occurred.

- It asserts that LifeBrite billed "for drug testing performed by other laboratories as if the testing had been performed at and by LifeBrite," (CC ¶ 6), and that LifeBrite "leveraged" other laboratories "who provided their patients' urine specimens to LifeBrite," (CC ¶ 10), but it fails to identify any other laboratory involved in this purported scheme.

- It asserts that "some of" these so-called, but unidentified, "Pass-Through Labs" provided specimens to LifeBrite "on the condition that Blue Cross NC pay them for testing those specimens," (CC ¶ 11), but it does not identify a single such arrangement.

- It asserts that LifeBrite "misrepresented" tests it performed "as medically necessary tests ordered by LifeBrite providers for patients seen at LifeBrite," (CC ¶ 15), but it does not identify a single claim for a single medically unnecessary test nor does it identify a single claim that misrepresents the location of the patients.

- It asserts that LifeBrite "failed to collect member payment responsibilities," (CC ¶ 24), but it does not identify a single member from whom LifeBrite did not seek to collect such payments.

- It asserts that LifeBrite "paid kickbacks" to ensure that "healthcare providers and laboratories participated in LifeBrite's scheme" (CC ¶ 82), but it does not proffer a single allegation regarding LifeBrite's marketing practices let alone identify a single instance in which a "kickback" was offered or paid.

15

Indeed, BCBSNC does not allege a single fact to support <u>any</u> of these defamatory and irresponsible allegations.[14]

Instead, BCBSNC compares the number of lab tests, and the amount of lab billing, submitted to BCBSNC by Pioneer prior to its bankruptcy to the number of lab tests and billings submitted by LifeBrite. (<u>See</u> CC ¶¶ 17-19, 21, 84-85.) This comparison, of course, says nothing about the propriety of LifeBrite's practices. BCBSNC also proffers a map of the United States, which breaks down by State where the laboratory outreach patients resided. (CC ¶ 20.) But far from supporting BCBSNC's claimed "fraudulent scheme," (<u>see</u> CC ¶ 1), the fact that BCBSNC <u>knows</u> the location of these patients confirms the transparency of LifeBrite's practices. These allegations – which are the only <u>facts</u> pled by BCBSNC relating to LifeBrite[15] – do not plausibly suggest that LifeBrite

---

[14] Pleading on "information and belief" is permitted under Rule 9(b) <u>only when</u> "essential information lies uniquely within another party's control" and <u>only if</u> "the pleading sets forth the specific facts upon which the belief is reasonably based." <u>N.C. Farmers' Assistance Fund, Inc. v. Monsanto Co.</u>, 740 F. Supp. 2d 694, 705 (M.D.N.C. 2010) (internal quotation marks and citations omitted). Here, BCBSNC provides neither the "information" on which it relies nor any plausible reasons for its "belief." BCBSNC, moreover, does not – and cannot – allege that the facts are uniquely in LifeBrite's possession. Obviously, BCBS members would know whether LifeBrite collected member payment responsibilities, and providers would know about LifeBrite's marketing practices.

[15] Paragraphs 66-76 purport to describe the toxicology laboratory industry and supposed "widespread fraud" within it. (<u>See</u>

16

engaged in any misconduct. Indeed, there is no non-conclusory allegation that LifeBrite did anything other than perform services for BCBS Members and submit those claims to BCBSNC. BCBSNC's allegations therefore fail to satisfy the requirements of Twombly and Iqbal let alone the heightened pleading requirements of Rule 9(b). Because each of the counterclaims is premised on legally deficient allegations of fraud, the counterclaims should be dismissed in their entirety.

**B. BCBSNC Does Not Allege A Claim for Breach of Contract.**

Not only does BCBSNC fail to adequately allege any fraudulent conduct by LifeBrite, it does not even allege conduct that constituted a breach of the Agreements. As noted above, the only well-pled facts are that LifeBrite submitted claims to BCBSNC for lab tests conducted for people living outside North Carolina. (See CC ¶¶ 16-21.)[16] Such conduct is entirely consistent with the terms of the Agreements. In particular:

- Section 2.1.1 of the NPA required LifeBrite "to render Medically Necessary Covered Services to Members

---

CC ¶ 66.) The vast majority of these allegations have nothing to do with LifeBrite and the facts alleged do not support BCBSNC's conclusory assertion that LifeBrite's conduct is in any way similar to the conduct alleged in the matters referenced, but not described, in Paragraphs 74 and 75.

