# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LIFEBRITE HOSPITAL GROUP OF STOKES, LLC,

        Plaintiff,

vs.

BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, an Independent Licensee of the Blue Cross Blue Shield Association,

        Defendant.

Case No.:  1:18-cv-00293-WO-LPA

## FIRST AMENDED ANSWER AND COUNTERCLAIMS

For its First Amended Answer to the Complaint by LifeBrite Hospital Group of Stokes, LLC ("LifeBrite Hospital") in the above-captioned matter, Defendant Blue Cross and Blue Shield of North Carolina ("Blue Cross NC") states as follows. Unless specifically admitted herein, Blue Cross NC denies each and every allegation of the Complaint.

## FACTUAL BACKGROUND

1.      LifeBrite Hospital Group of Stokes, LLC (hereinafter "LifeBrite") is a healthcare company organized and existing under the laws of the State of Georgia and is registered in North Carolina as a foreign company. LifeBrite's principal place of business is located in Danbury, Stokes County, North Carolina.

**ANSWER**: Blue Cross NC is without sufficient information to admit or deny the allegations in Paragraph 1.

2.     Blue Cross and Blue Shield of North Carolina (hereinafter "BCBSNC") is a not-for-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business in Durham County, North Carolina, and with offices in Wake County, North Carolina.

> **ANSWER**: Blue Cross NC admits that it is a hospital and medical services corporation formed and existing under the laws of the State of North Carolina with its principal place of business in Durham County, North Carolina. To the extent any further response is required, Blue Cross NC denies the remaining allegations in Paragraph 2.

3.     This is an action concerning the refusal of BCBSNC to compensate LifeBrite for covered services rendered to BCBSNC and/or its affiliate's insureds. This is also an action based on contract and breach of contract by BCBSNC, and for unjust enrichment by LifeBrite against BCBSNC.

> **ANSWER**: Blue Cross NC admits that LifeBrite Hospital has made the allegations described in Paragraph 3. Blue Cross NC denies the veracity of those allegations, denies that LifeBrite Hospital is entitled to any relief, and further states that LifeBrite Hospital is liable to Blue Cross NC as described in Blue Cross NC's First Amended Counterclaims.

4.      This Court has jurisdiction over Defendant pursuant to N.C. Gen. Stat. 1-75.4 and other applicable law.

>   **ANSWER**: Blue Cross NC answers that Paragraph 4 contains legal conclusions to which no response is required. To the extent a response is required, Blue Cross NC denies the allegations in Paragraph 4.

5.      Venue is proper in this Court pursuant to N.C. Gen. Stat. 1-79 and other applicable law.

>   **ANSWER**: Blue Cross NC answers that Paragraph 5 contains legal conclusions to which no response is required. To the extent a response is required, Blue Cross NC denies the allegations in Paragraph 5.

6.      LifeBrite operates a critical access hospital known as LifeBrite Community Hospital of Stokes in Danbury, Stokes County, North Carolina (the "Hospital"). The Hospital offers a variety of customary hospital services, including inpatient, outpatient and outreach laboratory.

>   **ANSWER**: Blue Cross NC admits that LifeBrite Hospital operates the Hospital and the Hospital is a critical access hospital. Blue Cross NC is without sufficient information to admit or deny the remaining allegations in Paragraph 6, and therefore denies the same.

3

7.      BCBSNC is the largest provider of private health insurance in North Carolina. It is a licensee of the Blue Cross Blue Shield Association (the "Association") which is a federation of thirty-six (36) independent health insurance organizations and companies (the independent plans are referred to as "BCBS Affiliates"). (https://www.bcbs.com/about-us/blue-cross-blueshield- system)

    **ANSWER**: Blue Cross NC admits the allegations in Paragraph 7.


8.      The Association operates the Blue Card program which allows policy holders of BCBS Affiliates to secure healthcare nationwide from other BCBS Affiliates, including but not limited to BCBSNC. See Exhibit A.

    **ANSWER**: Blue Cross NC admits that the BlueCard program allows members in one state to secure healthcare in other states according to the terms of the BlueCard program. Blue Cross NC has no information regarding the accuracy or source of Exhibit A, and therefore denies any allegations regarding Exhibit A. Blue Cross NC denies any remaining allegations in Paragraph 8.


9.      LifeBrite and BCBSNC are parties to that Network Participation Agreement which requires LifeBrite to provide services to members covered by plans issued or administered by BCBSNC, its affiliates or another BCBS Affiliate (a "Member"). In turn, BCBSNC is required to compensate LifeBrite for such services. A

4

copy of the Network Participation Agreement, and its assignment to LifeBrite, is attached hereto as Exhibit B. (pricing information is redacted).

> **ANSWER**: Blue Cross NC admits that it has an agreement with LifeBrite Hospital regarding the provision of healthcare services. Blue Cross NC states that the agreement speaks for itself. Further answering, Blue Cross NC states that Exhibit B to the Complaint only contains odd-numbered pages of the agreement between Blue Cross NC and LifeBrite Hospital. Therefore, Blue Cross NC denies that Exhibit B is an accurate and complete copy of the referenced agreement. A true and accurate copy of the agreement is attached to Blue Cross NC's First Amended Counterclaims as Exhibit A.

10.     The Network Provider Agreement adopts by specific reference and incorporates BCBSNC's policies and procedures. These policies and procedures are found in the "Blue Book," which is accessible at: http://bcbs.com/assets/providers/public/pdfs/BlueBook_July2016.pdf. Copies of the relevant excerpts are attached as Exhibit C. Section(s) 5.1 clearly states that all Blue Card claims, i.e. claims for members of a BCBS Affiliate holding a blue card, should be sent to BCBSNC and 5.1.1 clearly state that the Blue Card program applies to all claims except for the following: prescription drugs, stand-alone dental, stand-alone vision and Federal Employees Program. These provisions are material to the Network Provide Agreement.

5

**ANSWER**: Blue Cross NC states that the Network Provider Agreement and the Blue Book speak for themselves and no further response is required. To the extent any further response is required, Blue Cross NC denies the remaining allegations in Paragraph 10.

11. Starting with dates of service of November 14, 2017, in clear contravention and in breach of the Network Participation Agreement, BCBSNC unilaterally started denying several Blue Card claims stating that the claims should be sent to the State where the lab specimen was drawn. These denials are a breach of the Network Provider Agreement and has been continual since December 12, 2017. As of the date of filing of this Complaint, the Plaintiff has been damaged in excess of $15,490,440.00.

**ANSWER**: Blue Cross NC denies the allegations in Paragraph 11.

12. By and through its agents, LifeBrite made several good faith efforts to resolve this matter with BCBSNC, including but not limited to telephone calls and written correspondence to Network Management as set forth and required in the Network Participation Agreement.

**ANSWER**: Blue Cross NC admits that representatives of LifeBrite Hospital and representatives of Blue Cross NC have discussed by phone and correspondence certain aspects of their relationship but Blue Cross NC denies that LifeBrite Hospital acted in good faith during those communications. To the extent any

6

further response is required, Blue Cross NC denies the remaining allegations in Paragraph 12.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

13.     LifeBrite realleges and incorporates all of the foregoing paragraphs set forth in the Complaint.

**ANSWER**: Blue Cross NC incorporates its answers to the foregoing paragraphs.

14.     BCBSNC has materially breached the Network Participation Agreement by its refusal to process claims and reimburse LifeBrite for services rendered to its members.

**ANSWER**: Blue Cross NC denies the allegations in Paragraph 14.

15.     LifeBrite is entitled to a judgment against the BCBSNC of the full amount due under the Network Participation Agreement because of BCBSNC's breach, plus interest at the rate of eight percent (8.0%) per annum, plus reasonable attorney fees.

**ANSWER**: Blue Cross NC denies the allegations in Paragraph 15.

## SECOND CAUSE OF ACTION
## UNJUST ENRICHMENT

16.     LifeBrite realleges and incorporates all of the foregoing paragraphs set forth in the Complaint.

7

**ANSWER**: Blue Cross NC incorporates its answers to the foregoing paragraphs.

17.     In the alternative, LifeBrite's provision of services to Members conferred a valuable benefit to BCBSNC. BCBSNC has received services from LifeBrite in excess of $25,000.00, to which it should be required to compensate LifeBrite for the reasonable value of those services.

**ANSWER**: Blue Cross NC denies the allegations in Paragraph 17.

18.     LifeBrite is entitled to a judgment in excess of $25,000.00 from BCBSNC for the unjust enrichment of BCBSNC.

**ANSWER**: Blue Cross NC denies the allegations in Paragraph 18.

## ADDITIONAL DEFENSES

Blue Cross NC asserts the additional defenses below on information and belief. Blue Cross NC has not knowingly or intentionally waived any defenses and reserves the right to assert any and all additional defenses that become available or apparent during discovery, and Blue Cross NC reserves the right to seek to amend its answer.

