IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LIFEBRITE HOSPITAL GROUP OF     )
STOKES, LLC,                    )
                                )
            Plaintiff and       )
            Counter Defendant,  )
                                )
      v.                        )         1:18CV293
                                )
BLUE CROSS AND BLUE SHIELD OF   )
NORTH CAROLINA,                 )
                                )
            Defendant and       )
            Counter Claimant.   )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Currently before this court is Plaintiff's motion to remand
this case to the Stokes County Superior Court. (Doc. 16.)
Plaintiff has also moved to dismiss Defendant's first amended
counterclaims pursuant to Fed. R. Civ. P. 9(b), 12(b)(1) and
12(b)(6). (Doc. 24.) For the reasons described herein, this
court finds that Plaintiff's motion to remand should be granted
and that Plaintiff's motion to dismiss the first amended
counterclaims should be denied as moot.

I.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

     A.   **Factual Background**

     Plaintiff LifeBrite Hospital Group of Stokes, LLC
("LifeBrite") is a healthcare company whose principal place of

business is Danbury, North Carolina. (Complaint ("Compl.") (Doc. 5) ¶ 1.) Defendant Blue Cross and Blue Shield of North Carolina ("BCBSNC") "is the largest provider of private health insurance in North Carolina" and is affiliated with the national Blue Cross Blue Shield insurance network. (Id. ¶ 7.)

Defendant and Pioneer Health Services of Stokes County, Inc.[1] entered into a Network Participation Agreement[2] (the "NPA") on January 1, 2013, pursuant to which Pioneer Health agrees to provide "medically necessary covered services" to covered individuals (those properly enrolled in Blue Cross Blue Shield benefit plans) at Pioneer Health's facility in Danbury, North Carolina, and Defendant agrees to reimburse Pioneer Health for these services pursuant to the terms of the relevant benefit plan. (Id. ¶¶ 9-10; Network Participation Agreement (Doc. 17-7) at 4-5, 10, 17.) The agreement further provides that Defendant

---

[1] The Network Participation Agreement was made between Defendant and Pioneer Health Services of Stokes County, Inc. (Compl., Ex. B (Doc. 5-2).) Pioneer Health subsequently entered bankruptcy. (See Doc. 25-7.) Plaintiff then purchased Pioneer Health and assumed its obligations under the contract, (id.; see also Def.'s Countercls. (Doc. 20 at 14), and the NPA was subsequently amended in 2017 to reflect this assumption, (see Doc. 2-2.)

[2] Per the parties' explanation, this court will refer and cite only to the complete copy of the NPA attached by Plaintiff at Doc. 17-7. (See Pl.'s Mem. (Doc. 17) at 12 n.9; Def.'s Opp'n Br. (Doc. 21) at 9 n.1.)

shall "be responsible for making judgments and decisions concerning whether certain services are Covered Services under the Benefit Plan and the extent to which payment may or may not be made thereunder." (NPA (Doc. 17-7) at 8.) The general NPA applies to benefit plans provided by PPOs, HMOs, and "Other Members." (Id. at 18.)

Defendant and Pioneer Health also entered into a Medicare Provider Agreement[3] (the "MPA" and, collectively with the NPA, the "Provider Agreements"), effective August 1, 2011, to "govern the terms of Provider participation with BCBSNC for delivery of health care services to BCBSNC Members . . . under BCBSNC Medicare Advantage Plan." (Doc. 2-3 at 4.) Similar to the NPA, under this contract, Pioneer Health agrees to provide medically necessary covered services to participants in Defendant's Medicare plans, and Defendant agrees to compensate Pioneer Health pursuant to an attached reimbursement schedule. (Id. at 7, 10, 15, 28–34.) The MPA also attaches a list of participating providers. (Id. at 21–27.)

Plaintiff contends that, beginning in late 2017, Defendant breached the Provider Agreements by denying reimbursement for lab tests conducted by Plaintiff and "stating that the claims

_____

[3] This agreement was also amended in 2017 to reflect Plaintiff's purchase of Pioneer Health. (See Doc. 2-4.)

should be sent to the State where the lab specimen was drawn."
(Compl. (Doc. 5) ¶ 11.) Plaintiff brings claims for breach of
contract and unjust enrichment and alleges damages in excess of
$25,000.00. (Id. ¶¶ 13–18.)

B.    **Procedural History**

Plaintiff initially filed the Complaint in Stokes County
Superior Court, after which Defendant removed the case to this
court. (See Notice of Removal ("Removal Notice") (Doc. 1.))
Defendant answered the Complaint and asserted counterclaims
against Plaintiff for fraudulent misrepresentation, negligent
misrepresentation, breach of contract, breach of contract
accompanied by a fraudulent act, tortious interference with
contract, unfair or deceptive trade practices, restitution,
declaratory and injunctive relief, constructive trust and
equitable liens, and unjust enrichment. (Doc. 11.)

Plaintiff moved to dismiss the counterclaims, (Doc. 15),
and to remand the case to state court, (Doc. 16). Plaintiff
filed a memorandum in support of these motions. (Pl.'s Mem. of
Law in Supp. of (1) Motion to Remand and (2) Motion to Dismiss
Counterclaims ("Pl.'s Mem.") (Doc. 17).) Defendant then filed an
amended answer and an amended set of counterclaims. (First
Amended Answer and Counterclaims ("Def.'s Countercls.") (Doc.
20).) Defendant also responded opposing Plaintiff's motion to

remand. (Def.'s Br. in Opp'n to Pl.'s Mot. to Remand and Mot. to Dismiss Counterclaims ("Def.'s Opp'n Br.") (Doc. 21).)

Generally, Defendant alleges that Plaintiff fraudulently billed Defendant for over $76 million of "urine toxicology testing that it did not perform." (Def.'s Countercls. (Doc. 20) at 11, 38.) Specifically, Defendant asserts that LifeBrite Laboratories, LLC ("LifeBrite Labs"), Plaintiff's sister company, improperly solicited doctors to use its laboratories for urinalysis testing and to overprescribe urinalysis tests by falsely representing that LifeBrite Labs was an in-network Blue Cross provider and could receive favorable reimbursement rates. (Id. at 11-13, 33.) Defendant contends that these arrangements typically provided a standard authorization[4] for lab testing, without a determination of whether the tests were medically necessary and that Plaintiff paid kickbacks to certain providers consisting of a portion of the reimbursement received for urine tests. (Id. at 33-35.) Defendant further alleges that Plaintiff failed to collect member co-pays for the relevant lab testing, which might have alerted Defendant to the ongoing scheme because

---

[4] Specifically, Defendant suggests that Plaintiff received authorization to perform both screening and definitive testing, but then performed definitive urinalysis testing before the initial screening results (which normally indicate whether definitive testing is necessary) were available. (Id. at 33.)

members were likely to dispute charges from hospitals or health institutions other than those where they actually received testing or treatment. (Id. at 37.)

