IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LIFEBRITE HOSPITAL GROUP OF
STOKES, LLC,                        )
                                    )
          Plaintiff,                )
                                    )
     v.                             )        1:18CV293
                                    )
BLUE CROSS AND BLUE SHIELD OF       )
NORTH CAROLINA,                     )
                                    )
          Defendant.                )

### MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is a Motion to Dismiss First Amended
Counterclaims pursuant to Rule 12(b)(6) filed by Plaintiff
LifeBrite Hospital Group of Stokes, LLC ("LifeBrite").
(Doc. 50.) For the reasons stated herein, this court finds that
the motion should be granted in part and denied in part.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

     A.   **Factual Background**

On a motion to dismiss, a court must "accept as true all of
the factual allegations contained in the complaint." Ray v.
Roane, 948 F.3d 222, 226 (4th Cir. 2020) (internal quotation
marks omitted) (quoting King v. Rubenstein, 825 F.3d 206, 212
(4th Cir. 2016)). The court may also consider documents

"attached to the complaint as exhibits." <u>Goines v. Valley Cmty.</u>
<u>Servs. Bd.</u>, 822 F.3d 159, 166 (4th Cir. 2016); <u>see also</u> Fed. R.
Civ. P. 10(c) ("A copy of a written instrument that is an
exhibit to a pleading is a part of the pleading for all
purposes."). The following facts are taken from the First
Amended Counterclaim and its attachments as true.

      1.   **<u>The Parties</u>**

    LifeBrite operates a critical access hospital in Danbury,
North Carolina, a town of 189 residents. (First Am. Countercls.
(Doc. 20) ¶ 12.)[1] Prior to January 31, 2017, Pioneer Health
Services of Stokes County, Inc. ("Pioneer") operated the
hospital. (<u>Id.</u> ¶ 13.) In December 2016, Pioneer went bankrupt,
and LifeBrite's parent company purchased Pioneer. (<u>Id.</u>)
LifeBrite assumed all rights and obligations relating to the
operation of the hospital beginning on January 31, 2017. (<u>Id.</u>)
LifeBrite Laboratories, LLC ("LifeBrite Labs") is in Atlanta,
Georgia and is an affiliated company of LifeBrite. (<u>Id.</u> ¶¶ 2,
4.)

    Defendant Blue Cross and Blue Shield of North Carolina
("BCBSNC") is a hospital and medical services corporation. (<u>Id.</u>

---

     [1] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

-2-

¶ 32.) BCBSNC is an independent licensee of the Blue Cross and Blue Shield Association ("BCBS Association"). (Id. ¶ 34.) BCBS Association has a "BlueCard program, which allows members of one BCBS Association licensee's health plans to obtain healthcare services in another BCBS Association licensee's service area . . . . (Id. ¶ 35.) Under the BlueCard program, if a BCBS member from another BCBS Association licensee receives care from a participating provider in North Carolina, "services performed and billed by that provider . . . are billed to [BCBSNC]." (Id. ¶ 36.) BCBSNC pays the claim and then reconciles with the other Association licensee. (Id. ¶ 37.)

## 2. **Managed Care and BCBSNC**

BCBSNC insures group health plans directly and also provides administrative services to self-funded group plans pursuant to an administrative services agreement between BCBSNC and the health plan's sponsor, typically an employer. (Id. ¶¶ 40-41.) "Many of the health plans sponsored by private employers are governed by ERISA, 29 U.S.C. § 100 et seq." (Id. ¶ 41.)

BCBSNC also "administers the Service Benefit Plan, an insurance plan for federal employees . . . sometimes known as the 'Federal Employee Program.' Similarly, [BCBSNC] is

-3-

authorized to administer Medicare Advantage plans by the Centers for Medicare and Medicaid Services." (<u>Id.</u> ¶ 48.)

### 3. <u>BCBSNC's Network of Participating Providers</u>

BCBSNC has a network of participating (or "in-network") healthcare providers who contract with BCBSNC to accept a negotiated rate for their services in exchange for increased access to BCBSNC members and increased certainty in payment from BCBSNC. (<u>Id.</u> ¶ 51.) Non-participating (or "out-of-network") providers may receive less money from BCBSNC than participating providers, and BCBSNC members usually must pay a larger share of the cost of services from non-participating providers. (<u>Id.</u> ¶ 52.) LifeBrite is a participating provider. (<u>Id.</u> ¶ 53.) LifeBrite Labs is a non-participating provider. (<u>Id.</u> ¶ 54.)

### 4. <u>The Contracts</u>

As an in-network provider of BCBSNC, LifeBrite was bound by several contracts with BCBSNC, including a Network Participation Agreement ("NPA") and a Medicare Provider Agreement ("MPA") (together, "the Contracts"). (Ex. A, Network Participation Agreement ("NPA") (Doc. 20-1); Ex. B, Medicare Provider Agreement ("MPA") (Doc. 20-2).) The Contracts governed reimbursement BCBSNC would pay to LifeBrite for services LifeBrite provided to its patients who were members of BCBSNC or

-4-

another BCBS Association plan. (First Am. Countercls. (Doc. 20) ¶ 15.)

Under the terms of the Contracts, LifeBrite agreed to "render Medically Necessary Covered Services to Members . . . according to the terms of this Agreement." (NPA (Doc. 20-1) § 2.1.1.) LifeBrite also agreed to "provide Covered Services to Members so as to provide health or medical care in conformity with accepted and prevailing practices applicable to acute care hospitals." (Id. § 2.1.2.1.) LifeBrite further agreed "to accept and treat BCBSNC Members and to provide Medically Necessary Covered Services . . . in accordance with the terms of this Agreement." (MPA (Doc. 20-2) § 2.1.) LifeBrite was guaranteed payment under the Contracts "[f]or Covered Services provided to Members at the sites listed in the Site of Service Exhibit." (NPA (Doc. 20-1) § 4.1.) The NPA Site of Service Exhibit included one facility: Pioneer Community Hospital of Stokes. (Id. at 17.) The MPA listed several facility providers, including Pioneer Community Hospital of Stokes. (MPA (Doc. 20-2) at 21.)[2]

---

[2] Pioneer Community Hospital of Stokes is marked through in the chart of group and/or facility providers on the MPA, (MPA (Doc. 20-2) at 21), but it is then written in pen below the chart of providers.

