## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| LIFEBRITE HOSPITAL GROUP OF STOKES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:18cv293 |
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, | ) ) ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

This case comes before the Court on LifeBrite Hospital Group of Stokes, LLC ("LifeBrite Hospital"), LifeBrite Hospital Group, LLC, LifeBrite Laboratories, LLC ("LifeBrite Labs"), Christian Fletcher ("Fletcher"), and Amber Fletcher's (collectively, "LifeBrite's") Motion to Quash (Docket Entry 86), to which Blue Cross and Blue Shield of North Carolina ("BCBSNC") responded (Docket Entry 88) and LifeBrite replied (Docket Entry 89). The Motion to Quash targets subpoenas directed to Adam Walters, an attorney (and nonparty) who previously represented Fletcher and LifeBrite Labs. (See Docket Entry 86 at 2.) For the reasons that follow, the Court denies the Motion to Quash, but without prejudice to Walters's right to maintain objections he timely made to the subpoenas.

### I. Background

This case concerns reimbursement of health insurance claims associated with a rural, critical access hospital ("CAH"). (See

Docket Entry 5 at 1.) According to the Complaint in this case, BCBSNC, a private health insurance provider, "refus[ed] to compensate LifeBrite for [] services rendered to BCBSNC and/or its affiliate's insureds." (Id.) Such refusal allegedly contravenes a contract between LifeBrite Hospital and BCBSNC. (Id. at 2.)

BCBSNC, in turn, has contended (via Counterclaims) that the persons and entities comprising LifeBrite "engaged in a deceptive scheme to enrich themselves . . . by using LifeBrite Hospital's [billing identifiers] to bill for laboratory tests that LifeBrite Hospital did not perform." (Docket Entry 75 at 12.) BCBSNC's Counterclaims further assert that LifeBrite Labs conducted the laboratory tests at issue, and the reimbursement requests to BCBSNC should have identified LifeBrite Labs as the entity responsible for conducting the tests. (See id.) According to the Counterclaims, that scheme resulted in BCBSNC making outsized claim reimbursements to LifeBrite, to the tune of "more than $11 million in less than one year." (Id. at 14.)

Separate from this litigation, Christian Fletcher faced criminal charges for participating in a scheme involving LifeBrite Labs. (See id. at 23 (citing United States of America v. Perez, No. 3:20-cr-86 (M.D. Fla. June 27, 2022)). That alleged scheme involved LifeBrite Labs contracting with several CAHs across the southeastern United States and conducting laboratory testing on behalf of those hospitals, but then billing health insurance

2

providers using the CAH's hospital identification number, rather than that of LifeBrite Labs. (See generally id.; see also Docket Entry 86 at 4 (Motion to Quash reporting that, "[i]n 2020, the United States brought criminal charges against [] Fletcher for conspiracy to commit health care fraud").) The CAHs under scrutiny in that criminal case did not include LifeBrite Hospital. (See id.)

Fletcher testified during his criminal trial. (See Docket Entry 86 at 4-5; see also Docket Entry 89-1; Docket Entry 89-2; Docket Entry 89-3 (trial transcripts).) In that testimony, Fletcher explained that he relied upon the advice of his counsel, Walters, in contracting with the CAHs, and that Walters had concluded that the arrangements between LifeBrite Labs and the CAHs complied with applicable law. (See generally Docket Entry 86 at 4-5; see also Docket Entry 89-2 at 11, 93-94 (testimony describing Walters's conclusions that said arrangements violated no law or contract).)

A jury acquitted Fletcher. (See id. at 5 (citing United States of America v. Perez, No. 3:20-cr-86 (M.D. Fla. June 27, 2022).) Thereafter, on May 23, 2023, BCBSNC served subpoenas on Walters and his former law firm. (See Docket Entry 86-2 at 5 (certificate of service).) The subpoenas seek Walters's communications with Fletcher and LifeBrite regarding "use of a [h]ospital's [b]illing [i]dentifiers to bill for [l]aboratory

3

[s]ervices," as well as other documents and communications regarding LifeBrite entities and the CAHs at issue in Fletcher's criminal trial. (Id. at 13-14.)

As a result, LifeBrite filed the Motion to Quash, contending that this Court should quash the subpoenas "because on their face they seek communications and documents protected from disclosure by the attorney-client privilege and the work product doctrine." (Docket Entry 86 at 2.) The Motion to Quash also asserts that "LifeBrite has not waived its privilege as to these documents[, because Fletcher's testimony in his criminal trial concerned] hospitals other than the one at issue in this case (specifically, . . . hospitals in Florida, Georgia, and Missouri—none of which are the subject of this litigation) and claims submitted under the network agreements between those hospitals and payors other than BCBSNC." (Id.) Finally, the Motion to Quash argues that the subpoenas partly target "irrelevant contracts not at issue in this case." (Id. at 6.)

BCBSNC's Response first asserts that LifeBrite failed to sufficiently identify the documents and/or communications to which the attorney-client privilege would attach. (See Docket Entry 88 at 17-18.) Next, the Response contends that any attorney-client privilege "was waived—and documents on the subject became discoverable—when Fletcher testified broadly about the legal advice provided by Walters in connection with his advice-of-counsel

4

defense in the criminal case." (Id. at 18-19; see also id. at 23 (averring that "LifeBrite Labs' relationship with LifeBrite Hospital is nearly identical to its relationships with [the CAHs in the criminal trial]").) Third, the Response argues that the sought-after discovery bears relevance to LifeBrite's intent when it submitted claims to BCBSNC. (See id. at 28.)

