CLAIN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LIFEBRITE HOSPITAL GROUP OF
STOKES, LLC,

     *Plaintiff,*

v.

BLUE CROSS AND BLUE SHIELD OF
NORTH CAROLINA,

     *Defendant.*

**Case No.: 1:18-00293-WO-LPA**

BLUE CROSS AND BLUE SHIELD OF
NORTH CAROLINA,

     *Counterclaim Plaintiff,*

v.

LIFEBRITE HOSPITAL GROUP OF
STOKES, LLC; LIFEBRITE
HOSPITAL GROUP, LLC;
LIFEBRITE LABORATORIES, LLC;
CHRISTIAN FLETCHER; and AMBER
FLETCHER,

     *Counterclaim Defendants.*

**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA'S MEMORANDUM
IN SUPPORT OF MOTION FOR SANCTIONS**

1

## INTRODUCTION

LifeBrite Hospital Group of Stokes, LLC ("the Hospital" or "LifeBrite Hospital") commenced this suit in April 2018, alleging that Blue Cross NC was required to pay more than $32 million for lab testing. The Hospital concedes that it did not - indeed *could not* - perform the vast majority of the testing for which it sought payment (urine confirmation tests and blood tests). But it claimed a contractual right to bill for the work another lab (LifeBrite Laboratories, LLC ("the Lab" or "LifeBrite Labs")) performed. The Hospital is wrong as a matter of law, the contract does not permit such billing. Nonetheless, for seven years, the Hospital has pressed its claim for tens of millions of dollars in purported damages, and has resisted returning the $12 million it was paid for work it did not do. Its basis for this claim has remained the same: the Hospital's relationship with LifeBrite Labs was purportedly a "standard" billing arrangement involving a "reference lab."

Each of the LifeBrite Parties, namely LifeBrite Hospital, LifeBrite Labs, LifeBrite Hospital Group, LLC, Chrisitan Fletcher, and Amber Fletcher, have subsequently joined in the

Hospital's approach. In so doing, each has repeatedly attested to the following factual basis: (1) a qualified provider ordered every test from the Hospital, including panel screens for all urine testing; (2) the lab at the Hospital performed every screen test ordered by the provider; (3) the Hospital then itself "ordered," via an electronic "HL7 interface," confirmation testing to be performed by LifeBrite Labs based on the results of the screen; (4) LifeBrite Labs performed the confirmation testing ordered by the Hospital; (5) LifeBrite Labs provided the results back to the Hospital via the "HL7 interface"; (6) the Hospital communicated the results of every test it performed and every test LifeBrite Labs performed to the ordering provider; and (7) the Hospital provided the information necessary to bill for the tests to its billing company (Empower H.I.S., LLC).

As the Court has recognized, the LifeBrite Parties must be able to document every step in that process. That is true not only as a matter of logic, but also law - a lab performing these services must be able to document, among other things, which tests it performed, which tests it ordered from a reference lab, and when those tests were performed. Indeed,

this information must be transparent and unambiguous on the face of every test result returned to the ordering physician.

Blue Cross NC contests not just the contractual position the LifeBrite Parties have taken, but also the alleged underlying factual basis. Blue Cross NC contends that every test at issue in this case was ordered from and performed by *LifeBrite Labs*, and that all results of those tests were communicated to the provider by *LifeBrite Labs*. Accordingly, LifeBrite Labs and not some other party should have been billing payors for its work.

To resolve this factual dispute about the testing billed, Blue Cross NC has requested the documents showing each step in the process described by the LifeBrite Parties, including documents showing which entity performed which test, when the tests were performed, and why. The LifeBrite Parties have responded with evasion, obfuscation, misdirection, and outright misrepresentation. And they show no sign of abandoning this strategy, even in the face of this Court's clear direction that they must.

For years, the LifeBrite Parties insisted that the answer to Blue Cross NC's (and the Court's) questions about each

4

LifeBrite Entity's role in the testing could be found in "***final laboratory test reports***, claims data, test data printouts, and electronic UB-04 forms." (Dkt. 126 at 13.) (emphasis added). This, the LifeBrite Parties told Blue Cross NC and later the Court, justified the Lab's refusal to produce its Laboratory Information System ("LIS") for years, forcing Blue Cross NC to file multiple motions to compel.