[16] As noted above, Medicare refers to such individuals as "non-patients" and expressly permits rural hospitals, like the Hospital, to bill Medicare for laboratory services for such non-patients. See Ex. 5 § 30.3.

17

according to our Policies and Procedures and according to the terms of this Agreement." (See also MPA § 2.1.)

- Section 4.1 of the NPA obligated BCBSNC to pay "[f]or Covered Services provided to Members at the sites listed in the Site of Service Exhibit." (See also MPA § 4.3.)

- The Hospital is identified on the Site of Service Exhibit to the NPA. The MPA has no Site of Service requirements.

- Section 5.1 of BCBSNC's Blue Book Provider e-Manual states: "The Blue Card program lets you conveniently submit claims for members from other Blue Plans, including international Blue Plans, directly to Blue Cross NC."

- Section 5.1.1 of the e-Manual states: "The Blue Card Program applies to all inpatient, outpatient and professional claims, including vision and hearing exams" and excluding only prescription drugs, stand-alone dental, stand-alone vision and the Federal Employee Program.

- Section 5.8 of the e-Manual states: "Submit claims for services provided to Blue Card members to Blue Cross NC using your normal claims billing processes. Blue Cross NC will electronically route your claims to the member's Blue Cross and/or Blue Shield Plans."

- Section 5.8.7 of the e-Manual includes special claim submission rules for "ancillary providers." These rules apply to "independent clinical laboratories" – not hospital laboratories.

The alleged conduct complied in all respects with these provisions and BCBSNC therefore has not alleged a claim for breach of contract. To the contrary, LifeBrite initiated this action because BCBSNC breached its payment obligations under the NPA.

18

In short, because BCBSNC has not alleged – and cannot allege – a breach of the Agreements, it cannot save its deficient fraud-based claims by recasting them as contractual.

**C.    BCBSNC's Claims Fail for Additional, Independent Reasons.**

In addition to BCBSNC's failure to plead factual content that would allow the court to draw the reasonable inference that LifeBrite engaged in any misconduct and its failure to plead its claims with particularity, many of BSBNC's claims fail for additional, independent reasons.

**1.    Counts I, II and VI Fail Because They Do Not Allege Conduct That Is Independent of BCBSNC's Contractual Claims.**

Tort actions arising from a breach of contract can only be brought in cases where the alleged conduct constitutes an "independent tort." Strum v. Exxon Co., 15 F.3d 327, 330-31 (4th Cir. 1994). Tort claims based on the "same set of alleged facts" as a breach of contract claim are not actionable. See Johnson v. Sprint Sols., Inc., No. 3:08-CV-00054, 2008 WL 2949253, at *4 (W.D.N.C. July 29, 2008) (dismissing negligent misrepresentation claim where plaintiff failed "to present any identifiable and distinct fact, wholly separate from her breach of contract claim"). Here, the allegations underlying BCBSNC's fraudulent misrepresentation and negligent misrepresentation claims are indistinguishable from the allegations underlying its claim for

19

breach of contract. (Compare CC ¶¶ 93, 102 with id. ¶¶ 109, 110.)
BCBSNC thus brings no "identifiable" claim for an independent tort
and its fraudulent misrepresentation and negligent
misrepresentation claims fail for this additional reason. See
Strum, 15 F.3d at 330 ("Parties contract partly to minimize their
future risks. Importing tort law principles of punishment into
contract[s] undermines their ability to do so.").