1.     Plaintiff's claims are barred by its own breaches of contract.

2.     Plaintiff's claims are barred by estoppel.

3.     Plaintiff's complaint fails to state a claim on which relief may be granted.

4.     Plaintiff's claims are barred by its own failure to perform the contract.

8

5.      Plaintiff's claims are barred by Plaintiff's fraud.

6.      Plaintiff's claims are barred by improper notice of breach and failure to exhaust remedies.

7.      Plaintiff's claims are barred by the doctrine of justification.

8.      Plaintiff's claims are barred by its prevention and frustration.

9.      Plaintiff's claims are barred by public policy.

10.     Plaintiff's claims are subject to set-off.

11.     Plaintiff's claims are barred by the doctrine of unclean hands.

12.     Plaintiff's claims are barred by the doctrine of unconscionability.

13.     Plaintiff's claims are barred, in whole or in part, by any and all applicable statutes of limitation.

14.     Plaintiff's claims are barred by the doctrines of waiver and laches.

15.     Plaintiff's claims are barred because Plaintiff would be unjustly enriched if allowed to recover the sums alleged in the Complaint.

16.     Plaintiff's claims are barred because Plaintiff failed to mitigate its damages.

17.     Plaintiff's claims are barred because Plaintiff's damages, if any, were caused by Plaintiff's own acts and/or omissions.

18.     Plaintiff's claims are barred by preemption.

19.     Plaintiff's claims are barred by a failure to exhaust administrative remedies.

20.     Plaintiff's claims are barred by failure to fulfill all conditions precedent to payment.

21.     Plaintiff's claims are barred because the challenged decisions were based upon the proper exercise of discretion by claims administrators and such discretion was not arbitrary or capricious.

22.     Plaintiff's claims are barred by the terms of the relevant policies and plans.

23.     Plaintiff's claims are barred by the doctrines of accord, satisfaction, or settlement.

24.     Plaintiff's claims are barred because Plaintiff does not have standing to bring those claims.


Blue Cross NC denies that LifeBrite Hospital is entitled to any of the relief it seeks in its Prayer for Relief. Blue Cross NC further prays as follows:

1.      That the Court only grant a jury trial on matters so triable;

2.      That LifeBrite Hospital take nothing on its Complaint;

3.      That the Complaint be dismissed with prejudice and judgment entered in favor of Blue Cross NC on all causes of action in the Complaint;

4.      For reasonable attorneys' fees to the extent permitted under applicable law;

5.      For costs and expenses of suit incurred herein; and

6.      For other and further relief as this Court deems just and proper.

## FIRST AMENDED COUNTERCLAIMS
### (Jury Trial Demanded On All Matters for Trial)

For its counterclaims against LifeBrite Hospital Group of Stokes, LLC ("LifeBrite Hospital"), Blue Cross and Blue Shield of North Carolina ("Blue Cross NC") states as follows:

1.     Since at least August 2017, LifeBrite Hospital has engaged in a deceptive scheme to enrich itself at Blue Cross NC's expense by billing for urine toxicology testing that it did not perform.

2.     In submitting its claims for reimbursement, LifeBrite Hospital represented that it had performed the services when, in fact, it knew that was not the truth. LifeBrite Hospital knew that the entity that actually did the work—and the only entity that should have been seeking reimbursement for that work—was LifeBrite Laboratories, LLC ("LifeBrite Labs"), a sister company of LifeBrite Hospital.

3.     LifeBrite Hospital's misrepresentations were intentional—and enormously profitable. As a contracted, rural hospital, LifeBrite Hospital enjoyed favorable reimbursement rates for services that it provided to its patients—patients who typically lived in the community the hospital served and who had limited access to alternative healthcare providers.

4.     LifeBrite Labs, on the other hand, an Atlanta, Georgia company, had no contract with Blue Cross NC—nor any affiliation with Stokes County or the State of North Carolina. As one of thousands of out-of-network laboratories around the country, LifeBrite Labs would be paid only a small fraction (if anything) for services it rendered

Case 1:18-cv-00293-WO-LPA   Document 20   Filed 06/27/18   Page 11 of 61

to patients insured by a Blue Cross NC or a sister Blue Cross and Blue Shield plan (collectively "Blue Plans").[1]

5.     In other words, LifeBrite Hospital knew that by lying about who performed the urine toxicology testing, it could transform a claim that would pay in a range of $0 to $100 into a payday of around $2,500. And that is exactly what LifeBrite Hospital did— billing Blue Cross NC for more than $76 million worth of tests and being paid more than $11 million in less than a year.

6.     LifeBrite Hospital's deception and misdeeds extended well beyond the representations it made to Blue Cross NC about the rendering provider. In some ways, that was the easy part. The harder part was figuring out where to get the urine for LifeBrite Labs to test in the first place. Given the competitive landscape in the laboratory business, and with virtually no history in this space as compared to well-established, well known, and well-resourced competitors, LifeBrite Hospital knew it had a substantial uphill climb to attract referrals. The path it chose was illegal and fraudulent—and lucrative.

7.     LifeBrite Labs paid sales representatives to solicit physician practices and detox facilities for urine specimens. Their sales pitch made no mention that a tiny rural hospital in a town of fewer than 200, would be involved in any way in the testing or billing. Instead, the reps sold the referral sources on LifeBrite Labs, making it clear that that facility—and that facility alone—would be the one that did the work.

---

[1] *See* "The BlueCard Program," *infra*.

8. When physicians asked about the cost that their patients would incur for those services, the sales reps assured the providers that the patients would never be asked to pay a dime—notwithstanding the fact that such routine waivers of patient cost-sharing obligations are illegal.

9. As a further incentive to induce providers to choose LifeBrite Labs, the sales reps offered the valuable services of a LifeBrite Labs employee at no cost to the physician. In open defiance of Blue Cross NC's requirements for a toxicology test to be medically necessary, those LifeBrite Labs employees convinced physicians to routinely over-prescribe testing such that nearly every patient received the test that would render the highest reimbursement, regardless of what was necessary or appropriate to provide for the patient's care.

10. When it billed for the testing of these specimens, LifeBrite Hospital knew full well the illegal and fraudulent steps that its sister company had taken to obtain them; it knew that the tests were not medically necessary as set forth in Blue Cross NC's medical policies; and it knew that the claims were not payable as a result. But LifeBrite Hospital concealed those facts in order to get paid—indeed, it is still trying to hide its conduct even at present.

11. Blue Cross NC brings these amended counterclaims in an effort to address the injuries it suffered as a result of LifeBrite Hospital's breaches of contract. Blue Cross NC is entitled to relief as a result of LifeBrite Hospital's misrepresentations, breaches of contract, tortious interference with member contracts, and violations of North Carolina's

13

Unfair or Deceptive Trade Practices statutes. Blue Cross NC is also entitled to restitution, declaratory and injunctive relief, and other equitable relief as set forth herein.

## FACTUAL BACKGROUND

12.     LifeBrite Hospital operates a critical access hospital located in Danbury, North Carolina. According to the 2010 census, Danbury had a population of 189 residents.

13.     In December 2016, a bankruptcy court approved the sale of LifeBrite Hospital's predecessor entity, Pioneer Health Services of Stokes County, Inc. ("Pioneer"). LifeBrite Hospital Group, LLC, a parent company of LifeBrite Hospital and related to LifeBrite Labs, purchased Pioneer and assumed all rights and obligations relating to the operation of the hospital beginning January 31, 2017.

14.     At all times relevant to the underlying dispute, LifeBrite Hospital was an in-network provider of Blue Cross NC under several network participation agreements, including a Network Participation Agreement (the "Commercial Contract"), effective January 1, 2013, and a Medicare Provider Agreement (the "Medicare Contract"), effective August 1, 2011. Both contracts (collectively, the Commercial Contract and Medicare Contract are referred to herein as the "Contracts") were assigned to LifeBrite Hospital effective January 31, 2017. True and correct copies of the Commercial Contract and the Medicare Contract are attached as Exhibits A and B, respectively, and are incorporated herein.

14

15.     Among other things, the Contracts provided the terms and conditions for reimbursement to be paid by Blue Cross NC to LifeBrite Hospital, for services that LifeBrite Hospital provided to patients of the hospital who had insurance through Blue Cross NC or another Blue Plan.

16.     The Contracts were to inure solely to the benefit of LifeBrite Hospital and could not be transferred or assigned to any other provider without the express written consent of Blue Cross NC. (Ex. A at § 6.4.1.)

17.     LifeBrite Hospital submitted, or caused to be submitted, claims to Blue Cross NC under LifeBrite Hospital's name, National Provider Identifier(s) ("NPI"), tax identifier(s), billing information, and—most importantly—pursuant to LifeBrite Hospital's favorable contracted reimbursement rates and participating status with Blue Cross NC.

18.     The vast majority of the patients were never present at LifeBrite Hospital, were never treated by LifeBrite Hospital-credentialed healthcare providers, and were located in areas not serviced by LifeBrite Hospital.  Instead, their only connection to LifeBrite Hospital was that their urine testing was billed through LifeBrite Hospital in order to take advantage of LifeBrite Hospital's participating status and favorable reimbursement rate with Blue Cross NC.

19.     In the two years prior to being acquired by LifeBrite Hospital, Pioneer billed Blue Cross NC on average well under $40,000 per month for lab tests—tests that were performed on patients under the care of the hospital, as the Contracts allowed.