In summary, Defendant alleges that Plaintiff engaged in a far-reaching scheme to channel outside lab tests performed on patients across the country through its own Blue Cross North Carolina network agreement, obtain reimbursements to which Plaintiff was not entitled, and share this reimbursement money with the providers who prescribed the tests. Defendant asserts these actions breached the Provider Agreements because Plaintiff was permitted to submit only claims for services performed directly by Plaintiff at the designated site of service in North Carolina and that, in the process, Plaintiff misrepresented who was conducting the tests, on which patients the tests were conducted, whether the tests were medically necessary, and what codes the tests were conducted under. (Id. at 38-41.)

Plaintiff moved to dismiss the amended counterclaims, (Doc. 24), and filed a memorandum in support of this motion, (Doc. 25). Defendant responded, (Doc. 27), and Plaintiff replied, (Doc. 28). Plaintiff also filed a reply brief in regarding its motion to remand. (Doc. 26.) This court, by text order dated March 12, 2019, denied Plaintiff's motion to dismiss, (Doc. 15),

Defendant's original counterclaims as moot. (Docket Entry 3/12/2019.)

This court ordered supplemental briefing on the issue of the Employee Retirement Income Security Act ("ERISA") § 502(a) standing, (Doc. 31), to which both parties responded. (Def.'s Supplemental Brief ("BCBSNC First Suppl. Br.") (Doc. 32); Pl.'s Resp. to Def.'s Supplemental Brief ("Pl.'s First Suppl. Br.") (Doc. 35).) The court then ordered a second round of supplemental briefing on the issue of ERISA standing, (Doc. 38), to which both parties responded, (Def.'s Supplemental Brief ("BCBSNC Second Suppl. Br.") (Doc. 39); Pl.'s Supplemental Brief ("Pl.'s Second Suppl. Br.") (Doc. 40.)

## II.  **ARGUMENTS AND LEGAL BACKGROUND**

This court will first evaluate Plaintiff's motion to remand, because the motion to dismiss counterclaims requires an analysis of the merits that is appropriate only if this court has jurisdiction over the case. See generally Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 98 (1998) (referencing "two centuries of jurisprudence affirming the necessity of determining jurisdiction before proceeding to the merits").

### A.  **Arguments**

Defendant asserts that this case was properly removed to federal court on two alternative grounds. First, Defendant

argues that "portions of Plaintiff's claims are completely preempted by Employment Retirement Income Security Act of 1974 ('ERISA')" because Defendant looks to the underlying ERISA plan to determine whether services are "medically necessary" under the Provider Agreements. (Removal Notice (Doc. 1) ¶¶ 6, 13.) Second, Defendant contends that the case is removable under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). (Id. ¶ 7.) Because certain contested lab test claims were provided to federal employees (or their family members or other beneficiaries) with health insurance under the Federal Employee Health Benefits Act ("FEHBA"), Defendant argues that it "acts under a federal officer" in administering these plans for the Office of Personnel Management ("OPM") and that Plaintiff's claims turn on interpreting the underlying FEHBA plans.[5] (Id. ¶¶ 19-25.) Defendant further asserts that certain of the contested lab test claims were provided to Medicare beneficiaries and that the case is removable under § 1442(a)(1) because Defendant acts under a federal officer when it is directed and employed by the Centers for Medicare and Medicaid

---

[5] Defendant further argues that the FEHBA's express preemption statute (5 U.S.C. § 8902(m)(1)) applies in this case to bar Plaintiff's claims, and that Defendant has potential sovereign immunity and federal common law defenses. (Id. ¶¶ 27-29.)

Services ("CMS") to administer the underlying benefit plans. (Id. ¶¶ 30-34.)

In response, Plaintiff contends that this case is solely "a contractual dispute regarding the parties' obligations under the" Provider Agreements that does not implicate ERISA or directly involve the administration of any federal health insurance plan. (Pl.'s Mem. (Doc. 17) at 15–18.)[6] Specifically, Plaintiff asserts that this case involves only the refusal to process claims and not any scope-of-coverage determinations that might implicate ERISA or Medicare. (Doc. 26 at 8–9.) Further, Plaintiff argues that there is no "direct connection" in this case between Defendant and the federal government because Defendant did not act at the direction of any government agency when it denied lab testing claims; for that reason, Plaintiff asserts that § 1442(a)(1) is not applicable. (Id. at 13–15.) Therefore, Plaintiff asks this court to remand the case to state court.

### B.  Exceptions to the Well-Pleaded Complaint Rule

It is well-accepted that this court must determine subject matter jurisdiction based solely on the allegations in the

---

[6]  All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

complaint at the time it was filed. See, e.g., Taylor v. Anderson, 234 U.S. 74, 75 (1914) ("[W]hether a case is one arising under the Constitution or a law or treaty of the United States . . . must be determined from what necessarily appears in the plaintiff's statement of his own claim . . . unaided by anything alleged in anticipation or avoidance of defenses."). This means that counterclaims filed by the defendant are not considered in the jurisdictional inquiry. See Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 831 (2002) ("It follows that a counterclaim — which appears as part of the defendant's answer, not as part of the plaintiff's complaint — cannot serve as the basis for 'arising under' jurisdiction.").

Here, the parties are not diverse. (See Compl. (Doc. 5) ¶¶ 1-2); see also Long v. Silver, 248 F.3d 309, 314 (4th Cir. 2001). Therefore, for this court to properly exercise subject matter jurisdiction, the case must implicate a question of federal law under 28 U.S.C. § 1331. Because Plaintiff does not explicitly rely on any federal law in its original complaint, this court appears to lack subject matter jurisdiction. However, while subject matter jurisdiction is normally determined from the face of the complaint without regard to any defenses or counterclaims, "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of

claims is necessarily federal in character." <u>Met. Life Ins. Co.</u>
<u>v. Taylor</u>, 481 U.S. 58, 63-64 (1987).

There are two potentially relevant exceptions to the well-
pleaded complaint rule. First, with regard to ERISA (the
statutory framework that sets forth minimum standards for
employer-provided health insurance programs), the Supreme Court
has held that "Congress has clearly manifested an intent to make
causes of action within the scope of the civil enforcement
provisions of § 502(a) removable to federal court." <u>Id.</u> at 66;
<u>see also</u> 29 U.S.C. § 1144(a). Claims that merely "relate to any
employee benefit plan" under ERISA § 514 are conflict-preempted
and the defendant may assert an ERISA-based defense, but
"conflict preemption under § 514 does <u>not</u> provide a basis for
federal jurisdiction." <u>Sonoco Prods. Co. v. Physicians Health</u>
<u>Plan, Inc.</u>, 338 F.3d 366, 371 (4th Cir. 2003).