-5-

Additionally, LifeBrite agreed not to bill or seek reimbursement from any BCBSNC member for services BCBSNC determined were not "Medically Necessary." (NPA (Doc. 20-1) § 4.5.5.) Section 1.12 of the NPA defines "Medically Necessary" as services that are:

- Provided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease; and, except as allowed under NCGS 58-3-255, not for experimental, investigational, or cosmetic purposes;
- Necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms;
- Within generally accepted standards of medical care in the community;
- Not solely for the convenience of the insured, the insured's family, or the provider.

(Id. § 1.12.) Furthermore, LifeBrite agreed to comply will all applicable laws, regulations, and industry standards, (id. § 2.3.2.), as well as comply with BCBSNC's programs, policies, and procedures, (id. § 2.3.1; MPA (Doc. 20-2) § 2.1). LifeBrite further agreed not to assign, delegate, or transfer any part of its obligations under the Contracts without BCBSNC's consent. (NPA (Doc. 20-1) § 6.4.1; MPA (Doc. 20-2) § 6.4.)

### 5.  Overview of Laboratory Testing

One of the services for which LifeBrite sought reimbursement from BCBSNC was laboratory drug testing. (First Am. Countercls. (Doc. 20) ¶ 81.) "Drug tests are laboratory

analyses used to aid in the detection of prescription, recreational, or illicit substances . . . ." (Id. ¶ 64.) The most common method of drug testing is a urine test. (Id. ¶ 65.) There are two categories of urine testing: presumptive testing and definitive testing. (Id. ¶ 66.) "Presumptive testing is used . . . to determine the presence or absence of one or more drugs or drug classes. . . . Presumptive testing is also referred to as 'screening' or 'qualitative' testing." (Id. ¶ 67.) On the other hand, "[d]efinitive testing is a follow-up test performed . . . to validate the identity and quantity of a specific drug . . . . Definitive testing is also referred to as 'confirmation' or 'quantitative' testing." (Id. ¶ 68.) Definitive testing is necessary only in limited circumstances. (Id. ¶ 69.) BCBSNC covers drug testing "when it meets (1) all the terms and conditions of the member's benefit plan; (2) when it meets all the requirements of [BCBSNC's] Corporate Medical and other applicable policies; and (3) when it meets all the terms and conditions of the rendering provider's contract." (Id. ¶ 70.)

### 6.  The Alleged Fraudulent Scheme

BCBSNC alleges that after LifeBrite assumed Pioneer's duties under the Contracts, it "repeatedly made material misrepresentations to [BCBSNC] in order to get paid for services it did not provide, on specimens it knew had been illegally

-7-

procured, and that it knew did not meet the applicable medical necessity requirements." (Id. ¶ 81.) BCBSNC relied on LifeBrite's misrepresentations and paid $11 million to LifeBrite based on those misrepresentations. (Id.)

The scheme is alleged to have occurred as follows. LifeBrite sales representatives approached providers to use LifeBrite for their laboratory testing, representing that LifeBrite Labs was in-network with BCBSNC when it in fact was not. (Id. ¶ 82.) LifeBrite sales representatives further "represented that the providers' patients would not be required to pay their cost-sharing obligations." (Id.) LifeBrite sales representatives did not tell the providers that LifeBrite Labs would be performing the services, but the services would be billed through LifeBrite. (Id.) LifeBrite sales representatives also persuaded providers to request a standard definitive testing panel, rather than first requesting a presumptive test, which was in violation of BCBSNC's policies. (Id. ¶¶ 83–85.) BCBSNC alleges that LifeBrite "paid kickbacks to some of these providers" to persuade the providers to use LifeBrite. (Id. ¶ 87.)

The laboratory tests were not performed by LifeBrite; rather, LifeBrite Labs, a non-participating provider located in Atlanta, Georgia, performed the tests. (Id. ¶¶ 88, 100.) In

-8-

fact, "LifeBrite Hospital did not have the capability to perform definitive testing at the facility in Stokes County." (Id. ¶ 90.) But when LifeBrite submitted claim forms to BCBSNC, the claim forms indicated LifeBrite was the entity rendering services. (Id. ¶ 99.)[3] LifeBrite Labs was not mentioned on the claim forms. (Id.)

Additionally, LifeBrite represented on the claim forms that the services were performed on patients of the Stokes County hospital rather than non-patients, (id. ¶¶ 91, 102–03), failed to refer in-network for laboratory testing services, (id. ¶ 92), and represented that the tests were medically necessary, (id. ¶¶ 104–05).

"To conceal its scheme, LifeBrite Hospital consciously ignored its obligation to collect member payment obligations." (Id. ¶ 94.) Had LifeBrite collected such payment, this would likely have alerted BCBSNC members that they were being charged for services at a hospital they had never visited. (Id.) BCBSNC lost approximately $1.7 million in unpaid member obligations due to LifeBrite's failure to collect member payment. (Id. ¶ 95.)

---

[3] BCBSNC included two sample claims in its counterclaims as further evidence of LifeBrite's misrepresentations. (First Am. Countercls. (Doc. 20) ¶¶ 109–17; Ex. C ("Sample Claim 1") (Doc. 20-3); Ex. D ("Sample Claim 2") (Doc. 20-4).)

In November 2017, BCBSNC placed LifeBrite on prepayment review because of the noticeable increase in claims. (Id. ¶ 119.) Prepayment review required LifeBrite to submit medical record documentation sufficient to establish the medical necessity of the services before BCBSNC would pay. (Id.) Even while on prepayment review, LifeBrite submitted claims for laboratory testing done at LifeBrite Labs but omitted LifeBrite Labs from the claim forms. (See Sample Claim 1 (Doc. 20-3); Sample Claim 2 (Doc. 20-4).)[4] Only LifeBrite was listed as the provider. (See Sample Claim 1 (Doc. 20-3); Sample Claim 2 (Doc. 20-4).)

BCBSNC paid $11 million of LifeBrite's claims before it realized LifeBrite had engaged in fraud. (Id. ¶¶ 5, 81.) On November 14, 2017, BCBSNC began to deny LifeBrite's claims. (Compl. (Doc. 5) ¶ 11.)