LifeBrite's Reply initially insists that LifeBrite sufficiently identified the categories of documents over which it asserts attorney-client privilege. (See Docket Entry 90 at 5-7.) Then, the Reply rejoins that Fletcher's testimony in the criminal trial involved "a far more limited subject matter [than that advanced by BCBSNC]." (Id. at 8.) Finally, the Reply disputes the relevance of the discovery. (See id. at 12 (arguing that "[t]he legality of LifeBrite Labs' contracts with the [CAHs in the criminal trial], and Fletcher's testimony that he followed his lawyers' advice, does not tend to prove or disprove the intent or negligence of Fletcher in acquiring and operating LifeBrite Hospital").)

## II. Discussion

### A. Discovery Standards

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). This standard applies to "[a]ll civil discovery, whether

5

sought from parties or nonparties." <u>Virginia Dep't of Corr. v. Jordan</u>, 921 F.3d 180, 188 (4th Cir. 2019). "Discovery rules are to be accorded broad and liberal construction," <u>Boshea v. Compass Mktg., Inc.</u>, No. 21-CV-309, 2021 WL 4425765, at *2 (D. Md. Sept. 27, 2021), and "[r]elevance is not, on its own, a high bar," <u>Jordan</u>, 921 F.3d at 188. That said, Federal Rule of Civil Procedure 45 imposes "[a] more demanding variant of [Federal Rule of Civil Procedure 26's] proportionality analysis," <u>id.</u> at 189, in order to ensure that parties do not draw nonparties "into the[ir ] dispute without some good reason," <u>id.</u> Notwithstanding the greater scrutiny of discovery requests to nonparties, "the ultimate question [under either Federal Rules of Civil Procedure 26 or 45] is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient." <u>Id.</u>

When faced with a motion to quash a subpoena directed to a nonparty, "the court for the district where compliance is required must quash or modify [the] subpoena [if it] . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies[,] or [] subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). An overbroad subpoena imposes an undue burden. <u>See</u> <u>In re Subpoena Duces Tecum to AOL, LLC</u>, 550 F. Supp. 2d 606, 612 (E.D. Va. 2008). In addition, although "[n]o requirement of relevance is included in the text of [Federal] Rule [of Civil Procedure] 45[], it is settled that a subpoena is limited

6

in scope by Rule 26(b)(1) of the Federal Rules of Civil Procedure." Coleman v. District of Columbia, 275 F.R.D. 33, 36 (D.D.C. 2011). Accordingly, courts may quash subpoenas directed to third parties when those subpoenas target materials that "bear little apparent connection [to matters at issue]." In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y, No. 21-MC-65, 2023 WL 2467738, at *3 (D.D.C. Mar. 7, 2023).

## B. The Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege "is founded upon the necessity . . . of the aid of persons having knowledge of the law . . ., which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." Hunt v. Blackburn, 128 U.S. 464, 470 (1888); see also United States v. (Under Seal), 748 F.2d 871, 873 (4th Cir. 1984) (recounting that, "[a]s modern society became increasingly complex, courts recognized that individuals would need to rely on experts to transact business involving legal problems"). "[W]hen the privilege applies, it affords confidential communications between lawyer and client complete protection from disclosure." Hawkins v. Stables, 148 F.3d 379, 383 (4th Cir. 1998).

Importantly, the "party asserting privilege has the burden of demonstrating its applicability." National Lab. Rels. Bd. v. Interbake Foods, LLC, 637 F.3d 492, 501 (4th Cir. 2011). In that regard, the proponent must "specifically and factually support his claim of privilege, . . . [because] an improperly asserted privilege is the equivalent of no privilege at all." Byrnes v. Jetnet Corp., 111 F.R.D. 68, 71 (M.D.N.C. 1986). A party may meet this burden by "establishing an evidentiary basis . . . for each element of [the attorney-client privilege] for each . . . category of document." Victor Stanley, Inc. v. Creative Pipe, Inc., 250 F.R.D. 251, 267 (D. Md. 2008); see also Fed. R. Civ. P. 26(b)(5); Fed. R. Civ. P. 45(e)(2)(A) (both requiring that the person asserting privilege "describe the nature of the [privileged material] in a manner that . . . will enable other parties to assess the claim").

On the substance:[1]

---

[1] The Parties stand in agreement that "federal common law applies to the privilege issues." (Docket Entry 86 at 8 n.2; see also Docket Entry 88 at 17 n.5 ("agree[ing] . . . that federal common law applies to the privilege issues").) But neither Party cites any support for their proffered proposition that removing a case "on the basis that BCBSNC 'has been sued for actions taken as a person acting as a federal officer of an agency of the United States or under color of such office'" (Docket Entry 86 at 8 n.2 (citing Docket Entry 75 at 23)) sufficiently implicates a federal question such that federal common law governs questions of privilege. See Ohio v. Doe, No. 3:04-CV-155, 2005 WL 5610228, at *3 (S.D. Ohio Apr. 22, 2005) (applying Ohio statute regarding waiver of attorney-client privilege after federal public defender removed dispute to federal court pursuant to 28 U.S.C. § 1442, while observing that, "by exercising removal jurisdiction over this

8

> The privilege applies only if (1) the asserted holder of
> the privilege is or sought to become a client; (2) the
> person to whom the communication was made (a) is a member
> of the bar of a court, or his subordinate and (b) in
> connection with this communication is acting as a lawyer;
> (3) the communication relates to a fact of which the
> attorney was informed (a) by his client (b) without the
> presence of strangers (c) for the purpose of securing
> primarily either (i) an opinion on law or (ii) legal
> services or (iii) assistance in some legal proceeding,
> and not (d) for the purpose of committing a crime or
> tort; and (4) the privilege has been (a) claimed and (b)
> not waived by the client.