It is now undisputed that the LifeBrite Parties' representations about where the key information in this case could be found were false. And Christian Fletcher, who repeatedly swore to their veracity in verifying interrogatory responses, appears to have known that all along. Testifying as the corporate designee for LifeBrite Hospital, Fletcher stated unequivocally that "you can't look at a **lab report** and see who ran the test," and that he could only get that information from the LIS. (Declaration of Jeffrey S. Gleason, Ex. 1 at 271:11-13, 352:20-24, 354:20-25.) (emphasis added). The LifeBrite Parties have not even attempted to square that revelation with their prior statements, nor could they.

Backed into an evidentiary corner, it appears that the LifeBrite Parties intend to double down on their evasion

5

strategy. In supplemental interrogatory responses and at the Hospital's deposition, Fletcher has now sworn that the mySQL data from the LifeBrite Labs LIS contains all the answers. But no one from LifeBrite will commit to showing or explaining to Blue Cross NC how to find those answers. This does not appear to be an accident or miscommunication.

More than five years after filing suit, LifeBrite Labs eliminated the easy path to those answers when, in late 2023, it destroyed the user-friendly LIS interface it had used for nearly a decade.[1] Now, Blue Cross NC must turn to experts to query the data that LifeBrite Labs produced, which adds considerable time and cost to what should be a simple process.

Making matters worse, LifeBrite Labs refuses to confirm what the data it produced means, *i.e.*, where in the data one can find each of the steps taken in the testing process. Based on the deposition testimony of the vendor responsible for the LIS, it is seemingly indisputable that Blue Cross NC's

---

[1] Around the same time, LifeBrite Labs destroyed another source of data when it sold the analyzers that Blue Cross NC contends were used to perform the screens in Atlanta. LifeBrite Labs did not preserve any of the data on those analyzers, which may have included evidence that would prove those analyzers performed the screens. (Gleason Decl., Ex. 1 at 21:12-21.)

allegations are correct; every test at issue was performed at LifeBrite Labs, with LifeBrite Labs doing all the reporting to the ordering providers. But the LifeBrite Parties still refuse to concede that point, offering no alternative explanation. (Gleason Decl., Ex. 1 at 176:9-14.)

Blue Cross NC fears that, without this Court's imprimatur, the delays and substantial costs that the LifeBrite Parties have imposed on these proceedings will continue unabated, including into trial, and with material prejudice to Blue Cross NC. Accordingly, Blue Cross NC respectfully requests that the Court put an end to the LifeBrite Parties' cat-and-mouse games and hold them accountable for their abuse of the discovery process. To that end, Blue Cross NC requests the following relief:

*First*, that the Court award Blue Cross NC attorneys' fees incurred in pursuit of its motions to compel. (Dkt. 125; Dkt. 133.)

*Second*, that the Court award Blue Cross NC attorneys' fees and expert fees incurred in its effort to understand where the testing was performed without access to the easy-to-use LIS interface the LifeBrite Parties destroyed.

7

*Third*, that the Court impose an evidentiary sanction precluding the LifeBrite Parties from offering any evidence at trial (or in any motion) that challenges Blue Cross NC's interpretation of the LIS data that the LifeBrite Parties produced.

*Fourth*, such other relief the Court deems warranted.

## BACKGROUND

As the Court is aware, Blue Cross NC's attempts to secure discovery pertaining to the tests at issue have been significant and span years. (*See* Dkt. 125; Dkt. 133; Gleason Decl., Exs. 2-8, 10-17.) In particular, Blue Cross NC's Interrogatories to LifeBrite Hospital Nos. 5, 6, 7, 10, 11, 15, 16, 18, and 19, and Blue Cross NC's Interrogatory No. 9 to LifeBrite Labs, asked the LifeBrite Parties for information that would show where the testing was performed, which provider or entity ordered each test, and how each test was billed. (Gleason Decl., Exs. 9, 19.) Initially, LifeBrite Hospital invoked Fed. R. Civ. P. 33(d) in responding and directed Blue Cross NC to "final laboratory test reports, claims data, test data printouts, and electronic UB-04 forms." (Dkt. 126 at 13; *see also* Gleason Decl., Ex. 9)

8

Because the answers were insufficient, Blue Cross NC pressed for supplementation. (Gleason Decl., Ex. 2.) But the Hospital stuck to its guns, claiming through counsel that the documents identified in its responses provided all of the requested information. (*Id.*, Exs. 3-6.) As an apparent concession, the Hospital committed to producing, on a hard drive, data pulled from the LifeBrite Hospital LIS. (*Id.*, Ex. 4 at 9.) The Hospital represented that the hard drive included "all of the provider requisitions for tests, the directives issued by [LifeBrite Hospital] to conduct those tests and the results of the tests along with pdfs of the final lab report which was subsequently transmitted to the billing system for coding by a billing sub-contractor." (*Id.*) Blue Cross NC received that production on October 25, 2023. Not only did the Hospital rely on this hard drive, *LifeBrite Labs* also pointed to the Hospital hard drive in response to Interrogatory No. 9 to attempt to satisfy its own discovery obligations. (*Id.*, Ex. 19 at 16.)