Similarly, the Fourth Circuit has recognized that "a UTPA
count 'constitutes a boilerplate claim in most every complaint
based on a commercial or consumer transaction in North Carolina.'"
Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331,
348 (4th Cir. 1998) (citation omitted). "To correct this tendency,
and to keep control of the extraordinary damages authorized by the
UTPA, North Carolina courts have repeatedly held that 'a mere
breach of contract, even if intentional, is not sufficiently unfair
or deceptive to sustain an action under [the UTPA,] N.C.G.S. § 75-
1.1.'" Id. (quoting Branch Banking & Tr. Co. v. Thompson, 418
S.E.2d 694, 700 (N.C. Ct. App. 1992)) (alteration in original).
Instead, a showing of "substantial aggravating circumstances" is
required. Broussard, 115 F.3d at 348 (citation omitted).

Here, BCBSNC makes no attempt to allege any unfair or
deceptive acts that do not arise directly from LifeBrite's alleged
breach of contract. Its UTPA claim merely alleges that "LifeBrite

20

fraudulently submitted claims for payment, as more fully described in Count I." (CC ¶ 134.) As discussed above, Count I is based entirely on the same conduct that underlies BCBSNC's breach of contract claim. BCBSNC thus fails to plead any facts supporting "substantial aggravating circumstances" – indeed, Medicare permits the challenged practices – and thus the UTPA claim too is not actionable as an independent claim.

### 2. Count IV Fails Because North Carolina Does Not Recognize A Claim for "Breach of Contract Accompanied by a Fraudulent Act."

BCBSNC seeks to bring a separate claim for "breach of contract accompanied by a fraudulent act." However, "North Carolina does not recognize a cause of action for breach of contract accompanied by fraudulent acts." Curtis v. Café Enters., Inc., No. 5:15-CV-00032-RLV-DSC, 2016 WL 6916786, at *10 (W.D.N.C. Nov. 21, 2016), aff'd 715 F. App'x 268 (4th Cir. 2017).

### 3. Count V Fails Because BCBSNC Does Not Adequately Identify A Third-Party Contract.

The elements of tortious interference with contract are: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." DaimlerChrysler Corp. v. Kirkhart,

561 S.E.2d 276, 285 (N.C. Ct. App. 2002) (citation omitted). To
state a claim for tortious interference, a claimant must "identify
a contract with which Defendants allegedly interfered." Gateway
Mgmt. Servs., Ltd. v. Carrbridge Berkshire Grp., Inc., 17 CVS 5275,
2018 WL 2164992, at *9 (N.C. Super. Ct. May 9, 2018) (unpublished);
see also Daimler Chrysler, 561 S.E.2d at 284-85. Thus, in Gateway,
the court rejected the plaintiff's tortious interference claim
where the plaintiff alleged broadly that "Defendants . . . were
aware of the identity of customers of [Plaintiff] and were aware
of the existence of contracts between [Plaintiff] and customers"
without specifying any particular contracts or categories of
contracts. 2018 WL 2164992, at *9 (alterations in original). The
court concluded that "these threadbare allegations are
insufficient, even under the liberal Rule 12(b)(6) standard." Id.
So too here. BCBSNC generally alleges that it had "a contract
with each of its members" (CC ¶ 125) and that these unidentified
"contracts required each member to pay a coinsurance, copayment,
or deductible payment," (id. ¶ 126), but it does not identify a
single contract, a set of contracts or any of the relevant member
payment terms with which LifeBrite supposedly interfered. Thus,
in addition to failing to allege facts supporting its conclusory
assertion that LifeBrite did not collect members' payment

22

obligations, BCBSNC also fails to adequately allege those obligations.  See Gateway, 2018 WL 2164992, at *9.

### 4. BCBSNC Is Not Entitled To The Remedies Sought In Counts VII-IX.

Counts VII-IX are for remedies – restitution under ERISA, declaratory and injunctive relief, attorneys' fees, and constructive trust and equitable liens.  These Counts do not assert additional claims against LifeBrite but instead seek particular remedies for the deficiently pled fraudulent scheme.  Because BCBSNC has not stated any violation of law or contract by LifeBrite (see Sections II.A and II.B, supra), it is not entitled to any of the remedies set forth in these Counts.  See Exact Scis. Corp. v. Blue Cross & Blue Shield of N.C., No. 1:16-cv-125, 2017 WL 1155807, at *10 (M.D.N.C. Mar. 27, 2017) ("[T]he Declaratory Judgment Act, 28 U.S.C. § 2201, is 'remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights.'") (citation omitted).