20.     Once LifeBrite Hospital took over the facility, it increased the billings for lab tests to an average of roughly $8.5 million per month—virtually none of which are tests performed on hospital patients.

21.     The following graphs illustrate the remarkable increase in the volume of lab testing claims and the charges of those claims billed by LifeBrite Hospital:



# LifeBrite vs. Pioneer: A 22,000 Percent Increase

Lab billing jumped more than 22,000 percent – from an average of $37,400 a month to $8.5 million a month when LifeBrite took over Pioneer Community Hospital.

$ = $10,000



**PIONEER COMMUNITY HOSPITAL OF STOKES**
JANUARY 2015 – JANUARY 2017

$37,400
monthly average

$ $ $ $

**LIFEBRITE COMMUNITY HOSPITAL OF STOKES**
AUGUST 2017 – APRIL 2018

$8.5 million
monthly average



22.     How did the new management generate such an incredible increase in referrals to a hospital that virtually none of the referring physicians had even heard of?  It didn't. Instead, LifeBrite Hospital billed Blue Cross NC for tests it never performed, for patients it never saw.

23.     LifeBrite Hospital's scheme is ongoing. In April 2018 alone, LifeBrite Hospital submitted 133,995 lab claims and billed Blue Cross NC more than $16 million. That is more than 72 times as many lab claims as the entire 2016 calendar year—and 63 times as much money.

24.     Of the $76 million that LifeBrite Hospital has billed to Blue Cross NC as part of this scheme, more than $74 million was for approximately 525,000 lab tests for people who do not appear to live in North Carolina and who were never patients at the Stokes County hospital. As shown on the following graph, 98 percent of the tests LifeBrite Hospital billed to Blue Cross NC are for people living outside North Carolina:



25.    Overall, from August 2017 to the present, LifeBrite Hospital's lab billing has jumped more than 22,000 percent. The reported number of lab tests purportedly performed at the hospital has jumped more than 24,000 percent.

26.    This was done in spite of the fact that LifeBrite Hospital knew that the claims it submitted to Blue Cross NC were not payable, were fraudulent, were in violation of the Contracts, and were otherwise unlawful.

27.    The purpose of LifeBrite Hospital's scheme was to increase the amount that it received from Blue Cross NC, without regard to the reasonableness or medical necessity of the underlying testing.

19

28.     LifeBrite Hospital and LifeBrite Labs failed to collect member payment responsibilities in an effort to further conceal this scheme.

## JURISDICTION AND VENUE

29.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question and under 28 U.S.C. § 1442(a)(1) because Blue Cross NC has been sued for actions taken as a person acting under a federal officer of an agency of the United States under color of such office.

30.     The Court has supplemental jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367 and Federal Rule of Civil Procedure 13, because the claims, including state law claims, are so related to the claims set forth in the Complaint and within the Court's jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution and because they arise out of the same transaction or occurrence in the Complaint.

31.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

### Counterclaim Plaintiff

32.     Counterclaim Plaintiff Blue Cross Blue Shield of North Carolina is a hospital and medical services corporation formed and existing under the laws of the state of North Carolina with its principal place of business in Durham County, North Carolina.

20

**Counterclaim Defendant**

33.     Counterclaim defendant LifeBrite Hospital Group of Stokes, LLC, is a limited liability company organized and existing under Georgia law and with its principal place of business in Danbury, North Carolina. LifeBrite Hospital's parent companies are LifeBrite Labs and LifeBrite Hospital Group, LLC. *See* ECF 14. On information and belief, the members of LifeBrite Hospital are residents of Florida or Georgia, and LifeBrite Labs is based in Atlanta, Georgia.

**THE BLUECARD PROGRAM**

34.     Blue Cross NC is an independent licensee of the Blue Cross and Blue Shield Association ("**BCBS Association**").

35.     Blue Cross NC is a participant in the BCBS Association's BlueCard program, which allows members of one BCBS Association licensee's health plans to obtain healthcare services in another BCBS Association licensee's service area (e.g., where a member is traveling or living outside of their home plan's service area).

36.     For medical claims generally, when a provider is a participating provider with Blue Cross NC, and is located in Blue Cross NC's service area, services performed and billed by that provider for any BCBS Association licensee's members are billed to Blue Cross NC.

37.     If those claims are for covered services, are medically necessary, and otherwise meet the requirements of the member's coverage, Blue Cross NC would pay

Case 1:18-cv-00293-WO-LPA   Document 20   Filed 06/27/18   Page 21 of 61

the claims then reconcile the cost of those services with the BCBS Association licensee responsible for each member.

38.     Pursuant to Section 5.8.7 of the Blue Cross NC Provider Blue Book, however, Blue Cross NC required laboratory claims to be submitted to the BCBS Association licensee where the specimen was collected.

## MANAGED CARE AND BLUE CROSS NC

39.     Blue Cross NC is an insurer and third-party claims administrator for group health plans that provide benefits to their covered individuals and dependents.

40.     Blue Cross NC may insure group health plans directly (the "**Fully-Insured Plans**").  For these plans, Blue Cross NC resolves claims and makes benefit payments from its own assets.

41.     Blue Cross NC also provides administrative services to self-funded group health plans (the "**Self-Funded Plans**").  Blue Cross NC delivers these services pursuant to Administrative Services Agreements between Blue Cross NC and the health plan's sponsor (usually an employer), which identify the rights and obligations of each party. Many of the health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 100 *et seq*.  Blue Cross NC provides insurance and/or administrative services to these employer-sponsored health plans, including the processing of claims for reimbursement of medical services provided to the individuals covered by these benefit plans.

42.     Blue Cross NC's determination of whether to reimburse claims that correspond to members of ERISA-governed Self-Funded Plans requires interpretation of those plans' terms, including but not limited to whether the health care services delivered were "covered services" and "medically necessary" within the meaning of those plans.

43.     Blue Cross NC paid claims to LifeBrite Hospital on behalf of a number of self-funded plans, and seeks redress in this lawsuit for those Self-Funded Plans.

44.     Each of the Self-Funded Plans delegated to Blue Cross NC the discretionary authority to determine claims for benefits.

45.     In this capacity, Blue Cross NC has processed claims and administered appeals on behalf of the Self-Funded Plans.

46.     Similarly, all (or nearly all) of the impacted Self-Funded Plans have given Blue Cross NC the authority and discretion to recover overpayments.

47.     Accordingly, Blue Cross NC has authority to seek recovery on behalf of the impacted Self-Funded Plans and for payments made by the Fully-Insured Plans.

48.     Blue Cross NC administers the Service Benefit Plan, an insurance plan for federal employees sponsored by the United States Office of Personnel Management and sometimes known as the "Federal Employee Program." Similarly, Blue Cross NC is authorized to administer Medicare Advantage plans by the Centers for Medicare and Medicaid Services. Blue Cross NC has the authority to seek recovery for benefits paid under these managed care plans, as well as any impacted insured individual plans.

49.     As with Blue Cross NC's determinations with respect to ERISA-governed Self-Funded Plans, Blue Cross NC must interpret the terms of Federal Employee Program and Medicare Advantage plans when deciding whether to reimburse claims that correspond to members of those plans. Those terms include but are not limited to whether the health care services delivered were "covered services" and "medically necessary" within the meaning of those plans.

**BLUE CROSS NC'S NETWORK OF PARTICIPATING PROVIDERS**

50.     The enrollees of Blue Cross NC are considered Blue Cross NC's "members."

51.     Blue Cross NC relies upon networks of participating (also known as "in-network") healthcare providers.  Participating providers contract with Blue Cross NC to accept a negotiated rate for their services, in exchange for, among other things, increased access to members of Blue Cross NC (due to the savings available to the members who receive treatment from participating providers) and increased certainty with respect to the amount that they will receive from Blue Cross NC for their services.

52.     On the other hand, non-participating (also known as "out-of-network") providers have not contracted with Blue Cross NC.  The reimbursement rates that Blue Cross NC is required to pay non-participating providers may be less than the rates Blue Cross NC is contractually obligated to pay participating providers, and members are typically personally responsible for a larger share of the cost of those services.

53.     LifeBrite Hospital is one of Blue Cross NC's participating providers.

24

54. LifeBrite Labs was not a participating provider with Blue Cross NC.

**THE BLUE CROSS NC/LIFEBRITE HOSPITAL CONTRACTS**

55. Blue Cross NC and LifeBrite Hospital's predecessor, Pioneer, entered into the Commercial Contract and the Medicare Contract. The Contracts were assigned to LifeBrite Hospital effective January 31, 2017. Redacted, but otherwise true, correct, and complete copies of the Commercial Contract and the Medicare Contract are attached hereto as Exhibits A and B, respectively.

56. The Contracts automatically renewed with the same terms and conditions unless terminated through the process set forth in the Contracts.

57. The Contracts contain a number of provisions making clear that Blue Cross NC contracted to reimburse LifeBrite Hospital only for services provided at and by LifeBrite Hospital.