A state-law claim may, however, be completely preempted by
ERISA and removable to federal court if the following criteria
are satisfied:

> (1) the plaintiff [has] standing under § 502(a) to
> pursue its claim; (2) its claim must fall[] within the
> scope of an ERISA provision that [it] can enforce via
> § 502(a); and (3) the claim must not be capable of
> resolution without an interpretation of the contract

governed by federal law, i.e., an ERISA-governed
employee benefit plan.[7]

Id. at 372 (internal quotation marks omitted) (quoting Jass v.
Prudential Health Care Plan, Inc., 88 F.3d 1482, 1487 (7th Cir.
1996)).

Second, 28 U.S.C. § 1442(a)(1) permits removal of any case
"against or directed to . . . [t]he United States or any agency
thereof or any officer (or any person acting under that officer)
of the United States or of any agency thereof, in an official or
individual capacity, for or relating to any act under color of
such office." (emphasis added). As with complete ERISA
preemption, "[§ 1442(a)(1)] . . . serves to overcome the well-
pleaded complaint rule which would otherwise preclude removal
even if a federal defense were alleged." Mesa v. California, 489
U.S. 121, 136 (1989) (internal quotation marks omitted).

> The federal officer removal statute allows a defendant
> to remove a case from state to federal court if the
> defendant establishes: (1) it is a federal officer or
> a person acting under that officer; (2) a colorable
> federal defense; and (3) the suit is for an act under
> color of office, which requires a causal nexus between
> the charged conduct and asserted official authority.

---

[7] Stated slightly differently, the test "requires two
inquiries: (1) whether the plaintiff could have brought its
claim under § 502(a); and (2) whether no other legal duty
supports the plaintiff's claim." Conn. State Dental Ass'n v.
Anthem Health Plans, Inc., 591 F.3d 1337, 1345 (11th Cir. 2009).

Ripley v. Foster Wheeler LLC, 841 F.3d 207, 209-10 (4th Cir. 2016) (internal quotation marks, alterations, and citations omitted).

## III. **ERISA PREEMPTION**

### A. **Summary and Legal Framework**

Defendant asserts that "at least one or more of the claims seek to recover benefits under the terms of an ERISA plan," (Removal Notice (Doc. 1) ¶ 10), and that, because "Blue Cross NC must interpret the terms and conditions of the underlying ERISA benefit plans to determine whether LifeBrite has rendered Medically Necessary Covered Services," the claims are removable, (Def.'s Opp'n Br. (Doc. 21) at 10 (internal quotation marks omitted)).[8] Defendant further argues that any claim "implicat[ing] coverage determinations under ERISA benefit plans" and involving the right to payment, rather than the rate of payment, is completely preempted. (Id. at 12-13.)

A brief overview of the relationship between the various parties here is informative. Plaintiff is a healthcare provider:

---

[8] ERISA covers only health benefit plans sponsored by private employers, not Medicare plans sponsored by the federal government. See, e.g., Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 74-75 (1st Cir. 2006). Therefore, only the NPA (and not the MPA) is relevant to the ERISA preemption issue.

a hospital network in Stokes County, North Carolina, that "offers a variety of customary hospital services, including inpatient, outpatient and outreach laboratory." (Compl. (Doc. 5) ¶ 6.) Defendant is the North Carolina branch of a national health insurance provider network. Defendant administers health insurance plans for a variety of plan sponsors, including private companies and the federal government (both plans for federal employees through the FEHBA, and plans under Medicare). These plans benefit certain covered individuals, including federal employees and their family members and individuals qualifying for Medicare benefits. The plan participants and beneficiaries, along with the participant's employer (or plan sponsor), pay insurance premiums to Defendant. Pursuant to the Provider Agreements (and, as specifically relevant here, the NPA), Plaintiff renders medically necessary hospital services to participants and beneficiaries at its North Carolina location, Plaintiff submits claims for these services to Defendant, and Defendant reimburses Plaintiff for covered services. (See Doc. 2-1.)

BCBSNC health insurance plans contain the following anti-assignment provision:

> The benefits described in this benefit booklet are
> provided only for MEMBERS. These benefits and the
> right to receive payment under this health benefit

-14-

plan cannot be transferred or assigned to any other
person or entity, including providers. BCBSNC may pay
a PROVIDER directly. For example, BCBSNC pays IN-
NETWORK PROVIDERS directly under applicable contracts
with those PROVIDERS. However, any PROVIDER'S right to
be paid directly is through such contract with BCBSNC,
and not through this health benefit plan. Under this
health benefit plan, BCBSNC has the sole right to
determine whether payment for services is made to the
PROVIDER, to the subscriber, or allocated among both.
BCBSNC's decision to pay a PROVIDER directly in no way
reflects or creates any rights of the PROVIDER under
this health benefit plan, including but not limited to
benefits, payments or procedures.

(Sample Member Contract (Doc. 20-5) at 118.)

"[T]he threshold requirement for complete preemption is
that the plaintiff possess standing to assert its claim under
§ 502(a)[, . . . and] the only parties entitled to pursue an
ERISA claim under § 502(a)(3) are participants, beneficiaries,
and fiduciaries."[9] Sonoco Prods., 338 F.3d at 372; see also Aetna
Health Inc. v. Davila, 542 U.S. 200, 201 (2004) (stating that
the question is "[i]f an individual, at some point in time,
could have brought his claim under ERISA § 502(a)(1)(B)"). A

_____

[9] The relevant party who must have standing under § 502(a)
for complete preemption to apply is Plaintiff, LifeBrite
Hospital. Defendant acknowledges, as it must, that any
counterclaims "are irrelevant to whether this Court has subject
matter jurisdiction over LifeBrite's Complaint." (Def.'s Opp'n
Br. (Doc. 21) at 11.) Defendant nevertheless argues that it has
ERISA § 503(a)(3) standing "by virtue of its limited fiduciary
role in administering some ERISA plans at issue in this case."
(Def.'s First Suppl. Br. (Doc. 32) at 4.) The court addresses
this in Part III.B.1.b infra.

plaintiff provider may also have standing if it were assigned a right to payment. See, e.g., Conn. State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1351 (11th Cir. 2009) ("Rutt and Egan must have had standing to assert ERISA claims, and because they are providers, they could only have derivative standing through assignments."); Marin Gen. Hosp. v. Modesto & Empire Traction Co., 581 F.3d 941, 948 (9th Cir. 2009) ("[T]he Hospital is not suing defendants based on any assignment from the patient of his rights under his ERISA plan pursuant to § 502(a)(1)(B); rather, it is suing in its own right pursuant to an independent obligation."); Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 400-01 (3d Cir. 2004) (concluding that the plaintiff hospital lacked standing under § 502(a) "because there is nothing in the record indicating that Psaras and Rovetto did, in fact, assign any claims to the Hospital").