B. **Procedural Background**

LifeBrite sued BCBSNC for breach of contract and unjust enrichment. (Id. ¶¶ 13-18.) BCBSNC answered and responded with ten counterclaims for fraudulent and negligent misrepresentation (Counts I-II), breach of contract (Count III), breach of

---

[4] Sample Claim 1 has a date of "11/15/2017" as the "Date of Service Start" and "Date of Service End," but the "Received Date," is "12/26/2017," (Sample Claim 1 (Doc. 20-3) at 4), which indicates LifeBrite was on prepayment review when it submitted the claim to BCBSNC.

-10-

contract accompanied by fraudulent act (Count IV), tortious interference with contract (Count V), unfair or deceptive trade practices (Count VI), restitution under ERISA § 502(a)(3) (Count VII), declaratory and injunctive relief under ERISA § 502(a)(3) and 28 U.S.C. §§ 2201 and 2202 (Count VIII), constructive trust and equitable liens (Count IX), and unjust enrichment (Count X). (First Am. Countercls. (Doc. 20) ¶¶ 121–221.) LifeBrite moved to dismiss BCBSNC's First Amended Counterclaims, (Pl.'s Mot. to Dismiss First Am. Countercls. ("Pl.'s Mot.") (Doc. 50)), and filed a brief in support, (Mem. of Law in Supp. of Pl.'s Mot. to Dismiss First Am. Countercls. ("Pl.'s Br.") (Doc. 51)). BCBSNC responded, (Def.'s Br. in Opp'n to Pl.'s Mot. to Dismiss First Am. Countercls. ("Def.'s Resp.") (Doc. 55)), and LifeBrite replied, (Reply Mem. of Law in Supp. of Pl.'s Mot. to Dismiss First Am. Countercls. ("Pl.'s Reply") (Doc. 57)). This matter is ripe for adjudication.

## II. <u>**STANDARD OF REVIEW**</u>

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the

-11-

court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556–57). When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. Id. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom, . . . in the plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004). This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

## III. **ANALYSIS**

### A. **Fraudulent and Negligent Misrepresentation (Counts I-II)**

LifeBrite moves to dismiss BCBSNC's claims for fraudulent and negligent misrepresentation. (Pl.'s Mot. (Doc. 50).) This court will first address LifeBrite's argument that North Carolina's economic loss rule bars BCBSNC's claims for fraudulent and negligent misrepresentation. (Id. at 26–28.)

Ordinarily, under North Carolina's economic loss rule, a contractual breach does not give rise to a tort action. Kelly v. Ga.-Pac. LLC, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009) (citing

-12-

N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N.C. 230, 328 S.E.2d 274 (1985)). However, the economic loss doctrine does not apply "to claims for fraud brought contemporaneously with claims for breach of contract." Bradley Woodcraft, Inc. v. Bodden, 251 N.C. App. 27, 34, 795 S.E.2d 253, 259 (2016) ("[W]hile claims for negligence are barred by the economic loss rule where a valid contract exists between the litigants, claims for fraud are not so barred . . . ."). Because a fraud claim may be brought in addition to a breach of contract claim, the question becomes whether BCBSNC sufficiently alleged fraud.

To state a claim for fraudulent misrepresentation under North Carolina law, a party must show that the other party made "(1) a false representation or concealment of a material fact which is (2) reasonably calculated to deceived, (3) made with intent to deceive, (4) which does in fact deceive, and (5) results in damage to the injured party." Jones v. Marsh, CIVIL ACTION NO. 3:20-CV-00614-GCM, 2021 WL 3130876, at *4 (W.D.N.C. July 23, 2021) (internal quotation marks omitted) (quoting Showell v. U.S. Airways, Inc., No. 3:06cv384, 2007 WL 3275131,

-13-

at *5 (W.D.N.C. Nov. 2, 2007)).[5] LifeBrite does not argue that BCBSNC failed to sufficiently plead any specific element of fraudulent or negligent misrepresentation. Instead, LifeBrite makes several general arguments in support of dismissing the misrepresentation claims. This court will address each argument in turn.

### 1. The Sample Claims

First, LifeBrite argues that because the sample claims show that LifeBrite Labs performed the laboratory testing services, the sample claims refute BCBSNC's allegation that LifeBrite concealed the involvement of LifeBrite Labs. (Pl.'s Br. (Doc. 51) at 18-19.) In general, BCBSNC alleges that LifeBrite fraudulently misrepresented its laboratory testing services to BCBSNC because LifeBrite represented it was performing the

---

[5] Similarly, "negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." Brinkman v. Barrett Kays & Assocs., 155 N.C. App. 738, 742, 575 S.E.2d 40, 43-44 (2003) (internal quotation marks omitted) (quoting Simms v. Prudential Life Ins. Co. of. Am., 140 N.C. App. 529, 532, 537 S.E.2d 237, 240 (2000)). "[T]he elements of fraud and negligent misrepresentation are similar under North Carolina law. A principal difference is that a claim for negligent misrepresentation does not require the intent to deceive, but may rest on the failure to use reasonable care in making representations or omissions." Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 1134453, at *13 (E.D.N.C. Jan. 25, 2011), mem. and recommendation adopted, 2011 WL 1134447 (E.D.N.C. Mar. 24, 2011).

testing services when, in fact, LifeBrite Labs—a non-participating provider—was performing the testing. (First Am. Countercls. (Doc. 20) ¶¶ 2, 54.)

Taking the allegations in the First Amended Counterclaims in the light most favorable to BCBSNC, the non-moving party, this court finds that the sample claims do not mean that all claims LifeBrite submitted included documentation of LifeBrite Labs' involvement and therefore put BCBSNC on notice that a non-participating provider was involved in the laboratory testing services. This court, after careful review of the sample claims in the First Amended Counterclaims, notes that it is far from clear that the sample claims show that LifeBrite Labs performed the testing.[6] More importantly, as of the date of both sample claims, BCBSNC had placed LifeBrite on prepayment review. (Id. ¶ 119.) Prior to being placed on prepayment review, LifeBrite did not have to provide supporting documentation, (see id.), and in accordance with the Contracts, BCBSNC could rely on

---

[6] After review of the sample claims, this court has found no mention of LifeBrite Labs in the sample claims. There is an Atlanta, Georgia address listed in the top left-hand corner of documentation LifeBrite submitted to BCBSNC, (see Sample Claim 1 (Doc. 20-3) at 5; Sample Claim 2 (Doc. 20-4) at 4), and LifeBrite Labs is based in Atlanta, (First Am. Countercls. (Doc. 20) ¶ 4). This court declines to find at this stage in the proceedings that is sufficient to have put BCBSNC on notice that LifeBrite Labs, not LifeBrite, was performing the laboratory testing.