United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982) (citing

United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 359 (D.

Mass. 1950)).

---

dispute, this [c]ourt has stepped into the shoes of [the state
court judge], and will apply the law of Ohio in the same manner as
that judicial officer would have applied it, had [the federal
public defender] not removed this matter").

    Even so, the Court concludes that federal common law applies,
for two alternative reasons.  First, BCBSNC's Counterclaims raise
questions related to ERISA (see Docket Entry 75 at 27-28), and when
a case "involv[es] both federal and state law claims, the federal
law of privilege applies." Virmani v. Novant Health Inc., 259 F.3d
284, 287 n.3 (4th Cir. 2001).  Second, this dispute involves
alleged waiver of the attorney-client privilege (by virtue of
testimony in a federal proceeding) and, under those circumstances,
federal standards govern waiver "even if state law [would]
provide[] the rule of decision." Fed. R. Evid. 502(f).  In any
event, "the elements of the North Carolina attorney-client
privilege are similar to the attorney-client privilege recognized
under federal common law," Mason C. Day Excavating, Inc. v.
Lumbermens Mut. Cas. Co., 143 F.R.D. 601, 607 (M.D.N.C. 1992), so
the Court's analysis would not meaningfully differ whether it
consulted federal or state law, see, e.g., State v. Murvin, 304
N.C. 523, 531 (listing same elements of attorney-client privilege
as federal common law); State v. Tate, 294 N.C. 189, 193
(discussing "well-settled" principle of North Carolina privilege
law that a party may waive the privilege by "offer[ing] testimony
concerning the substance of the communication").

9

"Although the privilege has a venerable pedigree and helps to ensure competent and complete legal services, it is nonetheless inconsistent with the general duty to disclose and impedes the investigation of the truth." (Under Seal), 748 F.2d at 875; see also United States v. Aramony, 88 F.3d 1369, 1389 (4th Cir. 1996) (observing that claims of privilege "interfere[] with the truthseeking mission of the legal process" (internal quotation mark omitted); see also Trammel v. United States, 445 U.S. 40, 50 (1980) ("Testimonial exclusionary rules and privileges contravene the fundamental principle that the public has a right to every man's evidence." (cleaned up).) As a consequence, "courts are careful to construe recognized privileges narrowly." In re Sealed Case, 676 F.2d 793, 806–07 (D.C. Cir. 1982); see also In re Grand Jury Proc., 727 F.2d 1352, 1355 (4th Cir. 1984) (reporting view that attorney-client privilege "is not favored by federal courts" (internal quotation marks omitted)).

Strict construction of the attorney-client privilege has led courts to conclude that "[a]ny disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege." Jones, 696 F.2d at 1072. Moreover, "[a]ny *voluntary* disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter." Id. (emphasis added); see

10

also Fed. R. Evid. 502(a) (providing that intentional disclosure of privileged information in federal proceeding results in waiver of privilege for other information that "concern[s] the same subject matter" and "ought in fairness to be considered together").  A voluntary disclosure of privileged material effects a broader waiver of the privilege than an inadvertent disclosure because parties should not enjoy the freedom to selectively disclose "part of a privileged communication to gain an advantage in litigation." Id.; see also Sealed Case, 676 F.2d 809 n.54 (noting that courts may "retain discretion not to impose full waiver as to all communications on the same subject matter where the client has merely disclosed a communication to a third party, as opposed to making some use of it").)  Concluding otherwise would permit the privilege to further interfere with the truth-seeking function of the legal process because "a party [could] reveal[] one beneficial communication but fail[] to reveal another, less helpful, communication on the same matter." U.S. ex rel. Mayman v. Martin Marietta Corp., 886 F. Supp. 1243, 1252 (D. Md. 1995).

Although the United States Court of Appeals for the Fourth Circuit has not directly answered "[w]hether assertion of the advice-of-counsel defense constitutes a waiver of the attorney-client privilege," United States v. Dallmann, 433 F. Supp. 3d 804, 813 (E.D. Va. 2020), other circuits to consider the issue have concluded that "the waiver certainly extends to the advice

11

given by the attorney and any communication made or evidence submitted to the attorney upon which the attorney's advice is based," id. at n.8 (collecting cases). Thus, courts across the country apply a fairly uniform standard: effectively that, "[w]hen a party raises an advice of counsel defense, [] all advice on the pertinent topic becomes fair game." U.S. ex rel. Drakeford v. Tuomey, 792 F.3d 364, 391 (4th Cir. 2015) (Wynn, J., concurring).