Because the Hospital hard drive did not answer Blue Cross NC's questions, and nor did subsequent meet and confer attempts, Blue Cross NC was forced to file two motions to

9

compel answers to these interrogatories with the Court. (Dkt. 125; Dkt. 133.) The LifeBrite Parties responded, once again asserting that "BCBSNC has more than everything it needs to know to litigate this case." (Dkt. 140 at 7, *see also* Dkt. 126 at 3.) They repeated their representation that the documents answered Blue Cross NC's interrogatories on their own, incorporated discovery letters stating the same, and relied heavily on the notion that all information was readily available from a simple review of the hard drive containing the LifeBrite Hospital LIS data. (Dkt. 126 at 3, 9, 13-16, 21; Dkt. 140 at 4, 7-8.)

At the April 29, 2024 discovery conference before this Court, the Court pressed the LifeBrite Parties' counsel for the evidentiary support to back up their clients' allegations, which counsel could not provide. (Gleason Decl., Ex. 10 at 14:22-25, 15:1-25, 16:1-2.) Since that hearing, the Court has subsequently noted that (remarkably) Blue Cross NC has had to look to third parties to get answers to questions such as "who specifically ordered the testing, who performed the confirmation testing, and whether the testing was medically necessary." (Dkt. 247 at 7, 17.)

At the Court's directive, the parties reached a stipulated agreement which was read into the record on April 30, 2024, pursuant to which the LifeBrite Parties would produce a complete copy of all their LIS's with all permissions and any associated HL7 data.[2] (Gleason Decl., Ex. 11 at 14:18-25, 15:1-12.) The LifeBrite Parties did not do so. Instead, on July 10, 2024, they produced one hard drive containing two mySQL databases, which purportedly represented all "the LIS systems and HL7 data in the LifeBrite case."[3] (Gleason Decl., Ex. 12.) But it is now clear that the production fell materially short of what they told the Court would be included.

The production was *not* a true and accurate copy of either the Hospital's LIS or the Lab's LIS and did *not* include "all permissions." Simply put, neither LIS was produced as it existed as recently as September 2023, *i.e.*, with the

---

[2] Specifically, the LifeBrite Parties agreed to produce the LIS used by LifeBrite Labs, the LIS used by LifeBrite Hospital for its outreach laboratory program, and the LIS used by LifeBrite Hospital for patients of the Hospital. (Gleason Decl., Ex. 11 at 14:18-25, 15:1-12.)

[3] The hard drive appeared to contain data for the LIS used by LifeBrite Labs and data for the LIS used by LifeBrite Hospital for its outreach laboratory program.

11

searching functionality and ability to display results that were then available. What was produced instead was a massive amount of complex data that was (supposedly) extracted from the LifeBrite Hospital and LifeBrite Labs LIS's. Missing from the production is the user interface necessary to access the data as it would have been accessed at all times relevant to this dispute. This is because the LifeBrite Parties destroyed that tool long into discovery, depriving Blue Cross NC of "all permissions" that existed prior to that destruction.

As documents produced by the LifeBrite Parties reveal, LifeBrite Labs' LIS was designed to facilitate simple searching for answers to, among many other things, who did what and when with respect to each test at issue. (*See* Gleason Decl., Ex. 18). For example, below is a screen shot showing that ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[REDACTED] (*See* Gleason Decl., Ex. 18).

[REDACTED]

Because the LifeBrite Parties destroyed the LIS interfaces, Blue Cross NC is left to sift through the data using SQL searches, a process that is incredibly manual, slow, and costly, as it requires the use of experts. The data as it has been produced by the LifeBrite Parties would be entirely unworkable in a trial setting.

The LifeBrite Parties later supplemented their interrogatory responses to reference this data, stating "Pursuant to Fed. R. Civ. P. 33(d) and the parties' correspondence and meet-and-confer efforts, LifeBrite

Hospital directs BCBSNC to its Hospital and Lab LIS Systems." (*See* Gleason Decl., Ex. 9 at 14, 17, 20, 25-26, 29, 30-31; Ex. 19 at 17.) But the answers say nothing about where in either set of LIS data the information responsive to the interrogatories can be found. Since receipt of the LIS data, Blue Cross NC has continually asked that the LifeBrite Parties provide basic information about the various fields in the data set. Those requests have fallen on deaf ears. (*Id.*, Exs. 13-17.)