Additionally, BCBSNC's claim for restitution under ERISA § 502(a)(3), as well as its claim for a constructive trust and equitable liens, fail because BCBSNC does not contend that LifeBrite "hold[s] particular funds that . . . belong" to BCBSNC. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214 (2002).  Rather, BCBSNC seeks money damages – i.e., legal relief – that are not recoverable through these equitable remedies.  Id.

23

at 210.  BCBSNC's requests for a constructive trust fail for the additional reason that BCBSNC does not – and cannot – allege a fiduciary relationship between it and LifeBrite.  See Rhodes, Inc. v. Morrow, 937 F. Supp. 1202 (M.D.N.C. 1996) (a constructive trust does not arise "where there is no fiduciary relationship and there is an adequate remedy at law").

### 5. Count X Does Not State A Claim For Unjust Enrichment.

Finally, BCBSNC's claim for unjust enrichment, which is not pled as an alternative to its claim for breach of contract and which incorporates all preceding allegations, must be dismissed. See Deltacom, Inc. v. Budget Telecom, Inc., No. 5:10-CV-38-FL, 2011 WL 2036676 (E.D.N.C. May 22, 2011) (dismissing claim for unjust enrichment where claim was not pled in the alternative and incorporated by reference all preceding allegations); Johnson, 2008 WL 2949253, at *4 (dismissing unjust enrichment claim where plaintiff admitted the existence of a contract between herself and the defendant).

24

**CONCLUSION**

For all these reasons, this action should be remanded to the North Carolina Superior Court, Stokes County, and the counterclaims should be dismissed.

Dated: June 6, 2018

                         Respectfully submitted,

                         /s/ Gilbert J. Andia, Jr.
                         Gilbert J. Andia, Jr. (NCSB No. 16533)
                         HIGGINS BENJAMIN, PLLC
                         301 N. Elm Street, Suite 800
                         Greensboro, NC 27401
                         Phone: (336) 273-1600
                         bandia@greensborolaw.com
                         OF COUNSEL:

                         Jennifer L. Spaziano
                         John T. Bentivoglio
                         Elizabeth L. Berry
                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         1440 New York Avenue NW
                         Washington, DC 20005
                         john.bentivoglio@skadden.com
                         jen.spaziano@skadden.com
                         elizabeth.berry@skadden.com

                         ATTORNEYS FOR PLAINTIFF LIFEBRITE
                         HOSPITAL GROUP OF STOKES, LLC

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the volume limitations of Local Rule 7.3(d)(1) because this brief contains 5,258 words, excluding the parts of the brief exempted by Local Rule 7.3(d)(1). This brief has been prepared in accordance with Judge Osteen's working copy rules in that it is in a fixed-pitch type, specifically, Courier New, with a size of 10 characters per inch.

This 6th day of June, 2018.

/s/ Gilbert J. Andia, Jr.
Gilbert J. Andia, Jr. (NCSB No. 16533)
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on the date indicated below, the undersigned electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S (1) MOTION TO REMAND AND (2) MOTION TO DISMISS COUNTERCLAIMS** using the CM/ECF system. Service of this document on the following Parties will be accomplished through the Notice of Electronic Filing in accordance with LCvR 5.3 on the following:

Chad Dwight Hansen
Kilpatrick Townsend & Stockton, LLP
1001 W. Fourth Street
Winston Salem, NC  27101
chadhansen@kilpatricktownsend.com

Jeffrey S. Gleason
Robins Kaplan LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
jgleason@robinskaplan.com

Timothy W. Billion
Robins Kaplan LLP
140 N. Phillips Avenue
Sioux Falls, SD 57104
tbillion@robinskaplan.com

Attorneys for Defendant

This 6th day of June, 2018.

/s/ Gilbert J. Andia, Jr.
Gilbert J. Andia, Jr. (NCSB No. 16533)
Attorney for Plaintiff