58. For example, LifeBrite Hospital agreed to "*render* Medically Necessary Covered Services to Members . . . according to the terms of this Agreement." (Ex. A at § 2.1.1 (emphasis added).) In addition, LifeBrite Hospital agreed to "*provide* Covered Services to Members so as to provide health or medical care in conformity with accepted and prevailing practices applicable to acute care hospitals." (Ex. A at § 2.1.2.1 (emphasis added).) LifeBrite Hospital also agreed to "*accept* and *treat* BCBSNC Members and to *provide* Medically Necessary Covered Services . . . in accordance with the terms of the Agreement." (Ex. B at § 2.1 (emphasis added).)

25

59. The Commercial Contract specifically provides that LifeBrite Hospital was only entitled to payment for "Covered Services provided to Members at the sites listed in the Site of Service Exhibit[.]" (Ex. A at § 4.1.)

60. The Medicare Contract specified a list of providers and service locations covered by the Medicare Contract. (Ex. B at §§ 2.1, 3.1.1.)

61. Other relevant provisions of the Contracts include:

    a. LifeBrite Hospital agreed "not to bill, charge, seek compensation, remuneration or reimbursement from any Member, us, or any third party for health care services and/or supplies provided to Members which are determined by us not to be Medically Necessary, or are not payable due to your failure to follow our applicable Policies and Procedures[.]" (Ex. A at § 4.5.5.)

    b. Medically Necessary services are:

        i. provided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease, and not for experimental, investigational, or cosmetic purposes;

        ii. necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms;

        iii. within generally accepted standards of medical care in the community; and

26

iv. not solely for the convenience of the insured, the insured's family, or the provider. (Ex. A at § 1.12.)

c. LifeBrite Hospital agreed to comply with all applicable laws, regulations, and industry standards. (Ex. A at § 2.3.2.)

d. LifeBrite Hospital agreed to comply with all of Blue Cross NC's programs, policies, and procedures. (Ex. A at § 2.3.1; Ex. B at § 2.1.)

e. LifeBrite Hospital agreed to "collect from Members applicable Deductibles, Coinsurance, and Copayments[.]" (Ex. A at § 4.4; *see also* Ex. B at § 2.2.)

f. LifeBrite Hospital agreed not to assign, delegate, or transfer any part of its obligations under the Contract without Blue Cross NC's prior written consent. (Ex. A at § 6.4.1; Ex. B at § 6.4.)

62. The Contracts also set the maximum amount that LifeBrite Hospital could receive from Blue Cross NC for the provision of Hospital Services.

63. Specifically, the Contracts set the payment amount as the lesser of LifeBrite Hospital's usual charge or the amount specified in the Reimbursement Exhibit attached to the Contracts. (Ex. A at § 4.1; Ex. B at § 4.3.)

27

## URINE DRUG TESTING AND PASS-THROUGH BILLING SCHEMES

### Urine Drug Testing

64.     Drug tests are laboratory analyses used to aid in the detection of prescription, recreational, or illicit substances in human specimens.  Drug testing may be used to meet state requirements, evaluate therapeutic compliance and drug aberrant behavior (*e.g.*, abuse or diversion), or to evaluate for child and elder abuse.  Drug tests can include analysis for most drugs, chemicals, and/or plant products that are known to be misused, including for recreational use.

65.     Although drug tests may be performed on a variety of specimen types, urine testing is the most commonly used because it is widely available, minimally invasive, and generally the least expensive for drug detection and monitoring.

66.     Urine testing typically falls into two categories of testing: presumptive and definitive.

67.     Presumptive testing is used, when medically necessary, to determine the presence or absence of one or more drugs or drug classes.  Presumptive testing is typically performed via immunoassay, and results are expressed as negative, positive, or numeric.  Presumptive testing is also referred to as "screening" or "qualitative" testing.

68.     Definitive testing is a follow-up test performed on a separate portion of the original specimen, when medically necessary, to validate the identity and quantity of a specific drug or metabolite.  Definitive testing is typically performed using either gas chromatography-mass spectrometry or liquid chromatography-mass spectrometry, and

results are expressed as a concentration of a particular metabolite or analyte

(*e.g.*, nanograms per milliliter (ng/mL)). Definitive testing is also referred to as

"confirmation" or "quantitative" testing.

69. Definitive testing is typically reasonable and necessary only in certain

limited circumstances, such as when a presumptive test is negative for a prescribed

medication or positive for a drug that was not prescribed or is illegal.

70. Drug testing is covered by Blue Cross NC when it meets (1) all the terms

and conditions of the member's benefit plan; (2) when it meets all the requirements of

Blue Cross NC's Corporate Medical and other applicable policies; and (3) when it meets

all the terms and conditions of the rendering provider's contract.

## The Toxicology Laboratory Industry

71. In recent years, government enforcement efforts, private lawsuits, and

investigative journalism have helped to identify widespread fraud within the toxicology

laboratory industry.

72. For example, in a November 2014 article about the massive increases in the

amount of urine testing being reimbursed by Medicare, the Wall Street Journal

summarized the then-recent history of the industry:

> Spending on the [urine drug] tests took off after Medicare
> cracked down on what appeared to be abusive billing for
> simple urine tests. Some doctors moved on to high-tech testing
> methods, for which billing wasn't limited.
>
> They started testing for a host of different drugs—including
> illegal ones that few seniors ever use—and billing the federal

29

> health program for the elderly and disabled separately for each substance.
>
> Medicare's spending on 22 high-tech tests for drugs of abuse hit $445 million in 2012, up 1,423% in five years.[2]

73.     In another example, in October 2015, the former Millennium Laboratories agreed to pay $256 million to the U.S. Department of Justice to resolve allegations that it billed Medicare "many millions of dollars' worth" of urine testing claims that were "not reasonable and necessary or that were furnished pursuant to prohibited referrals" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and other statutes.

74.     As a result of concerns about the frequency, cost, and manner with which toxicology laboratories were billing government and commercial payors, a number of changes were put into place as to how laboratories test and bill for urine testing.

75.     For example, the Centers for Medicare and Medicaid Services ("CMS") changed the way that urine testing is billed, in part because of a "concern about the potential for overpayment when billing for each individual drug test rather than a single code that pays the same amount regardless of the number of drugs that are being tested."

76.     Because these changes have decreased both the frequency and rate at which toxicology laboratories are reimbursed for urine testing, toxicology laboratories looked for other ways to gain access to more favorable reimbursement rates, including—as

---

[2]     Christopher Weaver and Anna Wilde Mathews, *Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill*, THE WALL STREET JOURNAL, Nov. 10, 2014 (available at: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782).

Case 1:18-cv-00293-WO-LPA    Document 20    Filed 06/27/18    Page 30 of 61

here—passing their urine testing claims through hospitals to take advantage of the hospitals' participating status and favorable reimbursement rates from payors.

77.     In other words, because of recurring compliance and quality issues, CMS and commercial payors restricted certain toxicology laboratories from their networks. This led the remaining laboratories—including those who were restricted from payors' networks for compliance and quality issues—to rely on health systems like LifeBrite to hide the true identity of the laboratory ordering or performing the urine testing, and take advantage of the hospitals' participating status and favorable reimbursement agreements with payors.

78.     Numerous pass-through schemes have been uncovered recently. For example, the Office of the Missouri State Auditor investigated "a billing scheme" where "the vast majority of billings were for patients who had never been to or received services" from the local rural hospital.[3] One of the laboratories involved in that case was LifeBrite Labs.

79.     Other similar pass-through schemes have been perpetrated, without limitation, in Florida and Oklahoma. *See Campbellton-Graceville Hosp. Corp. v. Peoples Choice Hosp.*, No. 5:16-cv-00222 (N.D. Fla. filed Aug. 3, 2016); *Aetna Inc. v. The*

---

[3] The State Auditor's report, which is incorporated herein, is accessible via the following link:
 https://www.auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited Feb. 22, 2018).  The State Auditor's press release announcing its findings is available via the following link: https://auditor.mo.gov/content/auditor-galloway-uncovers-evidence-90-million-billing-scheme-putnam-county-memorial-hospital (last visited Feb. 22, 2018).

*People's Choice Hosp., LLC*, No. 2:17-cv-04354 (E.D. Pa. filed Sept. 29, 2017) (recently transferred to the Western District of Texas).

80.     One individual associated with previous schemes is Jorge Perez. LifeBrite Hospital and LifeBrite Labs have a relationship with Mr. Perez and his company, Empower H.M.S. The return address labels on documents submitted to Blue Cross NC purportedly on behalf of LifeBrite Hospital show the records were sent by Empower H.M.S.