**B.** **Analysis**

Because the parties did not address standing in the original briefing, the court requested two rounds of supplemental briefing on the issue of ERISA standing. (Docs. 31, 38.)

BCBSNC puts forth two arguments for ERISA standing in its supplemental briefing: (1) Plaintiff has standing "because

LifeBrite sought payment from BCBSNC on certain claims at issue here pursuant to purported assignments of ERISA benefits;" and (2) "BCBSNC has standing under ERISA § 502(a)(3) because it is a 'fiduciary' of some ERISA plans at issue for purposes of its counterclaims." (BCBSNC First Suppl. Br. (Doc. 32) at 1–2.)

Plaintiff counters that "although BCBSNC has proffered the claim forms submitted by LifeBrite in response to the Court's order requiring that it address this deficiency, its Supplemental Brief makes clear that it intends to challenge the validity of these assignments at a later stage of this litigation." (Pl.'s First Suppl. Br. (Doc. 35) at 3–4.) Plaintiff also argues that BCBSNC "cannot serve as the basis for district court's "arising under" jurisdiction." (Id. at 6.)

The court will address each standing issue in turn.

### 1.   Assignment of Right to Payment

As part of its response to the court's order for supplemental briefing on the issue of § 502(a) standing, Defendant appended several examples of claims Plaintiff submitted which indicate Plaintiff certified that it was

submitting the claims pursuant to an assignment of benefits.[10]
(See Declaration of Roger Purnell, Ex. 2 (Doc. 33) at 10-50.) In
particular, Defendant asserts that "[o]n each of these UB04/CMS
1450 claim forms, LifeBrite represented on the forms it
submitted to Blue Cross NC that it had an assignment of benefits
for those members through its placement of a 'Y' in box 53."
(Id. at 3; see also id. at 10, 12, 14.)

In response, Plaintiff argues that Defendant is using these
"purported assignments" to stay in federal court but that "it
intends to challenge the validity of these assignments at a

---

[10] "When challenged in a motion to remand, the burden is on
the party asserting subject matter jurisdiction to prove by a
preponderance of evidence the facts necessary to establish the
court's jurisdiction." Byrd v. Deveaux, Civil Action No. DKC 17-
3251, 2018 WL 305838, at *2 (D. Md. Jan. 5, 2018) (citing Vest
v. RSC Lexington, LLC, C/A No. 3:16-cv-3018-CMC, 2016 WL
6646419, at *7 (D.S.C. Nov. 10, 2016)); see also Sonoco Prods.,
338 F.3d at 370.
     While generally removal on the basis of federal question
jurisdiction is appropriate only if the plaintiff's "well-
pleaded complaint" raises issues of federal law, Lontz v. Tharp,
413 F.3d 435, 439 (4th Cir. 2005), the complete preemption
doctrine is a "narrow exception" to this rule, see id. at 439-
40. Under this doctrine, "if the subject matter of a putative
state law claim has been totally subsumed by federal law . . .
then removal is appropriate." Id. Courts have considered
evidence outside the pleadings in determining whether there is
standing under ERISA in determining whether to remand. See,
e.g., Kearney v. Blue Cross & Blue Shield of N.C., 233 F. Supp.
3d 496, 504 (M.D.N.C. 2017). The court will therefore consider
Defendant's affidavits and documents concerning alleged
assignments.

later stage of this litigation." (Pl.'s First Suppl. Br. (Doc. 35) at 3–4 & n.1.)

A nearly identical issue arose in Watershed Treatment Programs, Inc. v. Blue Cross Blue Shield of Florida, Inc., Case No. 08-21713-CIV-SEITZ/O'SULLIVAN, 2009 WL 10701553 (S.D. Fla. Feb. 24, 2009). There, the plaintiff Watershed initially filed in state court for state law contract claims and Blue Cross Blue Shield of Florida ("BCBSF") removed the case to federal court, asserting that the plaintiff's claims were ERISA and FEHBA claims. Id. at *2. The plaintiff moved to remand. Id. BCBSF argued that the plaintiff had standing because a patient assigned its right to payment to the plaintiff "pursuant to a checked box numbered '53.'" Id. at *3. The health insurance plans there contained anti-assignment provisions; importantly, they contained the clause, "Any assignment, delegation, or transfer made in violation of this provision shall be void." Id. at *1. The plaintiff argued that these were not valid assignments "because the anti-assignment provision in BCBSF's plan forbid such assignments." Id. at *3.

BCBSF argued, among others things, that the anti-assignment provisions were waivable. Id. The court was unpersuaded and found that BCBSF could not show by a preponderance of the evidence that the plaintiff premised its suit on a valid

assignment and plaintiff thus lacked standing to sue under

ERISA. Id. The court found the waiver argument without merit,

reasoning that "any provision can generally be waived in any

particular contractual relationship," but that "plan providers

and administrators often marshal their non-assignment provisions

to dismiss health care providers' ERISA actions, and it would

prove arbitrary to allow plan administrators to use anti-

assignment provisions as both a shield against healthcare

providers' ERISA actions and a jurisdictional sword against

healthcare providers when they so choose." Id. at *4. The court

held that "[t]he anti-assignment provision in these plans

clearly and unambiguously bars the purported assignments BCBSF

offers as evidence of Watershed's standing," and granted the

plaintiff's motion to remand. Id. at *4–5.

Further, other circuit courts have held that "an

unambiguous anti-assignability provision in an ERISA-governed

welfare benefit plan voids any purposed assignment," thus

depriving the assignee of statutory standing to bring an ERISA

claim. Physicians Multispeciality Grp. v. Health Care Plan of

Horton Homes, Inc., 371 F.3d 1291 (11th Cir. 2004); see also

McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna, Inc., 857

F.3d 141, 146–48 (2d Cir. 2017); Griffin v. Coca-Cola Enters.,

Inc., 686 F. App'x 820, 821–22 (11th Cir. 2017).

BCBSNC, in its supplemental briefing, attempts to distinguish the present facts from those in McCulloch. BCBSNC points the following facts in McCulloch that distinguish this case from the facts at issue there: (1) the plaintiff was an out-of-network provider; (2) that the issue there involved only one contract; and (3) the Second Circuit assumed that the anti-assignment provision rendered the assignments "void." (Def.'s Second Suppl. Br. (Doc. 39) at 5-6.)