LifeBrite's representations on the claim forms, including that the services were rendered by LifeBrite and that the billing information was "true, accurate, and complete," (id. ¶ 99 (internal quotation marks omitted)). Thus, prior to November 2017, BCBSNC could rely on the claim forms without further documentation, and after November 2017 LifeBrite was subject to stricter conditions for claim reimbursement. Because the sample claims were subject to different, stricter conditions, this court does not find that these sample claims make BCBSNC's claims implausible. The alleged scheme began on January 31, 2017 when the Contracts were assigned to LifeBrite. (Id. ¶¶ 1, 55.) BCBSNC's allegations indicate that LifeBrite intentionally omitted LifeBrite Labs from the claim forms and instead listed only LifeBrite as the entity rendering the testing services. (Id. ¶¶ 99–100.) Moreover, this court notes that even when LifeBrite was placed on prepayment review, it continued to omit LifeBrite Labs from the claim form. The sample claim forms indicate the claim is "FROM" LifeBrite. (See, e.g., Sample Claim 1 (Doc. 20-3) at 2–5.) As alleged by BCBSNC, "after [BCBSNC] caught on to LifeBrite Hospital's scheme, LifeBrite Hospital continued to misrepresent who performed the testing. After [BCBSNC] flagged LifeBrite Hospital for prepayment review, LifeBrite Hospital began re-submitting claims for reimbursement.

-16-

Those resubmissions were submitted with LifeBrite Hospital's address even though LifeBrite Hospital did not perform the testing." (First Am. Countercls. (Doc. 20) ¶ 101 (emphasis added).) And tellingly, both sample claims were denied. (Sample Claim 1 (Doc. 20-3) at 3; Sample Claim 2 (Doc. 20-4) at 3.) If anything, BCBSNC's denial of the sample claims indicates that with the supporting documentation, BCBSNC realized the testing occurred at LifeBrite Labs and not LifeBrite. In short, even on the sample claims for which LifeBrite relies in support of dismissing the misrepresentation claims, LifeBrite omitted LifeBrite Labs as a provider. Accordingly, this court will decline to dismiss BCBSNC's misrepresentation claims because the sample claims included supporting documentation from LifeBrite Labs.

Second, LifeBrite argues that because the sample claims indicate the tests were done for non-patients of LifeBrite, "the sample claims belie the [First Amended Counterclaims'] conclusory assertions of fraud." (Pl.'s Br. (Doc. 51) at 19.)

This court disagrees with LifeBrite. Although the supporting documentation attached to the sample claims shows the tests were performed for non-LifeBrite patients and ordered by non-LifeBrite providers, (Sample Claim 1 (Doc. 20-3) at 5–7; Sample Claim 2 (Doc. 20-4) at 4–7), the actual claim forms do

-17-

not provide that information to BCBSNC. On the contrary, the claim forms list the claims as "FROM" LifeBrite and list the provider as "LifeBrite Community Hospital of Stokes." (Sample Claim 1 (Doc. 20-3) at 2-3; Sample Claim 2 (Doc. 20-4) at 2-3.) As discussed already, these sample claims were filed after LifeBrite was placed on prepayment review, which required it to submit supporting documentation, and these claims were denied. This court cannot glean from denied sample claims that BCBSNC's allegations should be disregarded. BCBSNC alleges that "each claim submitted by LifeBrite Hospital misrepresented that the tests were for patients of LifeBrite Hospital, ordered by LifeBrite Hospital providers, and were ordered to be performed by LifeBrite Hospital." (First Am. Countercls. (Doc. 20) ¶ 102.) The sample claims do not "belie" these assertions, (Pl.'s Br. (Doc. 51) at 19); rather, the sample claims bolster BCBSNC's allegations because the sample claims indicate LifeBrite claimed the tests were done at LifeBrite, by LifeBrite providers, when that was not the case, (Sample Claim 1 (Doc. 20-3) at 2-3; Sample Claim 2 (Doc. 20-4) at 2-3). Accordingly, this court will decline to dismiss BCBSNC's misrepresentation claims because the sample claims included supporting documentation showing the tests were requested by non-LifeBrite providers for non-LifeBrite patients.

-18-

Third, LifeBrite argues that the sample claims contradict BCBSNC's allegation that LifeBrite performed tests that were not medically necessary because the sample claims show different tests were ordered for different patients. (Pl.'s Br. (Doc. 51) at 20–21.) BCBSNC alleges that LifeBrite did not have the capability to perform "definitive tests," so every claim for definitive testing from LifeBrite was improper because LifeBrite could not have performed those tests. (First Am. Countercls. (Doc. 20) ¶¶ 68, 90.) The sample claims sought reimbursement for definitive tests performed, according to the claim form, by LifeBrite. (Id. ¶¶ 109–17.) Moreover, the sample claims reflect that LifeBrite did not follow BCBSNC's policies of first running an initial screening test before a definitive test. The initial screenings in the sample claims were negative, so a definitive screening should never have been performed. (Id. ¶¶ 69, 85, 105, 112, 115–16.)

Again, these sample claims do not contradict BCBSNC's allegations, especially given that these claims were denied and that at the time the sample claims were submitted LifeBrite was under different rules regarding supporting documentation. For these reasons, this court will decline to dismiss BCBSNC's misrepresentation claims based on LifeBrite's argument that the sample claims show the tests were medically necessary.

### 2. LifeBrite's Marketing Practices

Finally, LifeBrite argues that BCBSNC fails to allege a fraudulent scheme with respect to LifeBrite's marketing practices. (Pl.'s Br. (Doc. 51) at 21–23.) LifeBrite argues that BCBSNC's allegations describing communications between LifeBrite marketers and healthcare providers do not meet the heightened pleading standard for fraud claims. (Id. at 21.) LifeBrite relies on the sample claims to refute BCBSNC's allegations. (Id. at 22.) LifeBrite also argues that BCBSNC's allegations based upon "information and belief" do not meet the heightened pleading standard. (Id. at 22–23.)