"Of course, defining the 'subject matter,' and thus the scope of the waiver, is a critically important aspect of the waiver analysis." E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc., 269 F.R.D. 600, 605 (E.D. Va. 2010). Even in the case of a voluntary disclosure for tactical purposes, courts must take heed not to "open up the possibility of a fishing expedition of all confidential communications." Hawkins, 148 F.3d at 384 n.4. Courts must therefore closely scrutinize the disclosed material so as to balance the risk of a "fishing expedition," id., with the risk that a party could "use the attorney's opinions as [both] sword [and] shield to affect the factfinding process," Vaughan Furniture Co. Inc. v. Featureline Mfg., Inc., 156 F.R.D. 123, 128 (M.D.N.C. 1994).

Due to the critical importance of accurately defining the "subject matter" when faced with an argument for waiver of privilege, the Court highlights certain specific applications of the doctrine with the goal of clarifying some common principles.

12

For example, <u>Martin Marietta</u> involved a government contractor that faced a government investigation over its billing practices. <u>Martin Marietta</u>, 886 F. Supp. at 1244. The contractor, in the process of performing a contract to develop a prototype of a missile defense system, billed the government for research and development costs it incurred, ultimately exceeding the contract value, which the government argued the contractor could not do. <u>See</u> <u>id.</u> at 1244-45. During settlement negotiations, the contractor informed the government that a legal memorandum drafted by in-house counsel had concluded that the contractor's billing practices (as it related to research and development costs) complied with the relevant Defense Acquisition Regulation (as recently interpreted in a court opinion). <u>See</u> <u>id.</u> at 1247-48. As a result, the court concluded that the scope of the subject matter waiver included all in-house legal advice on the propriety of seeking reimbursement for research and development over and above the value of existing contracts, during the period the contractor employed that practice to support development of the missile defense system prototype. <u>See</u> <u>id.</u> at 1252. Thus, the scope of the waiver could theoretically include other government contracts, because the advice of in-house counsel consisted of interpreting one regulation in light of one court decision. <u>See</u> <u>id.</u> at 1247-48. In so holding, the court implicitly recognized that the contractor could apply the same legal advice to different contracts.

13

In <u>E.I. DuPont</u>, a company CEO issued a press release alleging that a competitor visited its facilities "expressly for the purpose of obtaining confidential [company] technology." <u>E.I. Dupont</u>, 269 F.R.D. at 603. As it turned out, the FBI orchestrated that visit as a sting operation, and the company later learned as much during discussions between its in-house counsel and the government, the details of which the company's in-house counsel subsequently relayed to the CEO. <u>Id.</u> at 605. Given the company CEO's disclosure of that information (via press release), the court held that the scope of the subject-matter waiver consisted of the company's communications with the government regarding the competitor's "one [visit] and [] the purpose for that [one visit]." <u>Id.</u> at 607. The court, however, declined to "artificially expand the scope of the subject matter to . . . all communications in [the company]'s possession relating to the [g]overnment's investigation of [the competitor]." <u>Id.</u> <u>E.I. DuPont</u> thus distinguishes between communications regarding (A) one general topic, and (B) individual transactions that fall under that topic. <u>See</u> <u>id.</u> (emphasizing that "the scope of the waiver is measured by the substance of the protected information that has been publicly disclosed," as well as importance of not "ignor[ing] what [the company] actually published"). In other words, <u>E.I. DuPont</u> recognizes that, when a party voluntarily discloses privileged communications regarding a

14

particular transaction, subject matter waiver should not extend to the entire (more general) topic.

Finally, in Blue Lake Forest Products, a timber company sought damages when the United States Forest Service suspended the company's timber operations. See Blue Lake Forest Prod., Inc. v. United States, 75 Fed. Cl. 779, 781 (2007). The Forest Service did so because, in prior litigation involving a different plaintiff, a court had concluded that the Forest Service had failed to adequately conduct certain environmental impact studies prior to awarding timber contracts. See id. In that prior litigation, the Forest Service had disclosed an internal legal memorandum that evaluated the Forest Service's compliance with its statutory obligations to conduct those environmental impact studies. See id. at 787-90. As a consequence, the court in Blue Lake Forest Products defined the scope of subject matter waiver as all documents and communications concerning the Forest Service's interpretation and implementation of its obligations in conducting environmental impact studies under the applicable federal law. See id. at 794. Blue Lake Forest Products highlights not just the possibility of cross-litigation subject matter waiver, but, like Martin Marietta, also stands for the proposition that the waiver can extend to a party's transactions with separate entities, so long as the underlying legal assessment governing the dealings with those entities remains the same.

15

## C. The Motion to Quash

### *Request One*

In light of the foregoing principles, the Court turns first to Request One in the subpoenas, which calls for "[a]ll [c]ommunications [Walters] had with any LifeBrite Entity, Christian Fletcher, or Amber Fletcher, [r]elated [t]o the use of a [h]ospital's [b]illing [i]dentifiers to bill for [l]aboratory [s]ervices." (Docket Entry 86-2 at 13.) As an initial matter, and contrary to BCBSNC's contention, LifeBrite has met its burden of demonstrating that these communications implicate the attorney-client privilege. (See Docket Entry 88 at 17-18.) In that regard, the parties do not dispute that Fletcher and LifeBrite Labs employed Walters as outside counsel, that Walters acted in that capacity while rendering advice, or that LifeBrite has sought to claim the privilege. (See generally id.) Rather, BCBSNC's argument appears to center on whether LifeBrite adequately described the documents to which the privilege would apply. (See id. at 18.)