Blue Cross NC has also pressed for the documents showing the electronic "HL7 interface" communications that the LifeBrite Parties claim occurred in relation to every test at issue. If that story is to be believed, there should be records of each of the following: (1) a message from the Hospital to the Lab ordering confirmation testing; (2) a Lab copy of that same message; (3) a Hospital copy of a message of the results of the Lab tests; (4) a Lab copy of that same message; and (5) a Hospital copy of a message to the billing company authorizing submission of a claim to the insurer. But the LifeBrite Parties have only produced what they claim are categories (1) and (3). That, of course, means only that the

14

Hospital LIS generated a message and the Lab LIS generated a message. It says nothing about where the message went – a critically important fact since it appears that at least the Hospital's message went nowhere – *i.e.*, the Lab did not receive those "orders" and certainly did not rely on them to direct its own testing as the LifeBrite Parties contend. (*See* Gleason Decl., Exs. 15-16.)

On March 12, 2025, Fletcher was deposed as the corporate designee for LifeBrite Hospital, where he was shown examples of the documents that he swore in interrogatory responses would enable Blue Cross NC to "ascertain *every piece* of information it seeks." (Dkt. 126 at 16 (emphasis in original); *see also* Gleason Decl., Ex. 4 at 9.) Without batting an eye, Fletcher unequivocally stated that the information Blue Cross NC (and the Court) sought about the performance of the tests could *not be found* in those documents. The *only* source of that information, Fletcher proclaimed, was the LIS. (Gleason, Ex. 1 at 271:7-17.)

Fletcher was also provided access to the hard drive that he and his counsel had maintained for years was the "LBH LIS," professing that it would allow Blue Cross NC to "determine

15

which tests were run in Danbury and which tests were run in Atlanta." (Gleason Decl., Ex. 6 at 4.) But the Hospital hard drive was nothing of the sort, Fletcher testified, saying, "This isn't the LIS." (Gleason Decl., Ex. 1 at 348:4.) And he admitted that he could not determine where the testing was done using that hard drive alone. (*Id.*)

## LEGAL STANDARD

"[F]ederal courts have inherent authority to sanction." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 519 (4th Cir. 2018). Courts may use this authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (internal quotation marks omitted) (citation omitted). Courts may also "fashion an appropriate sanction for conduct which abuses the judicial process." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 276 (4th Cir. 2022). (citation omitted).

When selecting a type of sanction, courts are not constrained by any rule or statute. *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 375 (4th Cir. 2013). Rather, they must consider "the whole of the case in choosing the appropriate sanction," and they have broad discretion to

16

order sanctions based on a party's conduct in discovery. *Id.*; *Harvey*, 48 F.4th at 276. A court "may decide. . .that all (or a set percentage) of a particular category of expenses" were incurred due to a litigant's conduct, including attorneys' fees and expert fees. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 110 (2017). Courts may also use their inherent authority to impose evidentiary sanctions, up to and including dismissal. *Projects Mgmt.* 734 F.3d at 376.

## ARGUMENT

### I. The LifeBrite Parties' misrepresentations and refusals to participate in discovery justify fee-shifting sanctions.

As a direct result of the LifeBrite Parties' prevarication, Blue Cross NC has incurred significant expense in filing multiple motions to compel. At the April 29-30, 2024, hearing addressing those motions, the Court indicated that it was not ready to impose sanctions based on the LifeBrite Parties' failure to produce the LIS data, among other things, but was willing to revisit that question at a later date. (Gleason Decl., Ex. 11 at 22:24-25, 23:1-5.) Nearly a year after that hearing, Fletcher confirmed under oath that the representations he and the LifeBrite Parties made in support of their motions withholding the requested

17

discovery were *false*. Simply put, the LifeBrite Parties did not have a good faith legal or factual basis for withholding the discovery at issue.

Monetary sanctions are appropriate here. Every dollar that Blue Cross NC has spent in trying to pry loose discovery from the LifeBrite Parties was caused by the LifeBrite Parties' obstructionist tactics. Forcing Blue Cross NC to bear those costs in light of Fletcher's revelations would be inequitable. And the LifeBrite Parties could not claim surprise were the Court to shift that burden to them. *Projects Mgmt.*, 734 F.3d at 376 (holding that a party was on notice of possible sanctions when it had a full opportunity to litigate its inadequate interrogatory responses at a hearing before the Court).