## THE FALSE BILLING SCHEME

81.     Since at least August 2017, LifeBrite Hospital has repeatedly made material misrepresentations to Blue Cross NC in order to get paid for services it did not provide, on specimens it knew had been illegally procured, and that it knew did not meet the applicable medical necessity requirements. Blue Cross NC reasonably relied on those misrepresentations in making the decision to pay over $11 million to LifeBrite Hospital. As LifeBrite Hospital knew when it sought that reimbursement, when it received that reimbursement, and as it retains that reimbursement today, the hospital was not entitled to any of that money. Indeed, LifeBrite Hospital and LifeBrite Labs used deception and misrepresentations at every step from procurement of specimens to test to submission of claims for reimbursements.[4]

---

[4] To date, Blue Cross NC has undertaken significant investigation of the scheme alleged in these counterclaims, including provider interviews and review of claims data. Nonetheless, the nature of LifeBrite Hospital's scheme, which included disguising the source of samples and failing to submit records to demonstrate medical necessity, has concealed some of the details of LifeBrite Hospital's scheme from Blue Cross NC. Blue

82.     To start, in order to acquire the specimens that were necessary to perpetrate the scheme, LifeBrite sales representatives approached providers to convince those providers to use LifeBrite.[5] Those sales representatives would represent that LifeBrite Labs was in-network with Blue Cross NC. It was not. Those sales representatives represented that the providers' patients would not be required to pay their cost-sharing obligations. Those sales representatives did not mention that the billing would be done through LifeBrite Hospital. As a result, the providers were not aware that the tests ordered were being performed by LifeBrite Labs but billed through LifeBrite Hospitals.

83.     Those sales representatives then convinced providers to agree to request a standard definitive testing panel. Thereafter, all of the definitive urine testing billed by LifeBrite Hospital would rely on that standard panel authorization. That practices does not conform with Blue Cross NC's medical policy and such testing is not medically necessary.

84.     Specifically, often, these definitive tests were performed before any results of screening testing were available, and the definitive tests were performed for numerous categories of drugs that should not have been tested.

_____

Cross NC anticipates that additional member interviews will uncover significant evidence that LifeBrite Hospital routinely did not collect member payment obligations, and discovery will reveal kickbacks or other incentives LifeBrite Hospital gave to providers to encourage referrals.

[5] Blue Cross NC does not know at this time whether the sales representatives actually worked for LifeBrite Labs or LifeBrite Hospital.

Case 1:18-cv-00293-WO-LPA    Document 20    Filed 06/27/18    Page 33 of 61

85. But, Blue Cross's Medical Policy[6] states:

> Definitive drug testing in pain management or substance abuse treatment may be considered medically necessary when ALL the following criteria are met:
>
> - Presumptive drug testing was performed according to the medically necessary criteria described above; and
>
> - The result of presumptive urine drug testing was one or more of the following:
>
>     o Positive for a nonprescribed drug with abuse potential; or
>
>     o Positive for an illicit drug (e.g., methamphetamine or cocaine); or
>
>     o Negative for prescribed medications with abuse potential; and
>
> - Clinical documentation specifies how the test result will be used to guide clinical decision making.

86. Additionally, providers have informed Blue Cross NC that the providers did not fill out any of the test handling or other paperwork beyond signing the order form.

---

[6] *See* Blue Cross Blue Shield of North Carolina Corporate Medical Policy, Drug Testing in Pain Management and Substance Abuse Treatment, *available at* https://www.bluecrossnc.com/sites/default/files/document/attachment/services/public/pdfs/medicalpolicy/drug_testing_in_pain_management_and_substance_abuse_treatment.pdf.

Instead, a LifeBrite[7] employee came into those providers' offices on a daily basis and prepared order forms for the physician to sign. In at least one instance, the individual performing the paperwork and handling was the same individual who had done the same for the pass-through scheme run through Putnam County Memorial Hospital.

87.    Upon information and belief, to ensure that these healthcare providers and laboratories participated in LifeBrite Hospital's scheme, LifeBrite Hospital paid kickbacks to some of these providers by, for example, promising the referring providers a portion of the reimbursement that LifeBrite Hospital received for each test or providing other benefits.

88.    LifeBrite Hospital continued its deception after the order forms and specimens were improperly procured. Tests ordered by providers—and subsequently billed to Blue Cross NC by LifeBrite Hospital—were not actually sent to LifeBrite Hospital's location in Stokes but instead were sent directly to Atlanta. LifeBrite Labs then performed the testing and submitted the claim to Blue Cross NC as if the testing had been performed by LifeBrite Hospital for a member seen at LifeBrite Hospital.

89.    Blue Cross NC is also aware of instances in which a treating provider performed a screening test, but LifeBrite Hospital billed Blue Cross NC for a screening test for the same member on the same date.

---

[7] Blue Cross NC does not have sufficient information at this time to determine if these employees were employees of LifeBrite Hospital or LifeBrite Labs.

90.     LifeBrite Hospital did not have the capability to perform definitive testing at the facility in Stokes County. Accordingly, every definitive test billed by LifeBrite Hospital was actually performed by LifeBrite Labs. Nonetheless, LifeBrite Hospital billed those tests to Blue Cross NC as if they had been performed by LifeBrite Hospital pursuant to LifeBrite Hospital's Contracts with Blue Cross NC.

91.     LifeBrite Hospital also made misrepresentations in the manner in which it submitted the claims for reimbursement. Under the Contracts and Blue Cross NC's Provider Manual § 9.46, the claims should have been submitted on a CMS-1500 form with place of service 81 (denoting that the service was for a nonpatient). Instead, LifeBrite Hospital submitted the claims on a UB-04 form[8], misrepresenting that the claims were for outpatient services when, indeed, they were for nonpatient services.

92.     Further, to the extent LifeBrite Hospital sent definitive testing to LifeBrite Labs, that referral was out-of-network in violation of Section 9.46 of the Provider Manual which requires LifeBrite Hospital to refer in-network.

93.     Had the claims been submitted as nonpatient reference lab claims, the claims would not have been paid by Blue Cross NC because the samples were drawn elsewhere and because LifeBrite Hospital did not have a reference lab agreement with Blue Cross NC. Even if the claims had been paid as a reference lab claim, they would have been subject to a fee schedule and paid, depending on the code used, approximately

---

[8] Many of the claims submitted by LifeBrite Hospital were submitted on electronic versions of the UB-04 form. Whether submitted electronically or on the paper form, LifeBrite Hospital's obligations to submit truth and accurate information were the same.

$100. Instead, by improperly submitting the claims, LifeBrite Hospital billed Blue Cross NC approximately $2,500 per test.

94.     To conceal its scheme, LifeBrite Hospital consciously ignored its obligation to collect member payment obligations. This was a significant failure because member payment obligations are an important check on fraud and abuse in the healthcare industry. For example, if a member in California receives a copayment bill from a hospital in North Carolina that the member has never been to, the member will likely dispute the bill, alerting Blue Cross NC to a problem. Similarly, a member would likely dispute a copayment or other bill for an unbundled series of unnecessary tests. LifeBrite Hospital's intentional failure to collect member payment obligations allowed LifeBrite Hospital to extract more money from Blue Cross NC by concealing its scheme.

95.     On the claims for which Blue Cross NC has already paid LifeBrite Hospital, member obligations would have totaled approximately $1.7 million. It is highly unlikely that members would have paid $1.7 million for testing at a hospital where the vast majority of them had never been. That $1.7 million figure does not include the member obligations that LifeBrite Hospital should have collected on the tens of millions of dollars of claims that Blue Cross NC has not reimbursed.

96.     LifeBrite Hospital's scheme involved tests from across the country. The breadth and brazenness of LifeBrite Hospital's scheme is highlighted by the fact that LifeBrite Hospital submitted thousands of lab testing claims *per month*, including 133,995 claims in April 2018 alone—for a hospital in a community with 189 residents.

Case 1:18-cv-00293-WO-LPA   Document 20   Filed 06/27/18   Page 37 of 61

97.     As a result of this scheme, LifeBrite Hospital billed Blue Cross NC for at least $76 million in lab testing that was fraudulent and not payable under the Contracts.

**Misrepresentations made by LifeBrite Hospital**

98.     Every claim that LifeBrite Hospital submitted as part of this scheme to Blue Cross NC using LifeBrite's billing credentials misrepresented that the services rendered were covered and reimbursable under the Contracts. The following is a summary of the specific misrepresentations made by LifeBrite in perpetrating this scheme.

99.     *First*, in submitting each claim for reimbursement represented that it was for tests performed by LifeBrite Hospital. Specifically, by submitting a claim under the Contracts, LifeBrite Hospital represented that the claim was "render[ed]" by LifeBrite Hospital, Ex. A at § 2.1.1. Similarly, each claim was submitted on a UB-04 form,[9] which contains a representation that the billing information is "true, accurate, and complete" and that the submitter did not "knowingly or recklessly disregard or misrepresent or conceal material facts:"

---

[9] For purposes of this pleading, Blue Cross NC will provide examples of each category of misrepresentation. At a later time, Blue Cross NC will separately provide LifeBrite Hospital with the entire universe of claims at issue of which Blue Cross NC is aware.

UB-04 NOTICE:  THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION
OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR
CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE
FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

Submission of this claim constitutes certification that the billing
information as shown on the face hereof is true, accurate and complete.
That the submitter did not knowingly or recklessly disregard or
misrepresent or conceal material facts. The following certifications or
verifications apply where pertinent to this Bill:

100.    But, in reality, each of those representations was false because the tests were not performed by or at LifeBrite Hospital. Instead, they were performed by LifeBrite Labs in Atlanta, Georgia, or on occasion by the providers themselves.