The court finds BCBSNC's first argument to be immaterial. While McCulloch involved an out-of-network provider and the case at bar involves an in-network provider, the anti-assignment provisions here and in McCulloch apply with the same force to the respective providers. There, the anti-assignment provision plainly prohibited assignments to out-of-network providers without Aetna's permission. McCulloch, 857 F.3d at 144. Here, the anti-assignment provision plainly prohibits assignments to "any other person or entity, including providers." (Sample Member Contract (Doc. 20-5) at 118.) The status of the provider is thus immaterial; the anti-assignment provisions prohibited assignments at issue.

Second, BCBSNC's argument that McCulloch only dealt with one health plan contract is not persuasive. BCBSNC argues the sample member contract here is "merely 'an example' that is

'representative' of [BCBSNC] member contracts. [BCBSNC] has not ascertained, and there is no evidence before this Court about, whether each benefit booklet associated with the 76 [BCBSNC] members of ERISA plans at issue in this case contain an anti-assignment clause." (Def.'s Second Supp. Br. (Doc. 39) at 4 (internal citations omitted).) The court finds, however, that there is still no evidence that Plaintiff <u>can</u> bring an ERISA claim. The only evidence of a contract the court has contains an anti-assignment provision. BCBSNC admits that it has not determined "which (if any)" of the health care plans at issue contain anti-assignment provisions. (<u>Id.</u>) BCBSNC's speculation will not suffice to carry its burden of demonstrating that Plaintiff has derivative standing under ERISA.

Finally, BCBSNC argues it is incorrect to find that the anti-assignment provision rendered the assignments void, as the Second Circuit did. While BCBSNC is technically correct that the assignments are not per se void under North Carolina law, the anti-assignment provision is valid: "contracts are freely assignable unless prohibited by statute, public policy, <u>or the terms of the contract</u>." <u>Parkersmith Props. v. Johnson</u>, 136 N.C. App. 626, 631, 525 S.E.2d 491, 494 (2000) (citing <u>Kraft Foodserv., Inc. v. Hardee</u>, 340 N.C. 344, 348, 457 S.E.2d 596, 598 (1995) (emphasis added). Further, BCBSNC has explicitly

admitted that the "[a]nti-assignment provisions in certain
benefit booklets for ERISA plans administered by Blue Cross NC
will ultimately render Plaintiff's purported assignments
invalid, depriving Plaintiff of standing under ERISA to seek
payment for services it allegedly provided to members of these
plans." (Def.'s Second Suppl. Br. (Doc. 39) at 1.) BCBSNC's
admission belies any possibility that it intends to treat the
assignments as anything but invalid. See McCulloch, 857 F.3d at
148 (noting that Aetna did not argue on appeal that the anti-
assignment provision did not apply and thus finding it failed to
establish the plaintiff could bring an ERISA claim).

The court finds McCulloch persuasive and will follow its
analysis. The court further finds that the Second Circuit's
words, in vacating and remanding the case with instruction to
remand McCulloch to New York state court, apply here:

> If we were to ignore that the health care plan
> prohibits an assignment to McCulloch in determining
> whether his claim is preempted, this would lead to a
> result that is both unjust and anomalous: McCulloch
> would be barred from pursuing state-law claims in
> state court on preemption grounds and from pursuing an
> ERISA claim in federal court for lack of standing.
> McCulloch — and other third-party providers in similar
> situations — would be left without a remedy to enforce
> promises of payment made by an insurer.

Id.

The court finds that the anti-assignment provision at issue
here is "unambiguous" and thus any alleged assignments to

Plaintiff are invalid. Accordingly, BCBSNC "has failed to establish that [Plaintiff] is the 'type of party' who may bring claims pursuant to § 502(a)(1)(B)." Id.

The court thus finds that BCBSNC has not proved by a preponderance of the evidence that Plaintiff has derivative standing under ERISA due to assignment of rights. Indeed, another court in this district concluded, considering a nearly identical anti-assignment provision in a BCBSNC insurance plan, "that the parties have specifically contracted against the assignment of benefits, and Plaintiff therefore lacks derivative standing to sue for recovery of benefits under ERISA." See Kearney v. Blue Cross & Blue Shield of N.C., 376 F. Supp. 3d 618, 627 (M.D.N.C. 2019). BCBSNC has therefore failed to satisfy its burden to show that Plaintiff has derivative standing under ERISA.

### 2. **BCBSNC's Status as a Fiduciary**

BCBSNC also argues that it is a "fiduciary" for the purposes of § 502(a)(3), which confers statutory standing on the "participant, beneficiary, or fiduciary" of an ERISA plan. 29 U.S.C. § 1132(a)(3). BCBSNC's counterclaims, however, may not serve as the basis for jurisdiction because "federal-question jurisdiction depends on the contents of a well-pleaded complaint, and may not be predicated on counterclaims." Vaden v.

Discover Bank, 556 U.S. 49, 56 (2009) (citing Holmes Grp., Inc.
v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 830
(2002)). This is true even when the counterclaim involves an
area subject to complete preemption: "Under the well-pleaded
complaint rule, a completely preempted counterclaim remains a
counterclaim, and thus does not provide a key capable of opening
a federal court's door." Id. at 66. BCBSNC's counterclaims
therefore do "not provide a key capable of opening a federal
court's door."

### 3. Standing Conclusion

This court finds that neither party has standing to bring a
civil enforcement claim under ERISA § 502(a) because the
assignments BCBSNC purports confer standing for LifeBrite are
invalid, and BCBSNC's counterclaims may not serve as the basis
for jurisdiction. The claims in this case are therefore not
completely preempted by ERISA and BCBSNC cannot remove the case
to federal court based on ERISA preemption. See, e.g., Borrero
v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1302 (11th
Cir. 2010) ("To sue derivatively, the provider must have
obtained a written assignment of claims from a patient with
standing to sue under ERISA.").

IV.  **FEDERAL OFFICER REMOVAL**

There is another legal mechanism on which BCBSNC argues removal. 28 U.S.C. § 1442(a)(1) permits removal of any case "against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." As with complete ERISA preemption, "[§ 1442(a)(1)] serves to overcome the well-pleaded complaint rule which would otherwise preclude removal even if a federal defense were alleged." Mesa, 489 U.S. at 136 (internal quotation marks omitted).

A.  **Legal Framework**

To remove a case under the federal officer statute, 28 U.S.C. § 1442(a)(1), the party seeking removal must show that: "(1) it is a federal officer or a person acting under that officer; (2) a colorable federal defense; and (3) the suit is for an act under color of office, which requires a causal nexus between the charged conduct and asserted official authority." Ripley, 841 F.3d at 209-10 (internal quotation marks, alterations, and citations omitted).