This court finds that the sample claims do not refute BCBSNC's allegations concerning communications from LifeBrite marketers to healthcare providers. BCBSNC alleges that "LifeBrite Labs paid sales representatives to solicit physician practices and detox facilities for urine specimens. Their sales pitch made no mention that a tiny rural hospital in a town of fewer than 200, would be involved in any way in the testing or billing." (First Am. Countercls. (Doc. 20) ¶ 7.) LifeBrite argues that "the sample claims proffered by BCBSNC show that the physicians signed forms identifying both [LifeBrite] and LifeBrite Labs." (Pl.'s Br. (Doc. 51) at 22.) As discussed supra, this court declines to make a finding on what, if any,

-20-

notice, the claim forms gave BCBSNC or healthcare providers. Accordingly, LifeBrite's argument is not persuasive.

LifeBrite's argument that BCBSNC's allegations based upon "information and belief" do not meet the heightened pleading standard is similarly without merit. Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." However,

> [a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999). Furthermore, "Allegations of fraud may be made 'upon information and belief' only when the matters are particularly within the defendants' knowledge, and facts are stated upon which the belief is founded." Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 197 (M.D.N.C. 1997).

BCBSNC's counterclaims contain one allegation made "[u]pon information and belief." (First Am. Countercls. (Doc. 20) ¶ 87.) BCBSNC alleges that "[u]pon information and belief, to ensure that these healthcare providers and laboratories participated in LifeBrite Hospital's scheme, LifeBrite Hospital paid kickbacks to some of these providers by, for example, promising the

-21-

referring providers a portion of the reimbursement that
LifeBrite Hospital received for each test or providing other
benefits." (Id.) BCBSNC also alleges that it

> has undertaken significant investigation of the scheme
> alleged . . . including provider interviews and review
> of claims data. Nonetheless, the nature of LifeBrite
> Hospital's scheme, which included disguising the
> source of samples and failing to submit records to
> demonstrate medical necessity, has concealed some of
> the details of LifeBrite Hospital's scheme from Blue
> Cross NC. Blue Cross NC anticipates that additional
> member interviews will uncover significant evidence
> that LifeBrite Hospital routinely did not collect
> member payment obligations, and discovery will reveal
> kickbacks or other incentives LifeBrite Hospital gave
> to providers to encourage referrals.

(Id. ¶ 81 n.4.)

This court finds that BCBSNC's allegation made "upon
information and belief" does not warrant dismissing BCBSNC's
misrepresentation claims. Whether LifeBrite paid kickbacks to
healthcare providers for using LifeBrite Labs is a matter
"particularly within [LifeBrite's] knowledge," Breeden, 171
F.R.D. at 197, especially since LifeBrite "conceal[ed] its
scheme," (First Am. Countercls. (Doc. 20) ¶ 94), so it is
reasonable that BCBSNC would not have uncovered evidence from
its internal investigation. Further, BCBSNC has provided "facts
. . . upon which the belief is founded," Breeden, 171 F.R.D. at
197: BCBSNC's internal investigation uncovered the alleged
fraudulent billing scheme and evidence that LifeBrite took steps

-22-

to conceal its scheme from others, (First Am. Countercls. (Doc. 20) ¶¶ 10, 28, 81, 94). Moreover, this court notes that the only allegation made "upon information and belief" is an allegation concerning LifeBrite paying kickbacks to providers who referred their testing to LifeBrite Labs. (See id. ¶ 87.) Even if this court were to ignore that allegation, LifeBrite has not shown that BCBSNC otherwise failed to adequately plead its misrepresentation claims, even under the heightened pleading standard under Federal Rule of Civil Procedure 9(b).

LifeBrite has not argued that BCBSNC failed to allege facts supporting an element of fraudulent or negligent misrepresentation. This court finds that BCBSNC's claims for fraudulent and negligent misrepresentation satisfy Rule 9(b). LifeBrite has notice of the time, place, contents of the misrepresentations, identity of persons making the misrepresentations, and what LifeBrite obtained thereby. Harrison, 176 F.3d at 784. Specifically, this court finds that LifeBrite has notice of the time period of the alleged fraudulent activities—namely, the time period that LifeBrite and BCBSNC were contractually bound beginning in January 2017 until BCBSNC stopped paying LifeBrite's claims in late 2017. LifeBrite has notice of the place—LifeBrite and LifeBrite Labs. They have notice of the persons—employees of LifeBrite and LifeBrite Labs.

And they have notice of what was obtained thereby—payment of claims submitted by LifeBrite to BCBSNC. Because this court finds that LifeBrite's arguments regarding the relevance of the sample claims and BCBSNC's allegation made "upon information and belief" do not require dismissal of the misrepresentation claims, this court will decline to dismiss Counts I and II.

## B. **Breach of Contract (Count III)**

LifeBrite moves to dismiss BCBSNC's claim for breach of contract, arguing that BCBSNC does not sufficiently plead facts plausibly constituting a breach. (Pl.'s Br. (Doc. 51) at 23–25.) "A party needs to prove only two elements to establish a breach of contract claim in North Carolina. First, it must show that a valid contract existed. Second, it must demonstrate that the opposing party breached one or more of the terms of the contract." Quorum Health Res., LLC v. Hugh Chatham Mem'l Hosp., Inc., 552 F. Supp. 2d 527, 530 (M.D.N.C. 2007) (citing Johnson v. Colonial Life & Accident Ins. Co., 173 N.C. App. 365, 369, 618 S.E.2d 867, 870 (2005)). The parties do not dispute the validity of the Contracts. Therefore, only the second element of BCBSNC's counterclaim is at issue.

First, LifeBrite argues that "Medicare expressly permits rural hospitals, like [LifeBrite], to bill Medicare for such laboratory services for such non-patients." (Pl.'s Br. (Doc. 51)

-24-

at 23-24.) However, whether Medicare allows LifeBrite to bill
Medicare for providing laboratory services to non-patients has
no bearing on whether the Contracts—the instruments binding
LifeBrite and BCBSNC—allow LifeBrite to bill BCBSNC for non-
patient laboratory services. BCBSNC alleges that LifeBrite
impermissibly billed BCBSNC for testing on non-patients of
LifeBrite. (See First Am. Countercls. (Doc. 20) ¶¶ 93, 102-03.)
"The contracts contain a number of provisions making clear that
Blue Cross NC contracted to reimburse LifeBrite Hospital <u>only
for services provided at and by LifeBrite Hospital</u>." (Id. ¶ 57
(emphasis added).) LifeBrite's reliance on Medicare's policy of
allowing rural hospitals to bill Medicare for providing
laboratory services to non-patients is not relevant to
determining whether LifeBrite was allowed to bill BCBSNC for
providing laboratory services to non-patients.