Request One calls for communications concerning use of a CAH billing identifier to bill for laboratory services. (See Docket Entry 86-2 at 13.) And, as the criminal trial transcript amply demonstrates, Walters frequently provided Fletcher and LifeBrite Labs with counsel related to said topic. (See, e.g., Docket Entry 89-1 at 29-30 (testimony reflecting that Fletcher hired Walters "to

16

ensure that [they] were compliant" when contracting with CAHs), 32 (noting that Fletcher retained Walters "with the specific purpose of giving advice about the reference laboratory agreement and the legalities surrounding it"), 50 (testimony describing memorandum Walters drafted addressing legality of proposed laboratory services agreement with one CAH); Docket Entry 89-2 at 12 (documenting Walters's conclusion from memorandum), 75-76 (testimony regarding Walters's assistance in drafting laboratory services agreement with second CAH), 126 (detailing Walters's time entries for work related to third CAH).) Accordingly, a sufficient evidentiary basis exists to support LifeBrite's invocation of privilege as to the communications covered by Request One. See Victor Stanley, 250 F.R.D. at 267.

Even so, BCBSNC urges that any claim of "privilege was waived—and documents on the subject became discoverable—when Fletcher testified broadly about the legal advice provided by Walters in connection with his advice-of-counsel defense in the criminal case." (Docket Entry 88 at 18-19.) Here, the Court must first distinguish between the CAHs at issue in the criminal trial, and LifeBrite Hospital; LifeBrite does not appear to dispute that Fletcher waived the privilege as to the former category. (See Docket Entry 90 at 7 (conceding that Fletcher testified regarding "contracts with [CAHs at issue in criminal trial]"), 9 (detailing

17

testimony related to said hospitals), 10 (seeking to distinguish LifeBrite Hospital from other CAHs).)

The Court agrees, and concludes that Fletcher did waive attorney-client privilege as it relates to communications with Walters concerning laboratory services agreements with the CAHs at issue in the criminal trial. Fletcher's testimony, which he could have withheld, plainly constitutes a "voluntary disclosure by [him, which] waives the privilege not only as to the specific communication disclosed, but [also] as to all other communications relating to the same subject matter." Jones, 696 F.2d at 1072; see also Fed. R. Evid. 502(a). In that regard, Fletcher testified at length in describing the advice he received from Walters when researching, negotiating, drafting, and ultimately executing agreements with those CAHs. (E.g., Docket Entry 89-1 at 32, 46, 48, 50; Docket Entry 89-2 at 12, 75-76.)

Further, Fletcher appears to have injected this testimony into the criminal trial in order "to gain an advantage in litigation," Jones, 696 F.2d at 1072, i.e., by raising an advice of counsel defense (which likely contributed to his acquittal). Thus, absent a finding of waiver, Fletcher "[could] reveal[] one beneficial communication but fail[] to reveal another, less helpful, communication on the same matter," Martin Marietta, 886 F. Supp. at 1252, and thereby "use [Walter]'s opinions as [both] sword [and] shield to affect the factfinding process," Vaughan Furniture, 156

18

F.R.D. at 128. Accordingly, Fletcher waived any privilege with regard to communications with at least three CAHs named in Request One.[2]

The question remains whether Fletcher's testimony at trial involved the same "subject matter" as his communications with Walters regarding a laboratory services agreement with LifeBrite Hospital. As noted, "defining the 'subject matter,' . . . is a critically important aspect of the waiver analysis." E.I. Dupont, 269 F.R.D. at 605. Additionally, the Court must endeavor to avoid "open[ing] up the possibility of a fishing expedition of all confidential communications," Hawkins, 148 F.3d at 384 n.4.

In deference to those concerns, the Court finds that the bulk of Fletcher's trial testimony, which addressed laboratory service agreements with other CAHs, does not result in a subject matter waiver as to Walters's communications with LifeBrite regarding the laboratory services agreement with LifeBrite Hospital, for two

_____

2 The subpoenas define "Hospital" to include five CAHs, including LifeBrite Hospital, the three CAHs Fletcher discussed in detail during the criminal trial, and "Chestatee Regional Hospital in Chestatee, Georgia." (Docket Entry 86-2 at 11.) However, Chestatee rarely appears in the trial transcript, and only does so in the context of Fletcher stating that he has "never been involved with Chestatee at all." (Docket Entry 89-3 at 22; see also id. at 23 (testimony that he "never had anything to do with Chestatee"). The record does not reflect that LifeBrite Labs ever entered into a laboratory services agreement with a CAH in Chestatee. (See generally Docket Entry 89-1; Docket Entry 89-2; Docket Entry 89-3.) Therefore, the Court would not consider Fletcher to have waived any privilege over communications with Walters regarding a CAH in Chestatee, to the extent those communications even exist.