Courts regularly impose such sanctions under similar circumstances. For instance, the Fourth Circuit upheld a court's decision to impose monetary sanctions where a party withheld clearly discoverable documents that the other side had repeatedly requested. *Six*, 891 F.3d at 519-20. The sanction was appropriate because this conduct necessitated additional motions and hearings. *Id.* And monetary sanctions

18

are generally appropriate where a party withholds relevant information that it is obligated to disclose. *E.g.*, *Beach Mart, Inc. v. L & L Wings, Inc.*, 302 F.R.D. 396 (E.D.N.C. 2014) (allowing an award of attorneys' fees for failure to supplement a response to a request for production).

The LifeBrite Parties have engaged in exactly the same conduct. They withheld production of the LIS for years, initially claiming that it did not exist, and later claiming that it was unnecessary because other documents would suffice. As discussed above, due to Christan Fletcher's own representations, it is now clear that *none* of those statements were true, and that the Lab and Hospital LIS's may be the most important pieces of evidence in this case. In the process of constructing their fable, the LifeBrite Parties repeatedly responded to interrogatories with references to documents that did not contain any answers, forcing multiple motions to compel.

Accordingly, Blue Cross NC respectfully requests that the Court issue an order under its inherent authority awarding Blue Cross NC attorneys' fees associated with its motions.

19

## II. The destruction of the LIS interface has directly resulted in additional attorneys' fees and expert fees to Blue Cross NC.

Since the motions to compel, the LifeBrite Parties have also forced Blue Cross NC to incur significant expenses by failing to preserve relevant evidence. While LifeBrite Labs and LifeBrite Hospital produced data that they say came from their respective LIS databases, neither produced the interface one needs to access as was done in the ordinary course of business. LifeBrite Labs destroyed that interface years into discovery. LifeBrite Hospital has not said why it is unable to produce its LIS interface.

Without the interfaces, Blue Cross NC requires the assistance of experts to query the databases. There is considerable cost associated with that need, both in expert fees and in the time it takes to run such manual searching.[4] And all of those costs are attributable to the LifeBrite Parties' failure to preserve the instrument that it now contends is essential to supporting *its allegations*.

---

[4] The data as it has been produced by the LifeBrite Parties is nearly entirely unworkable in both a deposition and trial setting due to the cumbersome manual searching required.

It is well established that a court "has the power to award reasonable expert witness fees for violations of its inherent authority, particularly where those fees are the direct result of the sanctionable conduct." *Chosin Few, Inc. v. Scott*, 209 F. Supp. 2d 593, 607 (W.D.N.C. 2002). Courts regularly award such expenses when incurring them is a "reasonable and necessary step" in light of the discovery violation. *Id.*

If the LifeBrite Parties had produced their LIS interface, rather than a mass of complicated mySQL data, Blue Cross NC's attorneys would not have needed to pore over the data for months, and would not have required expert assistance. Given the importance of the evidence, and the lack of guidance from the LifeBrite Parties, these steps were appropriate. Accordingly, Blue Cross NC respectfully requests that the Court award Blue Cross NC attorneys' fees and expert fees associated with Blue Cross NC's efforts to find answers to its interrogatories in the LIS data.

## III. The burden of the LifeBrite Parties' continued concealment justifies evidentiary sanctions.

The LifeBrite Parties' lack of transparency also merits evidentiary sanctions preventing the LifeBrite Parties from

21

presenting evidence challenging Blue Cross NC's interpretation of the LIS data. Unfortunately, the LifeBrite Parties' compliance with their discovery obligations has not improved even in light of the Court's clear directives at the April 29, 2024, hearing and beyond. To this day, the LifeBrite Parties refuse to tell Blue Cross NC how the data should be interpreted, including for example, what field indicates the date when the test was performed. (Gleason Decl., Ex. 13-17.) After taking the deposition of Computer Service and Support, Inc., the vendor who created and supported the LIS used by LifeBrite Labs, Blue Cross NC believes it understands most if not all of the relevant fields. But the fact that the LifeBrite Parties refuse to confirm that Blue Cross NC's reading is correct is troublesome, especially given that there is less than one month left in fact discovery. Blue Cross NC fears that the LifeBrite Parties will simply conjure up some alternative interpretation of the data to sow doubt at trial.