101.    Further, even after Blue Cross NC caught on to LifeBrite Hospital's scheme, LifeBrite Hospital continued to misrepresent who performed the testing. After Blue Cross NC flagged LifeBrite Hospital for prepayment review, LifeBrite Hospital began re-submitting claims for reimbursement. Those resubmissions were submitted with LifeBrite Hospital's address even though LifeBrite Hospital did not perform the testing.[10]

102.    *Second*, each claim submitted by LifeBrite Hospital misrepresented that the tests were for patients of LifeBrite Hospital, ordered by LifeBrite Hospital providers, and were ordered to be performed by LifeBrite Hospital. Specifically, by submitting a claim under the Contracts, LifeBrite Hospital represented that the claim was for inpatients or outpatients treated at the Stokes County site of service, Ex. A at § 4.1. Additionally, each UB-04 form submitted by LifeBrite Hospitals represented that the billing information is

---

[10] *See* Sample Claims 1 and 2, *infra*.

"true, accurate, and complete" and that the submitter did not "knowingly or recklessly disregard or misrepresent or conceal material facts."

103.    Those representations were false. The patients were not inpatients or outpatients of LifeBrite Hospitals, were not ordered by LifeBrite Hospital providers, and were not ordered to be performed by LifeBrite Hospital. As described above, the claims were for testing of specimens of non-patients of LifeBrite Hospitals, ordered by non-LifeBrite Hospital providers and were ordered to be performed by LifeBrite *Labs*, not LifeBrite Hospital. Again, LifeBrite Hospital doubled down on its misrepresentations after being caught. Each claim resubmission represented that the claim was for an outpatient seen at LifeBrite Hospital and were submitted with LifeBrite Hospital's address when that was not the case.

104.    *Third,* each claim misrepresented that the claim was medically necessary. Specifically, the Contracts require that every claim must be medically necessary. Ex. A at §§ 2.1.1, 4.5.5. By submitting each claim, LifeBrite Hospitals represented the claims were medically necessary, that the billing information is "true, accurate, and complete" and that the submitter did not "knowingly or recklessly disregard or misrepresent or conceal material facts."

105.    But, the tests were not medically necessary. They were based on standard panels that were not patient specific, they did not comply with Blue Cross NC's policies on definitive testing, and they were not supported by medical records—which is required to establish medical necessity.

40

106. *Fourth*, each claim submitted misrepresented that the submission contained accurate billing codes, were submitted on the correct form, and accurately represented the place of service. Specifically, each UB-04 form represented that the billing information is "true, accurate, and complete" and that the submitter did not "knowingly or recklessly disregard or misrepresent or conceal material facts."

107. Again, those representations were false because the claims were billed improperly and did not reflect that the services were not performed at LifeBrite Hospital.

108. Specifically, to maximize the revenue that they could extract from Blue Cross NC, LifeBrite Hospital billed the testing using codes that would maximize the amount likely to be paid, without regard to whether those codes reflected services that were actually appropriate or medically necessary, and without regard to appropriate billing practices.

*Sample Claim 1*

109. Attached as Exhibit C is a redacted claim from LifeBrite Hospital to Blue Cross NC for services provided to J.B.

110. J.B. was not an inpatient or outpatient of LifeBrite Hospital. Instead, J.B. was a patient of Spectrum Medical Care, Inc. Nonetheless, LifeBrite Hospital represented that this claim was for outpatient services provided by LifeBrite Hospital at its Danbury address.

111.    It appears that at least some of the testing involved in Sample Claim 1 was ordered from and performed by Solstas Lab Partners. Nonetheless, LifeBrite Hospital billed this claim to Blue Cross NC.

112.    J.B.'s screening tests were all negative. Nonetheless, Sample Claim 1 contains a laboratory report, with LifeBrite Hospital's address, showing that extensive definitive testing was performed despite the fact that J.B.'s screening test results were as expected.

113.    LifeBrite Hospital billed Blue Cross NC $2,216.00 for the services it purportedly provided to J.B.

*Sample Claim 2*

114.    Attached as Exhibit D are three claims submitted by LifeBrite Hospital to Blue Cross NC for services provided to H.S.

115.    H.S. lives in and was treated in Virginia. Nonetheless, LifeBrite Hospital represented to Blue Cross NC that it provided services to H.S. on an outpatient basis.

116.    H.S.'s screening tests were all negative. Nonetheless, LifeBrite Hospital billed Blue Cross NC for definitive testing three times in one week, at a total cost of $6,045.

117.    Because the results of the screening tests were as expected, definitive testing was not medically necessary under Blue Cross NC's medical policy. Nonetheless, LifeBrite Hospital represented to Blue Cross NC that these claims were payable.

*****

42

118.     Blue Cross NC reasonably relied on LifeBrite Hospital's representations when it paid LifeBrite Hospital's claims.

119.     After noticing the stunning increase in claims and payments in a few short months, Blue Cross NC placed LifeBrite Hospital on prepayment review in November 2017. As a result of the prepayment review, Blue Cross NC put a flag in its system intended to stop payments for certain lab codes to LifeBrite Hospital. Later, Blue Cross NC learned that a technical glitch allowed some claims to be processed for a period of time. Pursuant to §§ 6.1.1 and 6.1.2 of the Commercial Contract and § 6.9 of the Medicare Contract, Blue Cross NC required LifeBrite Hospital to submit medical record documentation sufficient to establish medical necessity for those lab codes before Blue Cross NC would make payments for those services. The Contracts permit Blue Cross NC to engage in prepayment review.

120.     LifeBrite Hospital failed to submit its medical records documentation in accordance with Blue Cross NC requirements. Rather, LifeBrite Hospital only submitted a cover sheet, claim form, and order form. Moreover, LifeBrite Hospital did not provide medical records sufficient for Blue Cross NC to evaluate the medical necessity of the claims. In fact, based on Blue Cross NC's review to date, LifeBrite Hospital has only submitted the claims form and test results (i.e., no office visit notes, treatment plans, or other records for the patients).

## CAUSES OF ACTION

### COUNT I
### FRAUDULENT MISREPRESENTATION

121.    Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

122.    LifeBrite Hospital made numerous misrepresentations of material facts and failed to disclose other material facts to Blue Cross NC each time LifeBrite submitted a pass-through lab testing claim for payment to Blue Cross NC. Those misrepresentations and omissions include but are not limited to the following:

    a.  That the tests were ordered from LifeBrite Hospital when they actually were not;

    b.  That the testing was medically necessary;

    c.  That the testing was provided for a member seen at one of LifeBrite Hospital's sites of service;

    d.  That the testing was performed by LifeBrite Hospital on an outpatient basis;

    e.  That the claims were properly coded in accordance with professional coding standards, industry standards, and Blue Cross NC policies and procedures;

    f.  That the claims were supported by the patient's medical records;

    g.  That LifeBrite Hospital properly collected member cost-sharing obligations;

        h.   The provider name, provider address, Tax ID, NPI, type of bill, and

            coding were accurate; and

        i.   That the claims were accurate.

123.   The hundreds of thousands of claims described in these counterclaims, including the misrepresentations described in paragraphs 82 to 108 and the sample claims referenced in paragraphs 110 to 117, are herein referred to a "misrepresented claims."

124.   Each time LifeBrite Hospital submitted a misrepresented claim to Blue Cross NC, LifeBrite Hospital misrepresented information upon which Blue Cross NC reasonably relied in making reimbursement decisions, including but not limited to the actual provision of services, the place of service, the medical necessity of the service, and the appropriate billing codes. Furthermore, LifeBrite Hospital misrepresented that the claim was payable under the Contracts.

125.   In addition to the misrepresentations LifeBrite Hospital made to Blue Cross NC in connection with LifeBrite Hospital's billing, LifeBrite Hospital made other material misrepresentations and omissions to Blue Cross NC, including: misrepresenting that LifeBrite Hospital intended to perform its obligations under the Contracts; failing to disclose that LifeBrite Hospital's parent company, LifeBrite Labs, was involved in a pass-through scheme; and failing to disclose LifeBrite Hospital's sales practices and relationships with providers. LifeBrite Hospital made those misrepresentations and omissions solely in an effort to exploit the Contracts as part of a systematic and methodical fraud.

Case 1:18-cv-00293-WO-LPA   Document 20   Filed 06/27/18   Page 45 of 61

126.    LifeBrite Hospital understood that, under the circumstances, and given the volume of claims received by Blue Cross NC from providers of all types, LifeBrite Hospital had a special relationship of trust and confidence toward Blue Cross NC that gave rise to a duty to speak and disclose material information regarding the claims submitted.

127.    LifeBrite Hospital had a duty to disclose to Blue Cross NC information material to the claims LifeBrite Hospital submitted. LifeBrite Hospital took on this obligation every time it filed a claim. The fact that LifeBrite Hospital concealed information about the source of specimens and the medical necessity of the testing shows that LifeBrite Hospital knew about its duty and knew that Blue Cross NC was relying on LifeBrite Hospital.

128.    LifeBrite Hospital's scheme relied upon this relationship, and the volume of claims received by Blue Cross NC, to hide LifeBrite Hospital's fraudulent claims.