This court finds that the first two elements of the test are easily resolved here in favor of removal. First, Defendant

is a corporation and "[t]he courts of appeals have uniformly held that corporations are 'person[s]' under § 1442(a)(1)." Goncalves v. Rady Children's Hosp. San Diego, 865 F.3d 1237, 1244 (9th Cir. 2017); see also Watson v. Philip Morris Cos., 551 U.S. 142, 153 (2007) (referring to Philip Morris, a company, as a "person" within the meaning of § 1442(a)(1)); Jacks v. Meridian Res. Co., 701 F.3d 1224, 1230 n.3 (8th Cir. 2012). Defendant is therefore a "person" capable of acting under the color of a federal officer and potentially within the scope of the removal statute.

Second, Defendant has identified three potential federal defenses to the allegations in Plaintiff's complaint: express FEHBA preemption under 5 U.S.C. § 8902(m)(1); sovereign immunity, because some reimbursement funds would come (indirectly) from the federal treasury; and federal common law under Jacks. (Removal Notice (Doc. 1) ¶¶ 26–29.) To meet this second requirement, the federal defense need not be proven to a certainty; rather, it suffices that a federal defense is potentially available. See Jacks, 701 F.3d at 1235 ("We do not require that these defenses be clearly sustainable in order to support removal."); see also Watson, 551 U.S. at 142–43 (noting that one purpose of the federal officer removal statute is to avoid "depriv[ing] federal officials of a federal forum in which

to <u>assert</u> federal immunity defenses") (emphasis added); <u>Willingham v. Morgan</u>, 395 U.S. 402, 409 (1969) ("[T]he validity of their defenses should be determined in the federal courts."). In large part because Plaintiff does not contest whether the asserted defenses are in fact colorable, this court finds that Defendant has met the low threshold required.

The third element, the requirement that Defendant "acted under color of office", is a closer question and this court will focus its analysis here. This element contains two separate inquiries. First the defendant must demonstrate that it "acted under" a federal officer, which "involve[s] an effort to assist, or to help carry out, the duties or tasks of the federal superior." <u>Watson</u>, 551 U.S. at 152 (emphasis omitted). Second, the Defendant must show that "those actions are causally connected to the dispute." <u>Goncalves</u>, 865 F.3d at 1244. Because Defendant's act of denying reimbursement to Plaintiff for certain urinalysis tests is certainly causally connected to, and in fact the sole initial source of, this litigation, the court's analysis here is directed only to the "acting under" requirement: namely, whether Defendant acted under a federal officer in denying reimbursement payments.

**B.  Overview of Relevant Circuit Cases**

There are four main circuit cases dealing with the federal removal statute in the context of either federal employee health benefit plans or the Medicare program. In Peterson v. Blue Cross/Blue Shield of Texas, a doctor sued BCBS of Texas after BCBS withheld reimbursement payments and ultimately suspended him from participating in Medicare due to suspected billing fraud. Peterson (Peterson II), 508 F.2d 55, 56–57 (5th Cir. 1975). The Fifth Circuit concluded that the suit was removable under § 1442(a)(1) because the defendants (BCBS, its vice president, and various state officials) "were persons acting within the purview of 1442(a)(1)." Id. at 58. The court finds it worth noting that the Fifth Circuit in Peterson II relied extensively on Peterson v. Weinberger (Peterson I), 508 F.2d 45, 51 (5th Cir. 1975). In Peterson I, dealing with Dr. Peterson's suit against Blue Cross/Blue Shield of Texas, the federal government, and the secretary of Health, Education and Welfare, among others, the Fifth Circuit found that BCBS and the other corporate defendants were "Medicare fiscal intermediaries who act[ed] as agents at the sole direction of the Secretary of Health, Education and Welfare," and thus the "United States [was] the real party in interest." Peterson I, 508 F.2d at 51–52.

In Anesthesiology Associates of Tallahassee v. Blue Cross
Blue Shield of Florida, Inc., a private practice that was the
assignee of reimbursement payments to plan participants sued
Blue Cross/Blue Shield of Florida for breach of contract,
alleging that BCBS improperly failed to reimburse amounts due.
Anesthesiology Assocs., No. 03-15664, 2005 WL 6717869, at *1
(11th Cir. Mar. 18, 2005). A number of the plans were covered by
ERISA or by FEHBA. Id. Relying in part on Peterson II, the
Eleventh Circuit held that, because "[a]ny duty to pay for
health services arises from the terms of the plan itself," the
plaintiff provider "has essentially complained about actions
performed under the authority of a federal officer or agency,
here OPM." Id. at *2. Therefore, the case was removable under
§ 1442(a)(1).

The final two cases each fall in the subrogation category.
In Jacks v. Meridian Resource Co., a federal employee suffered
injuries in a car accident, received treatment that was covered
under her BCBS insurance plan, and then successfully sued the
tortfeasor responsible for the accident and recovered monetary
damages. 701 F.3d at 1228. BCBS asserted a lien on the tort
judgment and the individual subsequently sued BCBS under
Missouri's anti-subrogation laws. Id. The Eighth Circuit
reviewed Supreme Court jurisprudence regarding the federal

officer removal statute and noted that courts have reached disparate conclusions regarding disputes under a federal employee health benefit plan. See id. at 1232 (summarizing district court decisions denying removal). Ultimately, the court held that, although the FEHBA plan allowed the insurer discretion regarding whether to pursue subrogation of a tort judgment, "[a]t all times, the carrier is subject to OPM oversight, uniquely operates with the United States Treasury, submits to OPM's regulatory requirements, and ultimately answers to federal officers." Id. at 1234. For those reasons, the Eighth Circuit concluded "that FEHBA program carriers contracting with the federal government to provide health care insurance for federal employees are not unrelated and wholly separate business entities merely doing business in a highly regulated arena, but rather conduct business under the delegation of the federal government," and found that the case was removable. Id. at 1234–35.

In Goncalves v. Rady Children's Hospital San Diego, the Ninth Circuit confronted similar facts to the Jacks case. 865 F.3d at 1237. A minor covered by his father's federal employee health insurance plan was injured by medical negligence, sued the hospital, and recovered under a settlement agreement. Id. at 1242–43. BCBS, which had reimbursed the hospital for the

patient's treatment, then asserted a subrogation lien on the
tort damages and the patient sued. Id. Noting that the "causal
connection" requirement is low, the court focused on whether
BCBS "acted under" a federal officer when it sought subrogation;
the Ninth Circuit answered this question in the affirmative,
because of "the interconnectedness between OPM and the Blues,
the Blues' obligation to pursue subrogation claims, and the
vital federal interest in the pursuit of subrogation claims."
Id. at 1247. The court further rejected the argument that any
discretionary choice by a non-government actor is outside the
scope of federal officer removal, focusing instead on OPM's
"extensive oversight" of BCBS' federal employee benefit plans.
Id. at 1249.