     Second, LifeBrite argues that the Contracts allowed
LifeBrite's conduct as alleged in the counterclaims. (Pl.'s Br.
(Doc. 51) at 24.) Section 2.1.1 of the NPA required LifeBrite
"to render Medically Necessary Covered Services to Members
according to our Policies and Procedures and according to the
terms of this Agreement." (NPA (Doc. 20-1) § 2.1.1.) Section 4.1
of the NPA provides that LifeBrite was entitled to payment for
"Covered Services provided to Members <u>at the sites listed in the</u>

-25-

Site of Service Exhibit." (Id. § 4.1 (emphasis added).)

Additionally, LifeBrite agreed "not to bill . . . for health

care services . . . which are determined by [BCBSNC] not to be

Medically Necessary." (Id. § 4.5.5.) LifeBrite agreed to

"collect from Members applicable Deductibles, Coinsurance, and

Copayments." (Id. § 4.4.) LifeBrite also agreed not to assign,

delegate, or transfer any part of its obligations under the

Contract without prior consent from BCBSNC. (Id. § 6.4.1.)

    This court finds that BCBSNC has alleged facts that, taken

in the light most favorable to BCBSNC, plausibly constitute a

breach of contract. BCBSNC has pled facts tending to show

LifeBrite breached its requirement "to render Medically

Necessary Covered Services" (id. § 2.1.1), because LifeBrite

ordered definitive tests often before the results of the

screening tests were available, which is not medically necessary

according to BCBSNC's medical policy, (First Am. Countercls.

(Doc. 20) ¶¶ 83-85). Additionally, in violation of Section 4.1

of the NPA, LifeBrite billed BCBSNC for services that were not

rendered at the sites listed in the Site of Service Exhibit.

Although LifeBrite is identified in the Site of Service Exhibit,

LifeBrite Labs is not. (NPA (Doc. 20-1) at 17 (listing "Pioneer

Community Hospital of Stokes" in the Site of Service Exhibit).)

LifeBrite was also required to collect coinsurance payments,

-26-

(id. § 4.4), which it did not do, (First Am. Countercls. (Doc. 20) ¶ 94). Finally, in violation of Section 6.4.1, LifeBrite assigned its obligations under the Contracts to LifeBrite Labs because LifeBrite Labs was the entity conducting the laboratory testing, not LifeBrite. (See id. ¶ 88.) LifeBrite did not have the capability to perform some of the tests for which reimbursement was sought. (Id. ¶ 90.) In sum, BCBSNC has sufficiently alleged facts plausibly constituting a breach of contract claim. Accordingly, this court will decline to dismiss Count III.

## C.    <u>Breach of Contract Accompanied by a Fraudulent Act (Count IV)</u>

LifeBrite argues that BCBSNC's claim for breach of contract accompanied by fraudulent act should be dismissed because such a claim is not recognized by North Carolina. (Pl.'s Br. (Doc. 51) at 29.) This court agrees with LifeBrite. "North Carolina does not recognize a cause of action for breach of contract accompanied by fraudulent acts." <u>Curtis v. Café Enters., Inc.</u>, CIVIL ACTION NO. 5:15-CV-00032-RLV-DSC, 2016 WL 6916786, at *10 (W.D.N.C. Nov. 21, 2016) (citing <u>Spillman v. Am. Homes of Mocksville, Inc.</u>, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992)); <u>see also</u> <u>FDIC v. Mingo Tribal Pres. Tr.</u>, Civil Action No. 5:13-CV-113, 2015 WL 1646751, at *5 (W.D.N.C. Apr. 15, 2015)

(dismissing independent cause of action for aggravated breach of contract).

BCBSNC argues that because it has pled a claim for contract as well as a claim for fraud, "its claim for breach accompanied by fraudulent acts should survive as a basis for additional damages." (Def.'s Resp. (Doc. 55) at 21.) Although punitive damages are recoverable where a breach of contract is accompanied by identifiable aggravated tortious, <u>Richardson v. Bank of Am., N.A.</u>, 182 N.C. App. 531, 558-59, 643 S.E.2d 410, 427-28 (2007), BCBSNC does not point to any authority, and this court has found none, establishing that North Carolina recognizes an independent claim for breach of contract accompanied by fraudulent act. Accordingly, this court will grant LifeBrite's Motion to Dismiss Count IV.

### D. <u>**Tortious Interference with Contract (Count V)**</u>

LifeBrite moves to dismiss BCBSNC's tortious interference with contract claim. (Pl.'s Br. (Doc. 51) at 29-30.)

> The elements of a claim for tortious interference with
> a contract are: "(1) a valid contract between the
> plaintiff and a third person which confers upon the
> plaintiff a contractual right against a third person;
> (2) the defendant knows of the contract; (3) the
> defendant intentionally induces the third person not
> to perform the contract; (4) and in doing so acts
> without justification; (5) resulting in actual damage
> to the plaintiff."

Beverage Sys. of the Carolinas, LLC v. Associated Beverage
Repair, LLC, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016)
(quoting United Lab'ys Inc. v. Kuykendall, 322 N.C. 643, 661,
370 S.E.2d 375, 387 (1988)). LifeBrite primarily disputes that
BCBSNC has alleged facts regarding LifeBrite's inducement.
LifeBrite argues that BCBSNC "fails to allege facts plausibly
suggesting that LifeBrite waived member cost-sharing
obligations" despite BCBSNC's investigation. (Pl.'s Br.
(Doc. 51) at 30.)

Contrary to LifeBrite's argument, this court finds that
BCBSNC has alleged facts plausibly suggesting a claim for
tortious interference with a contract. BCBSNC alleges that "[t]o
conceal its scheme, LifeBrite Hospital consciously ignored its
obligation to collect member payment obligations." (First Am.
Countercls. (Doc. 20) ¶ 94.) LifeBrite was required to collect
these cost-sharing obligations, (NPA (Doc. 20-1) § 4.4), but
failed to do so, (First Am. Countercls. (Doc. 20) ¶ 94). Taking
the facts in the light most favorable to BCBSNC, BCBSNC has
sufficiently pled facts plausibly suggesting a claim for
tortious interference with contract. Therefore, this court will
decline to dismiss Count V.