19

reasons. First, as the trial transcript establishes, Walters's legal analysis in evaluating potential agreements entailed consideration of federal law, but also relevant state law. (See Docket Entry 89-2 at (memorandum discussing "[federal] [A]nti-[K]ickback [S]tatute" as well as Medicare's "Shell Laboratory Rule").) For example, the memorandum Walters drafted when LifeBrite Labs sought to enter an agreement with a CAH in Florida specifically included review of "the Florida Brokering Act." (Id. at 11.) Additionally, Walters's time entries reflect further conferral with Fletcher regarding "Florida fraud and abuse concerns with hospital/lab arrangement and physician marketing." (Id. at 121; see also id. at 122 (entries noting "[r]eview [of] Florida statutes and regulations," "Florida law," "Florida fraud and abuse issues," and "Florida compliance issues"), 220 (cross-examination addressing section in memorandum on "Florida Anti-brokering Patient Act"), 233 (same), 235 (same), 237 (same); Docket Entry 89-3 at 46 (inclusion in contract with Florida CAH of language indicating that "[t]he parties believe that th[eir] agreement complies with . . . all relevant fraud and abuse laws and regulations for the state of Florida"), 51 (inclusion in contract with Missouri CAH of similar language that refers to Missouri law).)

Separately, but as importantly, Walters also reviewed each CAH's contracts with health insurance providers "before he rendered his opinion on whether there was any prohibitive language in

20

th[os]e contract[s] that would deem it inappropriate for the reference lab agreement that he was drafting." (Docket Entry 89-1 at 48.) That included, for the first CAH in Florida, at least thirteen separate contracts with providers. (See id.; see also Docket Entry 89-2 at 12-13 (reflecting that Walters "reviewed the insurance contracts" for first CAH).) The record shows that Walters repeated this exercise for each subsequent laboratory services agreement. (See id. at 212 (discussing Walters's review of payer contract for CAH in Missouri).)

Florida law would have no bearing on Walters's analysis of a laboratory services agreement between LifeBrite Hospital (a CAH in North Carolina) and LifeBrite Labs (a Georgia entity). Moreover, Walters likely would have (as his past practice suggests) undertaken a separate review of LifeBrite Hospital's contracts with insurance providers prior to rendering a final opinion on the permissibility of an agreement with LifeBrite Hospital. Therefore, unlike the scope of the counsel's review in Martin Marietta, see 886 F. Supp. at 1247-48, Walters's legal advice here required examining the laws of different jurisdictions, as well as distinct sets of contracts with payers. Thus, unlike in Blue Lake Forest Products, LifeBrite Labs could not readily transpose Walters's work regarding an agreement with one CAH to another. Put another way, and as the E.I. Dupont Court similarly recognized, the general topic of Walters's representation consisted of advising on

21

laboratory services agreements with CAHs; but that general topic included discrete transactions with distinct legal issues, and the Court must not "ignore what [Fletcher] actually published [at the criminal trial]." E.I. Dupont, 269 F.R.D. at 607. Therefore, Fletcher's testimony disclosing Walters's advice related to agreements with CAHs in Florida and Missouri does not waive privilege as to LifeBrite's communications with Walters for a similar agreement with LifeBrite Hospital.

However, BCBSNC's Response highlights three additional passages that it contends effect a broad subject-matter waiver, and the Court ultimately concludes that one of those passages does waive any privilege for LifeBrite's communications with Walters regarding the laboratory services agreement with LifeBrite Hospital. First, the Response cites a portion of Fletcher's testimony for the proposition that Fletcher and Walters discussed "[w]hether there were any legal concerns about LifeBrite Labs contracting with a rural hospital to perform tests that the hospital would bill commercial insurers for." (Docket Entry 88 at 12.) But in that portion of testimony, Fletcher only confirms that, "anytime [he was] going to deal with a critical access hospital, [he] made sure [] Walters **was aware** of what [he was] doing to get legal advice from [Walters]." (Docket Entry 89-2 at 33 (emphasis added).) This general testimony as to unspecified dealings, and Walters's awareness (but not approval of any

22

particular transaction), falls short of establishing a subject matter waiver for communications related to a specific agreement with LifeBrite Hospital. See United States v. White, 887 F.2d 267, 271 (D.C. Cir. 1989) (holding that "general assertion lacking substantive content that one's attorney has examined a certain matter is not sufficient to waive the attorney-client privilege").

Next, the Response contends that Fletcher used one legal memorandum from Walters for "every [] arrangement LifeBrite Labs considered" (Docket Entry 88 at 12), because "it applied with equal force to [all CAHs]" (id.). However, the passage BCBSNC cites as support, placed in context, pertains only to LifeBrite Labs' agreement with the first CAH in Florida. (See Docket Entry 89-3 at 42-43.) In that passage, Fletcher testified about the memorandum Walters prepared prior to LifeBrite Labs entering an agreement with that CAH. (See id.) Then, Fletcher's attorney asked:

> Q. And . . . this is the only memorandum we have before [] Walters drafts all of the **_contract_**, right?

> A. Yes, sir.

(Id. at 43 (emphasis added).) The question specifically probed the contract with the first CAH in Florida, and sought to ascertain whether Fletcher consulted any other source before Walters drafted all of that (one, particular) contract, not all contracts with all CAHs, as the Response suggests.[3] The Court thus concludes that any

---

3 Elsewhere, Fletcher maintains that Walters's memorandum "[was] relevant for all three contracts [with the CAHs at issue in

subject matter waiver as a result of Fletcher's answer would not extend to LifeBrite Hospital.