A party refusing to answer basic questions about its data would be problematic under any circumstances, but it is beyond the pale here where the LifeBrite Parties have explicitly

incorporated that information into numerous interrogatories under Rule 33(d). Of course, 33(d) is appropriate only when the information requested can be gleaned equally by both parties from a review of the cited documents. *T.N. Taube Corp. v. Marine Midland Mortg. Corp.*, 136 F.R.D. 449, 455 (W.D.N.C. 1991) (holding that a party's invocation of Rule 33(d) was improper where it had greater familiarity with the documents).

Through their invocation of Rule 33(d), the LifeBrite Parties have sworn that Blue Cross NC can determine each of the factual questions raised in its interrogatories *from the LIS data alone - i.e.*, without any additional information being provided by the LifeBrite Parties. The only reason they gave even this response is because the Court agreed that their previous answers were insufficient and ordered that they be supplemented. With less than a month left in fact discovery, these answers should be the LifeBrite Parties' final word on how one determines the answer to Blue Cross NC's questions about the testing. In other words, the LifeBrite Parties should not be permitted to offer any evidence challenging Blue Cross NC's interpretation of the LIS data.

23

Compared to sanctions imposed by other courts under similar circumstances, this is a sparing resolution of this issue. The Fourth Circuit has upheld a sanction of dismissal under the district court's inherent authority where a party, in answer to an interrogatory, claimed that certain information did not exist when, in fact, it did. *Projects Mgmt.*, 734 F.3d at 376. And one court dismissed a claim where a party failed to give appropriate interrogatory answers for 17 months despite "numerous admonitions of the court, and numerous promises to turn over the information." *Gardendance, Inc. v. Woodstock Copperworks, Ltd.*, 230 F.R.D. 438, 450 (M.D.N.C. 2005) (Osteen, Sr., J.); *see also Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976). These actions are just like those the LifeBrite Parties have taken here.

Blue Cross NC does not ask the Court to go that far because it recognizes that dismissal is a drastic sanction, and that courts must consider whether lesser sanctions would also be effective. *Id.* at 451 (holding that before dismissing a case, courts must consider, among other things, "the existence of sanctions less drastic than dismissal"). But the

24

LifeBrite Parties should not get to spin theories about the evidence in this case when they have refused for years to tell Blue Cross NC what those theories are based on.

Accordingly, Blue Cross NC respectfully requests that this Court prevent the LifeBrite Parties from offering evidence challenging Blue Cross NC's interpretation of the LIS data at any subsequent stage of this case.

## CONCLUSION

Because the LifeBrite Parties have repeatedly refused to provide the information that Christian Fletcher has now revealed to be foundational to this case, this Court should impose fee-shifting and evidentiary sanctions on the LifeBrite Parties.

Dated: April 25, 2025     */s/ Chad D. Hansen*

KILPATRICK TOWNSEND & STOCKTON LLP
Chad D. Hansen, NCSB No. 32713
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300
Facsimile: (336) 607-7500
Email:
ChadHansen@kilpatricktownsend.com

-and-

*/s/ Jeffrey S. Gleason*

ROBINS KAPLAN LLP
Jeffrey S. Gleason (*admitted pro hac vice*)
Nathaniel J. Moore (*admitted pro hac vice*)
Alexa R. Ely (*admitted pro hac vice*)
Joseph T. Janochoski (*admitted pro hac vice*)
Dominik M. Ruch (*admitted pro hac vice*)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55403
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
Email: JGleason@RobinsKaplan.com
Email: NMoore@RobinsKaplan.com
Email: AEly@RobinsKaplan.com
Email: JJanochoski@RobinsKaplan.com
Email: DRuch@RobinsKaplan.com


*Counsel for Defendant
and Counterclaim Plaintiff
Blue Cross and Blue Shield
of North Carolina*

26

<u>**CERTIFICATE OF COMPLIANCE**</u>

The undersigned attorney hereby certifies that the foregoing **Blue Cross Blue Shield of North Carolina's Memorandum in Support of its Motion for Sanctions** complies with LR 7.3(d)(1) of the Rules of Practice and Procedure in the United States District Court for the Middle District of North Carolina. This brief contains 4,479 words in reliance upon the word count feature of the word processing software used to create this document, exclusive of caption, signature block, Certificate of Service, any cover page or index, and this Certificate of Compliance.

Respectfully submitted this April 25, 2025

*/s/ Jeffrey S. Gleason*

27

## CERTIFICATE OF SERVICE

I hereby certify that on, April 25, 2025, **BLUE CROSS NC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SANCTIONS** was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Jeffrey S. Gleason*