129.    LifeBrite Hospital engaged in the above misrepresentations willfully and with the intent to defraud Blue Cross NC, and with willful and reckless disregard of Blue Cross NC's rights and interests.

130.    Blue Cross NC reasonably and justifiably relied on LifeBrite Hospital's misrepresentations.

131.    LifeBrite Hospital's misrepresentations did, in fact, deceive Blue Cross NC.

132.    As a direct and proximate result of LifeBrite Hospital's misrepresentations, Blue Cross NC sustained millions of dollars in damages.

133.    LifeBrite Hospital's fraudulent conduct was outrageous and aggravated such that punitive damages are appropriate.

134.    Blue Cross NC is entitled to recover compensatory and punitive damages from LifeBrite Hospital.

## COUNT II
## NEGLIGENT MISREPRESENTATION

135.    Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

136.    Due to the relationship between the parties, LifeBrite Hospital owed Blue Cross NC a duty of care in communication of information.

137.    LifeBrite Hospital made various misrepresentations of material facts and failed to disclose material facts to Blue Cross NC, as alleged herein.

138.    In making such misrepresentations, LifeBrite Hospital failed to exercise reasonable care and competence in obtaining and communicating information to Blue Cross NC.

139.    LifeBrite Hospital made its material misrepresentations in willful and wanton disregard of Blue Cross NC's rights and interests.

140.    Blue Cross NC reasonably and justifiably relied upon such negligent misrepresentations.

141.    As a direct and proximate result of LifeBrite Hospital's negligent misrepresentations, Blue Cross NC sustained millions of dollars in damages.

142.    LifeBrite Hospital's conduct was outrageous and aggravated such that punitive damages are appropriate.

143.    Blue Cross NC is entitled to recover compensatory and punitive damages from LifeBrite Hospital.

## COUNT III
## BREACH OF CONTRACT

144.    Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

145.    LifeBrite Hospital was a party to the Contracts with Blue Cross NC. The Contracts are enforceable agreements with respect to the time periods at issue, and Exhibits A and B are incorporated herein.

146.    For the reasons stated above, LifeBrite Hospital breached the Contracts, including but not limited to the provisions set forth in Paragraphs 58 to 61, inclusive.

147.    At the time Blue Cross NC made payments on claims submitted by LifeBrite Hospital, Blue Cross NC reasonably believed that the claims were submitted in accordance with LifeBrite Hospital's contractual, legal, professional, and ethical obligations. In fact, they were not.

148.    LifeBrite Hospital has failed to return the amounts Blue Cross NC paid for claims for services that were not provided to patients seen at LifeBrite Hospital, that were not medically necessary, and that were otherwise not payable.

149.    The Contracts contained an implied covenant of good faith and fair dealing.

150.     LifeBrite Hospital's wrongful conduct, as alleged herein, constitutes a breach of the implied covenant of good faith and fair dealing.

151.     As a direct and proximate result of LifeBrite Hospital's breaches of the Contracts, Blue Cross NC has incurred millions of dollars in damages, including but not limited to financial loss.

152.     Blue Cross NC is entitled to recover compensatory damages from LifeBrite Hospital, together with interest.

## COUNT IV
## BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT

153.     Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

154.     LifeBrite Hospital breached the Contracts as more fully described in Count III.

155.     LifeBrite Hospital's breaches were accompanied by fraudulent intent. LifeBrite Hospital undertook its obligations under the Contracts with no intention of performing those obligations. Instead, LifeBrite Hospital intended to use the Contracts as part of its systematic fraud scheme. LifeBrite Hospital's parent company, LifeBrite Labs, was already perpetrating a similar scheme. On information and belief, LifeBrite Labs became interested in the Stokes County hospital primarily as a means to continuing its scheme in a new location.

156.     LifeBrite Hospital's breaches were aggravated by LifeBrite Hospital's fraudulent conduct, more fully described in Count I.

157.    Blue Cross NC suffered damages as a result of LifeBrite Hospital's fraudulent conduct.

158.    LifeBrite Hospital's fraudulent conduct was outrageous and/or aggravated such that punitive damages are appropriate.

159.    As a direct and proximate result of LifeBrite Hospital's breaches of contract and fraudulent acts, Blue Cross NC has suffered millions of dollars in actual, plus interest, and is further entitled to punitive damages.

**COUNT V**
**TORTIOUS INTERFERENCE WITH CONTRACT**

160.    Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

161.    Blue Cross NC had a contract with each of its members. Attached hereto as Exhibit E, and incorporated herein, is an example of a contract between Blue Cross NC and its members. Exhibit E is representative of Blue Cross NC's member contracts.

162.    Each of those contracts required each member to pay a coinsurance, copayment, or deductible payment.

163.    LifeBrite Hospital knew about the members' contractual obligations to make those payments and was required by contract to collect the members' cost-sharing obligations. (*See* Ex. A § 4.4; Ex. B at Attach. B.)

164.    LifeBrite Hospital intentionally, wrongfully, and deliberately failed to collect members' cost-sharing obligations, thereby inducing the members to breach their contracts with Blue Cross NC.

50

165.   LifeBrite Hospital's waiver of member cost-sharing obligations resulted in greater use of services, which alters the bargain struck between Blue Cross NC and its members. That increased volume of services was a key to LifeBrite Hospital's scheme, but LifeBrite Hospital knew it could not accomplish its scheme without working around the contractual mechanism designed to protect Blue Cross NC from overuse of services.

166.   LifeBrite Hospital's wrongful conduct, as alleged herein, constitutes tortious interference with those contracts.

167.   LifeBrite Hospital's conduct was outrageous and aggravated, such that punitive damages are appropriate.

168.   As a direct and proximate result of LifeBrite Hospital's tortious interference, Blue Cross NC has suffered millions of dollars in actual damages, plus interest, and is further entitled to punitive damages.

**COUNT VI**
**UNFAIR OR DECEPTIVE TRADE PRACTICES, N.C. GEN. STAT. § 75-1.1, ET SEQ.**

169.   Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

170.   LifeBrite Hospital's actions and conduct, as alleged herein, constitute unfair or deceptive acts, practices, and methods of competition, in or affecting commerce, in violation of N.C. GEN. STAT. § 75-1.1. The conduct of LifeBrite Hospital was unfair, deceptive, unethical, and in violation of ethical standards of dealings between persons engaged in business and the public policy of the State of North Carolina.

51

171.   LifeBrite Hospital fraudulently submitted claims for payment, as more fully described in Count I.

172.   Blue Cross NC made substantial payments to LifeBrite Hospital for the claims that were fraudulently submitted.

173.   LifeBrite Hospital's fraudulent and unlawful actions were "in or affecting commerce" within the meaning of N.C. GEN. STAT. § 75-1.1.

174.   As a direct and proximate result of LifeBrite Hospital's unfair and deceptive trade practices, Blue Cross NC suffered millions of dollars in actual damages, plus interest thereon. Blue Cross NC is entitled to have and recover such actual damages, trebled pursuant to N.C. GEN. STAT. § 75-16, and attorneys' fees and costs pursuant to N.C. GEN. STAT. § 75-16.1.

## COUNT VII
## RESTITUTION UNDER ERISA § 502(a)(3)

175.   Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

176.   Many of the impacted group health plans are employer-sponsored group health plans covered by ERISA (the "**ERISA Plans**").

177.   Blue Cross NC has been delegated by the plan administrator of each of the ERISA Plans the discretionary authority to review and decide on claims for benefits under the ERISA Plans.

178.   The ERISA Plans also delegated to Blue Cross NC the authority to recover overpayments made by Blue Cross NC on the ERISA Plans' behalf.

179.    Because of the fraudulent scheme identified herein, Blue Cross NC has paid millions of dollars in benefits to LifeBrite Hospital.

180.    Blue Cross NC paid these amounts into certain financial accounts under LifeBrite Hospital's control, including an account number ending in -531.

181.    The amounts Blue Cross NC overpaid as a result of LifeBrite Hospital's scheme constitute discrete, identifiable funds.

182.    These funds remain either in LifeBrite Hospital's control, the control of its agents, or others acting in concert with LifeBrite Hospital or its officers.

183.    Blue Cross NC has standing to sue under ERISA § 502(a)(3) to obtain appropriate equitable relief to redress violations of the ERISA Plans and to enforce the terms of the ERISA Plans.

184.    As alleged herein, LifeBrite Hospital has submitted, or caused to be submitted, misleading and fraudulent claims to Blue Cross NC for payment of benefits for charges related to laboratory services.

185.    Blue Cross NC relied on the claim information supplied by LifeBrite Hospital, or that LifeBrite Hospital caused to be supplied, in determining whether to pay the claims.

186.    Had Blue Cross NC been aware that the claims misrepresented the services in order to make them appear payable, when in fact they were not, it would not have made those payments.

187.     Based upon the fraudulent claims LifeBrite Hospital submitted, or caused to be submitted, to Blue Cross NC, LifeBrite Hospital received payments in excess of the amounts that it was actually entitled to receive for those services.