In summary, the circuit court holdings summarized here
stand for the proposition that, absent an agency relationship
between an insurance company and a federal agency or office like
OPM, the OPM's oversight and management of federal employee
health plans, generally renders the insurance companies
subservient to the government such that any dispute arising
directly out of such a plan, or out of an attempt to pursue
subrogation under such a plan when the terms of the plan require
the insurer to seek subrogation, is removable under
§ 1442(a)(1). However, in both Jacks and Goncalves, the

plaintiff was an individual federal employee. Therefore, each of these claims indisputably arose _directly_ under the plaintiff's FEHBA benefit plan rather than under any ancillary contract between the insurer and a medical provider.

Plaintiff's claim here, however, arises under the Provider Agreements between Plaintiff and Defendant. When Defendant acts under the Provider Agreements, it is not directly subject to oversight, regulation, or management by OPM or any other federal agency. Rather, the Provider Agreements are private contracts between two corporate entities that are only tangentially related to any federal health plan. The Eleventh Circuit holding in Anesthesiology Associates, while superficially different because it involved a plaintiff provider, is in fact analogous to Jacks and Goncalves because the provider had received an assignment from the participants and was thus standing in the shoes of covered individuals. See Anesthesiology Assocs., 2005 WL 6717869, at *1. Here, while Defendant alleges that Plaintiff entered into an assignment, the court has already found those assignments invalid. Anesthesiology Associates is therefore inapplicable as well.

Peterson II is more directly comparable to the facts here. However, to bring this case within the scope of § 1442(a)(1), there must be close federal control and oversight over the

specific decision to cease making reimbursement payments to
Plaintiff under the Provider Agreements. There is no indication
here, however, that OPM even knew about the Provider Agreements,
knew that Defendant had stopped making payments, or directed
Defendant to do so. See Orthopedic Specialists of N.J. PA v.
Horizon Blue Cross/Blue Shield of N.J., 518 F. Supp. 2d 128, 137
(D.N.J. 2007) ("Defendant does not allege that OPM directed them
to erroneously promise to reimburse Plaintiff for Ms.
Diguglielmo's procedure. This act was taken by Defendant and
Defendant alone."). Further, the Fifth Circuit's finding that
Blue Cross/Blue Shield of Texas was a "Medicare fiscal
intermediar[y] who act[ed] as [an] agent at the sole direction
of the Secretary of Health, Education and Welfare," Peterson I,
508 F.2d at 51–52, further distinguishes the facts in Peterson
from those here. There is no evidence here that BCBSNC is acting
as an agent at the sole discretion of a government agency.
Peterson is thus inapplicable to the present situation.

### C. District Court Cases Finding Removal Improper

On the other hand, a line of related but distinguishable
district court decisions are more persuasive as to the outcome
here. First, in Orthopedic Specialists, a district judge in New
Jersey found that claims were not removable under § 1442(a)(1).
518 F. Supp. 2d at 128. The plaintiff provider had performed

surgery on an individual covered by an FEHBA plan, but BCBS
later determined that reimbursement for the surgery was
erroneously authorized and deducted the reimbursement amount
from other reimbursements to the same provider. Id. at 131. The
provider then sued to recover the cost of the surgery. Id. BCBS
argued that, because the contested surgery was conducted under
an OPM-managed plan, "its actions were taken under the direct
and detailed control of a federal agency or officer." Id. at 135
(internal citations omitted). The district court rejected that
argument, finding instead that "Plaintiff's promissory estoppel
claim in the instant case is unrelated to the provision of
benefits under the terms of the plan" and distinguishing
Peterson and Anesthesiology Associates because there was no
federal oversight of the decision "to erroneously promise to
reimburse Plaintiff for Ms. Diguglielmo's procedure." Id. at
136-37.

Second, in Dunn v. Blue Cross Blue Shield of Alabama, a
district judge in Alabama confronted a claim by a licensed
social worker who sued BCBS for failure to reimburse treatment
fees after BCBS suspended payments because of billing practice
concerns. Civil Action No. 2:10-cv-02220-AKK, 2011 WL 13285142,
at *1-2 (N.D. Ala. Mar. 17, 2011). The court examined in detail
the case law regarding federal officer removal of disputes

relating to FEHBA insurance plans, and drew the following distinction:

> Thus, a provider who is an assignee of reimbursement payments and who challenges the payment of FEHBA benefits cannot prevent a carrier, such as Blue Cross, from removing the case in light of FEHBA's exclusive remedy for FEHBA benefit challenges and the mandate that only OPM may be sued for such a determination. However, the Eleventh Circuit's unpublished opinion [in Anesthesiology Associates] does not stand for the proposition that a FEHBA carrier may remove any action in which it is sued by a provider who treats patients who happen to be federally insured.

Id. at *12 (internal quotation marks omitted). Further, the court noted that a causal "nexus ordinarily requires that the federal officer had some degree of control over the action in question." Id. at * 14. The court held that removal was improper because it could not "find a sufficient nexus between BCBSA's alleged tortious interference by informing ABBM of potential fraud, and the broad mandate by OPM under FEHBA to create a system that helps detect and prevent fraud and report on its success."[11] Id.; see also Mitchell v. Blue Cross & Blue Shield of Ala., Inc., Case No. 2:07-CV-134-RDP, 2008 WL 11374389, at *3

_____

[11] This court agrees with the Dunn court's requirement that the party seeking removal provide something more than a "broad anti-fraud mandate" from a government agency that allegedly authorized or directed the challenged actions. Dunn, 2011 WL 13285142, at *14. However, this court does not necessarily agree that such analysis properly falls under the "causal nexus" prong, as opposed to the "acting under" prong, of the federal officer removal test.

(N.D. Ala. Oct. 24, 2008) ("The contract terms on which
Defendant relies are not highly detailed, and there is no
evidence that Defendant's activities under it were highly
supervised or monitored.").