**E.    Unfair or Deceptive Trade Practices (Count VI)**

LifeBrite moves to dismiss BCBSNC's claim under North Carolina's Unfair or Deceptive Trade Practices Act ("UDTPA"). (Pl.'s Br. (Doc. 51) at 28–29.) LifeBrite argues the UDTPA claim fails because the allegations related to unfair and deceptive trade practices arise from the same allegations supporting BCBSNC's breach of contract claim, and a breach of contract is not sufficiently unfair or deceptive to establish a UDTPA claim. (Id. at 28.) On the other hand, BCBSNC argues that fraud is evidence that unfair or deceptive trade practices have occurred. (Def.'s Resp. (Doc. 55) at 21.)

"[I]t is well-settled that 'a plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred.'" Jones v. Harrelson & Smith Contractors, LLC, 194 N.C. App. 203, 217, 670 S.E.2d 242, 252 (2008) (quoting Bhatti v. Buckland, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991)). Thus, if BCBSNC has adequately pled fraud, BCBSNC has also established its claim under UDTPA.

As discussed supra Section III.A., BCBSNC has adequately pled fraudulent and negligent misrepresentation. Therefore, BCBSNC has also adequately pled a claim under UDTPA. See Mingo Tribal Pres. Tr., 2015 WL 1646751, at *6 ("This Court has already allowed the fraud cause of action to survive.

-30-

Accordingly, it is unnecessary to elaborate further in order to
deny Plaintiff's motion to dismiss with regard to UDTP. A
corollary of the Court's finding that Plaintiff has sufficiently
alleged an independent tort means that Plaintiff has alleged
more than an intentional breach of contract . . . .").
Similarly, because BCBSNC's allegations were sufficient to plead
fraud, application of the economic loss rule to BCBSNC's UDTPA
claim is precluded at the dismissal stage. See Wheeler v. BMW of
N. Am. LLC, 534 F. Supp. 3d 527, 534 (W.D.N.C. 2021) (finding
UDTPA claim not barred by North Carolina's economic loss rule
where the plaintiff had pleaded fraudulent concealment).
Accordingly, this court will decline to dismiss Count VI.

**F.  Restitution under ERISA § 502(a)(3), Declaratory
    and Injunctive Relief under ERISA § 502(a)(3) and
    28 U.S.C. §§ 2201 & 2202, and Constructive Trust
    and Equitable Liens (Counts VII-IX)**

LifeBrite argues that BCBSNC is not entitled to the
remedies sought in Counts VII through IX. (Pl.'s Br. (Doc. 51)
at 30-32.) LifeBrite first argues that "[b]ecause BCBSNC has not
stated any violation of law or contract . . . it is not entitled
to any of the remedies set forth in [Counts VII-IX]." (Id. at
30.) However, BCBSNC has sufficiently stated claims for, inter
alia, misrepresentation and breach of contract. See supra
Sections III.A & III.B. Therefore, LifeBrite's argument fails.

-31-

LifeBrite further argues that BCBSNC is not entitled to restitution under ERISA § 502(a)(3), constructive trust, or equitable liens because LifeBrite does not hold funds belonging to BCBSNC. (Pl.'s Br. (Doc. 51) at 31.) "Section 502(a)(3) is the civil enforcement mechanism available to ERISA fiduciaries seeking to recover benefits paid under an ERISA plan." Mid Atl. Med. Servs., LLC v. Sereboff, 407 F.3d 212, 217 (4th Cir. 2005). Section 502(a)(3) "authorizes the pursuit of a civil action by an ERISA fiduciary to enjoin any act which violates the terms of a plan, or to 'obtain other appropriate equitable relief' to enforce a plan's provisions." Id. (emphasis in original) (quoting 29 U.S.C. § 1132(a)(3)).

In Great-West Life & Annuity Insurance Co. v. Knudson, the Supreme Court denied the "equitable" relief sought by the fiduciaries because the fiduciaries were not claiming "particular funds that, in good conscience, belong[ed] to [them]." 534 U.S. 204, 214, 218 (2002). Instead, the fiduciaries sought "to impose personal liability on [the Knudsons] for a contractual obligation to pay money—relief that was not typically available in equity." Id. at 210. The Supreme Court explained that an ERISA plan fiduciary may seek equitable restitution "where money or property identified as belonging in good conscience to the [fiduciary] could clearly be traced to

-32-

particular funds or property in the [beneficiary's] possession."
Id. at 213.

Unlike the fiduciary in Knudson, in Sereboff, the Fourth
Circuit affirmed the district court's grant of equitable relief
"because [the fiduciary] s[ought] to recover funds that are
specifically identifiable, belong in good conscience to [the
fiduciary], and are within the possession and control of the
Sereboffs." 407 F.3d at 218. The Fourth Circuit noted that
unlike in Knudson, where the funds were placed outside the
possession or control of the beneficiary, in Sereboff, the funds
were in accounts controlled by the Sereboffs. Id. at 218-19.

This court finds that BCBSNC's action seeks equitable
restitution because BCBSNC "seeks to recover funds that are
specifically identifiable, belong in good conscience to
[BCBSNC], and are within the possession and control of
[LifeBrite]." Id. at 218. BCBSNC alleges that because of
LifeBrite's fraudulent scheme, it "has paid millions of dollars
in benefits to LifeBrite Hospital." (First Am. Countercls.
(Doc. 20) ¶ 179.) BCBSNC further alleges that "Blue Cross NC
paid these amounts into certain financial accounts under
LifeBrite Hospital's control." (Id. ¶ 180.) LifeBrite argues
that BCBSNC's "assertion that LifeBrite continues to hold
discrete, identifiable funds . . . is a 'formulaic recitation'

-33-

of an element of its claim . . . ." (Pl.'s Reply (Doc. 57) at 18
(some internal quotation marks omitted) (quoting Twombly, 550
U.S. at 555).) This court disagrees. BCBSNC does more than
recite the elements its claim for equitable restitution. In
fact, BCBSNC alleges a specific bank account in which the funds
are alleged to be held. (See First Am. Countercls. (Doc. 20)
¶ 180.) Thus, LifeBrite's second argument also fails.

Finally, LifeBrite argues that BCBSNC is not entitled to a
constructive trust because there is no fiduciary relationship
between LifeBrite and BCBCNC. (Pl.'s Br. (Doc. 51) at 31–32.)
BCBSNC argues that a fiduciary relationship is not required to
impose a constructive trust. (Def.'s Resp. (Doc. 55) at 23–24.)
Under North Carolina law,

> [a] constructive trust . . . "prevent[s] the unjust
> enrichment of the holder of title to, or of an
> interest in, property which such holder acquired
> through fraud . . . or some other circumstance making
> it inequitable for him to retain it against the claim
> of the beneficiary of the constructive trust."