Nonetheless, the Court does find that one passage from Fletcher's testimony waives privilege regarding the laboratory services agreement with LifeBrite Hospital. As the Response explains, Fletcher did "disclose[] that he relied on advice Walters provided about how LifeBrite Labs could contract with *any* rural hospital that would bill insurers for tests performed by the lab." (Docket Entry 88 at 20-21 (emphasis in original).) In the relevant passage, Fletcher's criminal trial counsel asked him, with regard to a draft agreement with the CAH in Missouri, whether "[LifeBrite Labs' in-house counsel] or [] Walters [had] told [Fletcher that] it would have been improper to enter into this type of agreement" (Docket Entry 89-2 at 93), to which Fletcher replied, "[n]o[, and that t]hey told [him] that it was proper as addressed in the contract that was written" (id.). The line of questioning continued:

_____

the criminal trial]." (Id. at 237.) True enough, because (as the Court has recounted) the memorandum discussed federal law, which would not vary from CAH to CAH, while also highlighting the importance of reviewing pertinent state law, as well as each CAH's contracts with payers. In that regard, the memorandum holds relevance across the board, at least in the sense that it established a framework for evaluating the propriety of laboratory services agreements with CAHs. But, as the entire transcript indicates, Walters had to review separate state laws, and separate contracts, for each CAH. Accordingly, Fletcher's suggestion that the one memorandum had relevance for all contracts does not lead to the conclusion that all contracts entailed the same "subject matter," for purposes of privilege waiver.

24

Q. If they had told you it was illegal, would you have done it?

A. No. We -- there was several proposals that they gave that said we should not do them, and we did not do them.

Q. So **every time** you were -- you brought something to Mr. Bonner or Mr. Walters, **if they told you, you couldn't do it, you didn't do it**?

A. **Correct. Every time.**

(Id. at 94 (emphasis added).) Fletcher's testimony here represents the classic embodiment of an advice of counsel defense: Fletcher stated, in effect, that whenever Walters voiced disapproval towards a proposal, Fletcher would discontinue the transaction, thereby prompting the jury to draw the inescapable inference that Walters approved of each agreement Fletcher and LifeBrite Labs completed. (See id.; see also Dallmann, 433 F. Supp. 3d at 813 (discussing scope of waiver when party raises advice of counsel defense and concluding that "[m]erely disclosing the advice received from the attorney would be a selective disclosure" and that "the waiver certainly extends to the advice given by the attorney and any communication made or evidence submitted to the attorney upon which the attorney's advice is based"). This particular testimony, unlike the prior two passages, does not address Walters's mere "aware[ness]." (See id. at 33.) Nor did Fletcher confine the scope of this testimony to an individual contract, or a particular CAH. (See Docket Entry 89-3 at 42-43.) Rather, Fletcher spoke to

25

"every time [ he] brought something to [] Walters."  (Docket Entry 89-2 at 94.)

To reiterate, this testimony constitutes a "voluntary disclosure by [Fletcher]."  Jones, 696 F.2d at 1072.  Voluntary disclosures of privileged information "waive[] the privilege not only as to the specific communication disclosed, but [also] as to all other communications relating to the same subject matter." Id.; see also Fed. R. Evid. 502(a).  Fletcher used this testimony in order "to gain an advantage in litigation," id., insofar as he "reveal[ed] one beneficial communication but [potentially] fail[ed] to reveal another, less helpful, communication on the same matter," Martin Marietta, 886 F. Supp. at 1252.  The Court cannot countenance the "use [of Walters]'s opinions as [both] sword [and] shield to affect the factfinding process."  Vaughan Furniture, 156 F.R.D. at 128.

As a result, the Court finds Fletcher waived the attorney-client privilege, and the subject matter of that waiver consists of all communications between LifeBrite and Walters related to Walters's approval of a laboratory services agreement between LifeBrite Labs and LifeBrite Hospital.  For the sake of clarity, this waiver extends not just to communications, but also to any

26

"evidence submitted to [Walters] upon which [his] advice [wa]s based." Dallmann, 433 F. Supp. 3d at 813.[4]

The foregoing analysis of Request One leaves LifeBrite's argument that the topic partly calls for irrelevant material because any communications regarding the CAHs at issue in the criminal trial "have absolutely no bearing on the claims or defenses in the instant litigation." (Docket Entry 86 at 11.) For one, such "conclusory assertions," Johns Hopkins Univ. v. Datascope Corp., No. 05-CV-759, 2007 WL 1450367, at *2 (D. Md. May 16, 2007), fail to meet LifeBrite's burden as the moving party. Putting that aside, considering that "[d]iscovery rules are to be accorded broad and liberal construction," Boshea, 2021 WL 4425765, at *2, and that "[r]elevance is not, on its own, a high bar," Jordan, 921 F.3d at 188, the Court finds that those communications (at a minimum) bear relevance to LifeBrite's state of mind in dealing with BCBSNC.