188.     Further, even if LifeBrite Hospital did not knowingly and intentionally submit misleading and fraudulent claims to Blue Cross NC, Blue Cross NC is entitled to equitable relief to enforce the terms of the ERISA Plans, and recover overpayments made to LifeBrite Hospital.

189.     Further, by knowingly accepting payments from the ERISA Plans, LifeBrite Hospital became bound by the ERISA Plans' terms and conditions, including conditions related to overpayments.

190.     The ERISA Plans, by their terms, require the return of overpayments and amounts that were erroneously paid.

191.     Thus, even to the extent that LifeBrite Hospital did not intentionally overcharge Blue Cross NC, Blue Cross NC is entitled to equitable relief to enforce the terms of the ERISA Plans and recover these overpayments.

192.     Because of LifeBrite Hospital's wrongful behavior, Blue Cross NC has paid millions of dollars in benefits to LifeBrite Hospital, that were not owed under the terms of the ERISA Plans.

193.     Blue Cross NC seeks equitable restitution to cover the assets that LifeBrite Hospital unlawfully obtained because of the conduct described herein.

194.    Specifically, Blue Cross NC seeks an Order imposing a constructive trust on the assets that LifeBrite Hospital received in the form of overpayments, as well as on any profits or income made by LifeBrite Hospital on those amounts.

195.    Blue Cross NC also seeks an Order restoring to it—individually and on behalf of the ERISA Plans—the sums held in constructive trust by LifeBrite Hospital.

**COUNT VIII**
**DECLARATORY AND INJUNCTIVE RELIEF**
**UNDER ERISA § 502(a)(3) AND 28 U.S.C. §§ 2201 AND 2202**

196.    Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

197.    Blue Cross NC acts as a claims fiduciary for the ERISA Plans.

198.    Therefore, Blue Cross NC has standing under ERISA § 502(a)(3) to enjoin any acts or practices that violate any provisions of the ERISA Plans, and to obtain other appropriate relief to redress such violations or enforce plan provisions.

199.    LifeBrite Hospital has engaged in a scheme to defraud Blue Cross NC into paying amounts to LifeBrite Hospital in excess of amounts owed under the relevant ERISA Plans, and for services that are not covered under the relevant ERISA Plans' terms, as described herein.

200.    There is an actual case and controversy between Blue Cross NC and LifeBrite Hospital as to the claims LifeBrite Hospital submitted, and continues to submit, to Blue Cross NC, all of which arise from the fraudulent scheme described herein.

201.    LifeBrite Hospital's fraudulent scheme is deceptive, unfair, and unlawful.

Case 1:18-cv-00293-WO-LPA    Document 20    Filed 06/27/18    Page 55 of 61

202.    No payment is due to LifeBrite Hospital on any claims that are pending, or may be submitted in the future, where such claims arise from LifeBrite Hospital's fraudulent scheme.

203.    There is a *bona fide*, present, and practical need for a declaration as to the lawfulness of LifeBrite Hospital's actions, including whether Blue Cross NC has the right to deny the claims implicated by LifeBrite Hospital's actions and scheme.

204.    Blue Cross NC is entitled to a judgment declaring that LifeBrite Hospital's actions and business practices are unlawful, and that any claims for payment of benefits submitted by LifeBrite Hospital to Blue Cross NC because of this scheme are non-payable and void.

205.    Blue Cross NC also seeks recovery of its reasonable and necessary attorney's fees and costs, pursuant to ERISA § 502(g)(1).

206.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Blue Cross NC is entitled to a judgment declaring that LifeBrite Hospital's actions and business practices are unlawful, even as to the non-ERISA plans impacted by this fraudulent scheme, and that any claims for payment of benefits submitted by LifeBrite Hospital as a result of its fraudulent scheme are non-payable and void.

## COUNT IX
## CONSTRUCTIVE TRUST AND EQUITABLE LIENS

207.    Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

56

208.	As a result of LifeBrite Hospital's actions alleged herein, LifeBrite Hospital received ill-gotten profits, gains, and amounts from Blue Cross NC. On information and belief, some of these amounts have been used to purchase various assets and real property.

209.	Blue Cross NC is entitled to trace the proceeds of the scheme and this conduct through whatever real and personal property and other accounts the proceeds may have flowed, and Blue Cross NC is further entitled to a constructive trust or an equitable lien on that profit in whatever form it may now exist.

210.	LifeBrite Hospital should be required to disgorge all ill-gotten gains.

211.	The Court should impose an equitable lien or constructive trust for the benefit of Blue Cross NC upon any real or personal property or good or other accounts held by LifeBrite Hospital that derived entirely or partially from any of the ill-gotten profits of LifeBrite Hospital's misconduct.

## COUNT X
## UNJUST ENRICHMENT

212.	Blue Cross NC realleges and incorporates each preceding paragraph of the Counterclaim as if fully set forth herein.

213.	In the alternative, and in the event no express contracts govern the parties' relationship, Blue Cross NC seeks restitution for the benefits it conferred upon LifeBrite Hospital in the form of fraudulently-billed reimbursements.

214. LifeBrite Hospital fraudulently submitted, or caused the submission of, claims to Blue Cross NC for services that were not performed at or by LifeBrite Hospital, or on behalf of LifeBrite Hospital patients.

215. Blue Cross NC, relying on LifeBrite Hospital's misrepresentations, issued reimbursements to LifeBrite Hospital that should not have been paid.

216. Blue Cross NC conferred those benefits in reliance on the reasonable belief that the reimbursements were properly owed.

217. LifeBrite Hospital appreciated the benefit conferred by Blue Cross NC.

218. LifeBrite Hospital has unjustly accepted and retained those benefits.

219. LifeBrite Hospital should be required to make restitution for the benefits it received, retained, and appropriated because justice and equity require such restitution.

220. Restitution is required by public policy to promote the stability of insurance markets and to avoid the continuing unjust enrichment of unscrupulous providers at the expense of insurance companies, employer groups, and patients.

221. Blue Cross NC is entitled to restitution in an amount to be determined at trial, including but not limited to all amounts LifeBrite Hospital received from Blue Cross NC because of LifeBrite Hospital's scheme.

## JURY DEMAND

Blue Cross NC demands that a jury determine all issues of fact so triable.

## PRAYER FOR RELIEF

WHEREFORE, Blue Cross NC respectfully requests judgment in its favor granting the following relief:

a)  Actual and consequential damages in an amount to be determined at trial, plus pre- and post-judgment interest at the legal rate;

b)  Punitive damages as appropriate;

c)  Damages for violations of N.C. GEN. STAT. § 75-1.1, trebled in accordance with N.C. GEN. STAT. § 75-16;

d)  Attorneys' fees and costs pursuant to N.C. GEN STAT. § 75-16.1.

e)  An order obligating LifeBrite Hospital to disgorge all revenues and profits derived from its scheme;

f)  A constructive trust or equitable lien in Blue Cross NC's favor on all property, real or personal or intangible wherever located, owned, or controlled by LifeBrite Hospital into which any of the proceeds of LifeBrite Hospital's misconduct have flowed;

g)  An injunction prohibiting LifeBrite Hospital from continuing its scheme;

h)  An award of Blue Cross NC's costs, including reasonable attorney's fees, in accordance with contractual provisions and ERISA § 502(g)(1);

i)  Other equitable relief, as described herein;

j)  A trial by jury for all matters so triable; and

k)  Any other relief deemed just, proper, and/or equitable.

59

Respectfully submitted, this the 27th day of June, 2018.

/s/ Chad D. Hansen
Chad D. Hansen, NCSB # 32713
Elizabeth L. Winters, NCSB # 44918
KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Tel: (336) 607-7300
Fax: (336) 607-7500

Jeffrey S. Gleason (MNSB #0396190)
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: (612) 349-8562
Fax: (612) 339-4181

Timothy W. Billion (SDSB #4641)
ROBINS KAPLAN LLP
140 N. Phillips Avenue, Suite 307
Sioux Falls, SD  57104
Tel: (605) 740-7102
Fax: (605) 740-7199

*Counsel for Blue Cross and Blue Shield of North Carolina*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on this date, I electronically filed the foregoing **FIRST AMENDED ANSWER AND COUNTERCLAIMS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record:

                      Jennifer L. Spaziano
                      SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                      1440 New York Ave., NW
                      Washington, DC 20005-2111
                      Tel:  (202) 371-7872
                      Fax: (202) 661-8327
                      Email: jen.spaziano@skadden.com

                      Gilbert J. Andia, Jr.
                      HIGGINS BENJAMIN, PLLC
                      301 N. Elm Street, Ste. 800
                      Greensboro, NC  27401
                      Tel: (336) 273-1600
                      Fax: (336) 274-4650
                      Email: bandia@greensborolaw.com

                      *Counsel for Plaintiff*

This the 27th day of June, 2018.

                      /s/ Chad D. Hansen
                      Chad D. Hansen, NCSB #32713
                      Elizabeth L. Winters, NCSB # 44918
                      KILPATRICK TOWNSEND & STOCKTON LLP
                      1001 West Fourth Street
                      Winston-Salem, NC  27101
                      Tel:  (336) 607-7300
                      Fax:  (336) 607-7500
                      *Counsel for Blue Cross and Blue Shield of North Carolina*