Third, in Transitional Hospitals Corp. of Louisiana, Inc. v
Louisiana Health Service, the plaintiff alleged that the
defendant, an affiliate of Blue Cross Blue Shield of Louisiana,
improperly withheld reimbursement payments that it was obligated
to make for care provided to a federal employee. No. Civ.A.02-
354, 2002 WL 1303121, at *1 (E.D. La. June 12, 2002). "All of
Transitional's claims were brought in its capacity as an
independent third-party medical provider rather than as an
assignee of Mr. Mitchell's rights against his plan," pursuant to
an oral contract that allegedly arose from representations made
by BCBS representatives. Id. at *1-3. The district judge held
that removal was improper because plaintiffs gave the court
"nothing upon which to conclude that its employees were acting
pursuant to any federal direction when they allegedly
misrepresented coverage to Transitional." Id. at *3. Similarly,
in Baptist Hospital of Miami, Inc. v. Humana Health Insurance
Co. of Florida, Inc., a provider sued Humana, alleging that the
insurer breached the terms of a participation agreement by
failing to make certain payments and reimbursing at a lower-

-37-

than-agreed rate. Case No. 1:15-cv-22009, 2015 WL 11237013, at

*1 (S.D. Fla. Aug. 18, 2015). The court held as follows:

> Here, Plaintiffs' claims arise out of individual
> contracts, the Letter Agreements, wherein Defendants
> promised to reimburse Plaintiffs at a set rate for
> specific medical services that they provided.
> Consequently, the duty to pay Plaintiffs arises out of
> those Letters of Agreement and the representations
> Defendants made in the Letters, not out of Defendants'
> administration of a FEHBA plan or the benefits owed to
> patients under the FEHBA plan.

Id. at *4. Therefore, the claims were not removable pursuant to

§ 1442(a)(1).

The court finds that these cases stand for the following

proposition: Where there is an independent contractual agreement

between a medical provider and an insurance company, an alleged

breach of that agreement alone does not come within the scope of

§ 1442(a)(1) despite the fact that the agreement will

necessarily reference the terms of the underlying benefit plans

and the fact that the government will always be intimately

involved in creating and managing the federal employee or

Medicare benefit plan at issue. Specifically, when an insurer

represents that a certain procedure is covered or that it will

reimburse a provider, and then fails to do so as promised, this

decision is generally independent and not traceable to the

federal government's general oversight of the underlying benefit

plan.

D.  **Analysis**

Here, the challenged action is Defendant's decision to withhold reimbursement payments under the Provider Agreements due to suspicion regarding anomalous billing and billing rates. Defendant, of course, cannot assert that OPM or any other government actor explicitly instructed Defendant to withhold these payments. Rather, as Defendant concedes, Defendant apparently independently chose to do so after investigating sudden changes in Plaintiff's billing practices. (See Doc. 27 at 2 ("After the scheme was exposed and Blue Cross NC stopped paying . . . .").) In fact, while OPM certainly must have known that Defendant had agreements with medical providers, there is nothing to suggest that OPM required Defendant to enter into the Provider Agreements or instructed Defendant to withhold payments under these contracts. See Watson, 551 U.S. at 156 ("Nor is there evidence of any contract, any payment, any employer/ employee relationship, or any principal/agent arrangement."). It is true, of course, that Defendant's decision may have been motivated by concerns about whether lab tests were "medically necessary" under the terms of the benefit plans; but OPM did not issue any specific instruction to investigate Plaintiff's practices or withhold payments.

Rather, Defendant can point only to OPM's general oversight and some implicit delegation of authority to maintain billing integrity and investigate suspicious practices by healthcare providers who provide medical services to federal employees as the source of any link to the "color" of federal authority. This court agrees that such a generalized mandate is insufficient to bring the claims within the umbrella of § 1442(a)(1). See Dunn, 2011 WL 13285142, at *14 ("Such removal based on broad language with little causal connection betrays the rationale for federal officer removal outlined above."). Although OPM may indeed rely upon private insurance companies to monitor provider billing practices and investigate suspected fraud, this does not constitute the "subjection, guidance, or control" required under § 1442(a)(1). See Watson, 551 U.S. at 152 ("[P]recedent and statutory purpose make clear that the private person's "acting under" must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior."); Kennedy v. Health Options, Inc., 329 F. Supp. 2d 1314, 1318 (S.D. Fla. 2004) ("Defendant has not demonstrated that its decision[] to discharge Plaintiff prematurely was performed pursuant to the direct and detailed control of an officer of the United States" and therefore "does not rise to the level of removal based on 28 U.S.C. § 1442(a)(1)").

This court sees no reason why the result here might be different in the Medicare, rather than the FEHBA, context. In both cases, the claim itself arises under the relevant Provider Agreement and not under the benefit plan itself, despite the fact that certain terms are determined only by reference to the underlying plan. A private insurance company may have a closer relationship with CMS in administering Medicare benefit plans than it does with OPM in administering FEHBA plans. See, e.g., Houston Cmty. Hosp. v. Blue Cross and Blue Shield of Tex., Inc., 481 F.3d 265, 272–73 (5th Cir. 2007) (noting that Medicare regulations suggest a greater delegation of control to private insurance companies, citing 42 C.F.R. § 421.5(b)). This court, however, finds no legally relevant distinction between Defendant's argument regarding removal under FEHBA and its argument regarding removal under Medicare. Defendant states that "Blue Cross NC is specifically authorized by its contracts to assist CMS in carrying out the government's obligation to provide Medicare benefits to beneficiaries" and therefore acts under the color of a federal officer in administering the plan. (Removal Notice (Doc. 1) ¶ 32.) As described herein, however, Plaintiff challenges Defendant's decision to withhold reimbursement payments under the MPA (an independent agreement)

and not any decision to deny Medicare benefits to actual participants or beneficiaries.

The court thus finds that the federal officer removal statute does not apply in this situation.

## V.   CONCLUSION

This court finds that Defendant has not satisfied its burden of demonstrating that federal jurisdiction is proper in the case, either under an ERISA complete preemption analysis or under the federal officer removal statute. This court will therefore grant Plaintiff's motion to remand and remand this case to the Stokes County Superior Court for further proceedings. Because this court lacks jurisdiction, the merits of both Plaintiff's claims and Defendant's counterclaims must be determined by the state court. Plaintiff's motion to dismiss Defendant's first amended counterclaims will therefore be denied as moot. See, e.g., Chandler v. Cheesecake Factory Rests., Inc., 239 F.R.D. 432, 440 (M.D.N.C. 2006); Burdick v. Teal, No. 1:02CV727, 2003 WL 1937118, at *3 (M.D.N.C. Apr. 22, 2003).

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Remand, (Doc. 16), is **GRANTED** and that this case is hereby **REMANDED** for further proceedings in the Superior Court of Stokes County, North Carolina.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to send a certified copy of this Memorandum Opinion and Order to the Clerk of Superior Court in Stokes County.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Dismiss First Amended Counterclaims, (Doc. 24), is **DENIED AS MOOT.**

This the 30th day of March, 2020.

_____
United States District Judge