Roper v. Edwards, 323 N.C. 461, 465, 373 S.E.2d 423, 425 (1988)
(quoting Wilson v. Dev. Co., 276 N.C. 198, 211-12, 171 S.E.2d
873, 882 (1970)). The North Carolina Court of Appeals has
recognized that a constructive trust may be imposed

> even in the absence of fraud or a breach of fiduciary
> duty, upon the showing of either (1) some other
> circumstance making it inequitable for the defendant
> to retain the funds against the claim of the
> beneficiary of the constructive trust, or (2) that the

-34-

> defendant acquired the funds in an unconscientious
> manner.

Houston v. Tillman, 234 N.C. App. 691, 697, 760 S.E.2d 18, 21 (2014). Thus, contrary to LifeBrite's argument, a fiduciary relationship is not required for a court to impose a constructive trust. See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 530, 723, S.E.2d 744, 752 (2012) (noting a trial court can impose a constructive trust even in the absence of a breach of fiduciary duty); see also Poulos v. Poulos, 841 S.E.2d 282, 289 (N.C. Ct. App. 2020) (reasoning that the trial court's finding that the plaintiff "could not prove claims for . . . breach of fiduciary duty . . . is irrelevant to the question of whether [the] [p]laintiff is entitled to a constructive trust").

Because a constructive trust may be imposed by a court in the absence of a fiduciary relationship, this court finds BCBSNC's claim for a constructive trust, as well as the other equitable remedies sought by BCBSNC—restitution, declaratory judgment, and injunctive relief—will not be dismissed at this stage in the proceedings.

### G. Unjust Enrichment (Count X)

LifeBrite moves to dismiss BCBSNC's claim for unjust enrichment. (Pl.'s Br. (Doc. 51) at 32.) LifeBrite argues that BCBSNC is not entitled to recover the money paid for laboratory

-35-

services because BCBSNC does not allege that the laboratory services were not provided. (Id.) On the other hand, BCBSNC argues its claim for unjust enrichment should not be dismissed because had LifeBrite submitted truthful claims, BCBSNC would have paid a lesser amount. (Def.'s Resp. (Doc. 55) at 24.)

A claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." Atl. Coast Line R.R. Co. v. State Highway Comm'n, 268 N.C. 92, 95-96, 150 S.E.2d 70, 73 (1966).

To establish a claim for unjust enrichment, a party must allege that it conferred a benefit on the other party, the other party consciously accepted the benefit, and the benefit was not conferred officiously or gratuitously. Se. Shelter Corp. v. BTU, Inc., 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002). "Furthermore, '[t]he mere fact that one party was enriched, even at the expense of the other, does not bring the doctrine of unjust enrichment into play. There must be some added ingredients to invoke the unjust enrichment doctrine.'" Peace

-36-

River Elec. Coop., Inc. v. Ward Transformer Co., 116 N.C. App. 493, 509, 449 S.E.2d 202, 213 (1994) (some internal quotation marks omitted) (quoting Williams v. Williams, 72 N.C. App. 184, 187, 323 S.E.2d 463, 465 (1984)); see also Collins v. Davis, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984)(stating recovery under unjust enrichment based is appropriate in circumstances where it would be "unfair for the recipient to retain" the benefit of the claimant's services, but that "more must be shown than that one party voluntarily benefitted another").

Here, BCBSNC seeks to pursue a claim against LifeBrite to recoup alleged overpayments based on application of the measure of damages for unjust enrichment. "This argument misconstrues the claim of unjust enrichment in North Carolina and . . . is unsupported in the law." Sullivan v. Lab'y Corp. of Am. Holdings, No. 1:17cv193, 2018 WL 1586471, at *7 (M.D.N.C. Mar. 28, 2018). BCBSNC did not provide a service or benefit to LifeBrite. Rather, it is BCBSNC who received the service—laboratory testing. "Generally, there is no claim for unjust enrichment where a [party] received the service she paid for and the [other party] did not solicit or induce her into accepting it." Id. at *7-8 (granting motion to dismiss unjust enrichment claim where the plaintiffs received laboratory services from the defendant but alleged that they overpaid for the services).

Moreover, BCBSNC does not allege that LifeBrite failed to conduct the laboratory tests. In <u>UBS Financial Services, Inc. v. Zimmerman</u>, Zimmerman brought an unjust enrichment claim against UBS. No. 5:16-CV-155-FL, 2016 WL 7017278, at *4 (E.D.N.C. Dec. 1, 2016). The district court dismissed the unjust enrichment claim, noting that although Zimmerman paid monthly fees to UBS as compensation for managing Zimmerman's securities, Zimmerman was not alleging that UBS failed to manage his securities but rather alleging that UBS failed to make certain disclosures to Zimmerman prior to Zimmerman's investment purchases. <u>Id.</u> Similarly, in this case BCBSNC does not allege LifeBrite failed to conduct the laboratory tests. Rather, BCBSNC alleges that LifeBrite failed to make truthful, accurate, and complete disclosures on its claim forms. (First Am. Countercls. (Doc. 20) ¶¶ 98-120.) Consequently, BCBSNC's claim for unjust enrichment fails, and LifeBrite's motion to dismiss Count X will be granted.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, this court finds that LifeBrite's Motion to Dismiss, (Doc. 50), will be granted in part and denied in part.

**IT IS THEREFORE ORDERED** that LifeBrite's Motion to Dismiss, (Doc. 50), is **GRANTED IN PART AND DENIED IN PART**. The motion is

-38-

**GRANTED** as to BCBSNC's counterclaims for breach of contract accompanied by fraudulent act (Count IV) and unjust enrichment (Count X). The motion is **DENIED** as to BCBSNC's counterclaims for fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), breach of contract (Count III), tortious interference with contract (Count V), unfair and deceptive trade practices (Count VI), restitution (Count VII), declaratory and injunctive relief (Count VIII), and constructive trust and equitable liens (Count IX).

This the 16th day of March, 2022.

_____
United States District Judge

Case 1:18-cv-00293-WO-LPA   Document 58   Filed 03/16/22   Page 39 of 39