To recap, BCBSNC has alleged that LifeBrite made fraudulent misrepresentations by falsely certifying that LifeBrite Hospital

---

4 The Court could read Fletcher's statement more broadly, and plausibly find a waiver as to the entire attorney-client relationship. (See Docket Entry 89-2 at 94 (not limiting testimony to any particular type of proposal).) However, the Court elects to read Fletcher's facially unqualified statement in context, and interpret it as a reference to proposals related to laboratory services agreements with CAHs. (See id. at 93 (discussing agreement with CAH in Missouri prior to relevant line of questioning).) In so doing, the Court aims to scrutinize "what [Fletcher] actually published," E.I. Dupont, 269 F.R.D. at 607, and avoid "artificially expand[ing] the scope of the subject matter," id.

conducted certain tests that Lifebrite Labs actually conducted, a practice that LifeBrite Hospital's contract with BCBSNC allegedly prohibited. (<u>See</u> Docket Entry 75 at 12-13, 17, 51.) A claim for fraudulent misrepresentation requires an "intent to deceive." <u>Taylor v. Gore</u>, 161 N.C. App. 300, 303 (2003). Fletcher's testimony at the criminal trial indicates that he understood the importance of evaluating a CAH's contracts with insurance providers prior to entering a laboratory services agreement. (<u>See</u> Docket Entry 89-1 at 48 (reflecting that Walters insisted on reviewing payer contracts before opining on permissibility of laboratory services agreement).) Therefore, the communications with Walters concerning agreements with those CAHs shed light on LifeBrite's knowledge (and intent) when executing the laboratory services agreement at issue in this case and submitting reimbursement claims to BCBSNC. Accordingly, LifeBrite's argument of irrelevance lacks merit.

In sum, the Court denies the Motion to Quash as to Request One, but does so without prejudice to Walters maintaining any objections he timely lodged.

### Requests Two and Three

Request Two seeks production of Walters's communications "with anyone other than [LifeBrite r]elated [t]o the use of a [h]ospital's [b]illing [i]dentifiers to bill for [l]aboratory [s]ervices." (Docket Entry 86-2 at 13.) Request Three further

28

seeks, as a catch-all request, "all communications [Walters] ha[s] had [r]egarding [the CAHs]" (id. at 13-14), {t]o the extent [the communications were not] responsive to Request [One]" (id. at 13). LifeBrite does not meaningfully address either of these requests in the Motion to Quash or Reply, describing them in the introduction of the Motion to Quash as "seek[ing] entirely irrelevant information" (Docket Entry 86 at 6), but otherwise failing to develop any argument to support quashing the particular requests (see generally id. at 6-12 (failing to discuss Requests Two or Three); Docket Entry 90 at 1-15 (same)).

On its face, Request Two does not raise any issues with privilege, as it targets Walters's communications with third parties. (See Docket Entry 86-2 at 13.) In addition, in connection with the discussion as to Request One, the Court has already concluded that communications on the topic of laboratory services agreements with CAHs hold relevance to LifeBrite's intent in dealing with BCBSNC. Finally, although the language of Request Three could potentially include privileged communications (in view of the constraints the Court adopted in defining the waiver), and could raise concerns of overbreadth, the Court declines to quash or modify either Request Two or Request Three, given that LifeBrite failed to develop any argument on those fronts. See Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (emphasizing that "[a] party should not expect a

29

court to do the work that it elected not to do"). Accordingly, the Court denies the Motion to Quash as to Requests Two and Three, but does so without prejudice to Walters maintaining any objections he timely lodged.

*Requests Four, Five, and Six*

Requests Four, Five, and Six all demand production of documents. (<u>See</u> Docket Entry 86-2 at 14 (seeking documents "reflecting the relationship between [the] LifeBrite [entities]"), <u>id.</u> (requesting production of documents "[r]elated [t]o [l]abratory [s]ervices performed by Lifebrite Labs and billed using a [CAH identifier]"), <u>id.</u> (soliciting documents on topics of "any [i]vestigation by BCBSNC, other [p]ayors, or any governmental organization [r]elated [t]o the billing of [l]abratory [s]ervices by a [CAH]").) Like with Requests Two and Three, LifeBrite does not develop an argument in support of modifying or quashing Requests Four, Five, and Six; the Motion to Quash only contends in a conclusory fashion that "these categories of documents [are] overbroad and entirely irrelevant [and also] clearly encompass documents protected by the work product privilege." (Docket Entry 86 at 10-11.) Given the lack of argument on point, <u>see</u> <u>Hughes</u>, 2014 WL 906220, at *1 n.1, the different purposes underlying work-product protection and the attorney-client privilege, <u>see</u> <u>United States v. Nobles</u>, 422 U.S. 225, 238 (1975), and the distinct standards for ascertaining a waiver as to each, <u>see</u> <u>E.I. Dupont</u>,

30

269 F.R.D. at 606, the Court declines to grant relief to LifeBrite on this aspect of its Motion to Quash. See generally United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (cautioning that "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace" (internal quotation marks omitted)). Accordingly, the Court will also deny the Motion to Quash as it relates to Requests, Four, Five, and Six, without prejudice to Walters's right to maintain any objections he timely lodged.

### III. Conclusion

Fletcher's testimony at his criminal trial waived the attorney-client privilege as to all communications between LifeBrite and Walters regarding evaluation and establishment of a laboratory services agreement between LifeBrite Labs and LifeBrite Hospital, as well as the three CAHs at issue in the criminal trial. Further, LifeBrite has failed to substantiate any other basis for the Court to quash or to modify any of the subpoena requests.

**IT IS THEREFORE ORDERED** that the Motion to Quash (Docket Entry 86) is **DENIED** without prejudice to Adam Walters maintaining any objections he timely lodged to the subpoenas at issue.

This 9th day of August, 2023.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

31