IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LIFEBRITE HOSPITAL GROUP
OF STOKES, LLC,                   )
                                  )
          Plaintiff,              )
                                  )
      v.                          )
                                  )
BLUE CROSS AND BLUE SHIELD        )
OF NORTH CAROLINA,                )
                                  )
          Defendant.              )
                                  )
**************************** )          1:18-cv-293
                                  )
BLUE CROSS AND BLUE SHIELD        )
OF NORTH CAROLINA,                )
                                  )
      Counterclaim                )
      Plaintiff,                  )
                                  )
      v.                          )
                                  )
LIFEBRITE HOSPITAL GROUP OF       )
STOKES, LLC; LIFEBRITE HOSPITAL   )
GROUP, LLC; LIFEBRITE             )
LABORATORIES, LLC; CHRISTIAN      )
FLETCHER; and AMBER FLETCHER,     )
                                  )
          Counterclaim            )
          Defendants.             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Defendant/Counterclaim Plaintiff Blue

Cross and Blue Shield of North Carolina's motion to strike or in

the alternative motion to dismiss, (Doc. 253), Counts II and III

of the Second Amended Complaint, (Docs. 238, 240), of Plaintiff/Counterclaim Defendant LifeBrite Hospital Group of Stokes, LLC and Counterclaim Defendant LifeBrite Laboratories, LLC (collectively, "the LifeBrite Parties"). This court will deny the motion to strike for the reasons set forth on the record on December 8, 2025, (Docket Entry 12/08/2025; Doc. 307). For the reasons stated herein, the alternative motion to dismiss will be granted.

## I.     FACTUAL BACKGROUND

This dispute revolves around the laboratory of a "critical access" hospital in rural Danbury, Stokes County, North Carolina. (See Doc. 240 ¶¶ 17 & n.2, 20-28.) Before January 2017, that hospital was Pioneer Community Hospital of Stokes County ("Pioneer Hospital"). (See id. ¶¶ 17, 20, 23.) In 2013, Pioneer Hospital entered into a Network Participation Agreement with Defendant Blue Cross Blue Shield of North Carolina ("BCBSNC"). (Id. ¶ 20; Doc. 240-2.) BCBSNC is "the largest provider of private health insurance in North Carolina" and a licensee of the national Blue Cross Blue Shield Association ("BCBSA"), "a federation of thirty-six (36) independent health insurance organization and companies." (Doc. 240 ¶ 18.) BCBSA operates "the Blue Card program," which allows a policy holder of one BCBSA licensee to secure healthcare services from another

- 2 -

BCBSA licensee. (Id. ¶ 19.) Pursuant to the 2013 Network Participation Agreement, Pioneer Hospital "agreed to provide services to members covered by plans issued or administered by BCBSNC, its affiliates or another BCBS Affiliate," and BCBSNC agreed to compensate Pioneer Hospital for such services. (Id. ¶¶ 20-21.) Among those services, Pioneer Hospital's laboratory "performed laboratory services for BCBSNC's insureds, including patients that were not physically present at the hospital." (Id. ¶ 26.) The laboratory performed lab tests on "specimens received from assisted living facilities, home healthcare providers, the North Carolina Office of Rural Health, hospice care providers, industrial accounts, and the North Carolina Department of Social Services." (Id.)

In May 2016, Pioneer Hospital's parent company filed for Chapter 11 bankruptcy. (Id. ¶ 23.) In December 2016, the bankruptcy court approved the sale of Pioneer Hospital to Counterclaim Defendant LifeBrite Hospital Group, LLC ("LBHG"), (id. ¶ 23), an entity wholly owned by parent company LifeBrite Laboratories, LLC ("LBL"), (id. ¶ 10). LBHG "assumed essentially all rights and obligations relating to the operation of the hospital beginning January 31, 2017." (Id. ¶ 23.) LBHG assigned those rights and obligations to Plaintiff LifeBrite Hospital of Stokes, LLC ("LifeBrite Hospital"), an entity wholly owned by

- 3 -

parent company LBHG. (Id. ¶¶ 8-9, 23.) Counterclaim Defendant Christian Fletcher, Chief Executive Officer ("CEO") of LBHG and LBL, became CEO of the Hospital. (Id. ¶¶ 11, 23.) Counterclaim Defendant Amber Fletcher, Chief Operating Officer ("COO") of LBL, became COO of the Hospital. (Id. ¶¶ 12, 23.)

Pioneer Hospital became LifeBrite Hospital. After notifying BCBSNC of the purchase on January 18, 2017, LifeBrite Hospital and BCBSNC agreed to a "First Amendment to the Medicare Provider Agreement: Novation and Substitution," effective January 31, 2017, that included, inter alia, language stating "[e]xcept as amended or extended herein, all other terms and conditions of the Network Participation Agreement shall remain in full force and effect." (Id. ¶ 25; Doc. 240-4 at 2-3.)[1]

LifeBrite Hospital subsequently continued and expanded its laboratory services. (Doc. 240 ¶ 27.) Specifically, it expanded its "outreach program and urine toxicology lab testing." (Id.) The laboratory in situ in Danbury "performed the drug screening tests on specimens received for patients not physically present at the hospital." (Id.) However, LBL, headquartered in Atlanta, performed "[o]ther testing requiring more sophisticated testing

---

[1] All citations in this Memorandum Opinion and Order to documents filed with this court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

techniques and equipment." (Id. ¶ 10, 27.) The tests performed as part of the "outreach program were billed by LifeBrite Hospital to commercial payers, including to BCBSNC." (Id. ¶ 28.)

LifeBrite Hospital's expanded "laboratory outreach program" resulted in an "uptick in laboratory claims" to BCBSNC beginning around July 2017. (See id. ¶ 29; Doc. 240-5 at 5 ("$4M in OOS labs since July"); Doc. 240-6 at 2 ("only started billing hard since August"); Doc. 240-12 at 4 ("Billing started in June 2017."); Doc. 240-15 at 5 (same).) BCBSNC first noticed the "uptick" in September 2017. (Doc. 240 ¶ 29; see also Doc. 240-5 at 4-5.) However, it was in early November 2017 that concerns about LifeBrite Hospital's increased laboratory billing surfaced internally at BCBSNC. (See Doc. 240 ¶¶ 30-31; Docs. 240-5, 240-7.) In an email to several BCBSNC colleagues on November 3, 2017, Director of BCBSNC's Special Investigative Unit ("SIU") Roger Purnell wrote, "We are flagging [LifeBrite Hospital] immediately — $4M in OOS labs since July," and "[j]ust found them." (Doc. 240-5 at 5; see Doc. 240 ¶ 30.) On the same day, Purnell emailed a representative of Blue Cross Blue Shield of Alabama to inform her that "a hospital lab the [sic] is hitting you — LifeBrite Community Hospital of Stokes . . . . We just discovered them today — only started billing hard since

- 5 -

August[.] We will have them flagged by Monday[.]" (Doc. 240-6 at 2; see Doc. 240 ¶ 31.)

On November 7, 2017, BCBSNC placed LifeBrite Hospital on prepayment review for all claims billed under certain laboratory codes. (Doc. 240 ¶ 32.) On that same day, a BCBSNC colleague forwarded to Purnell an email from September 2017 in which a BCBSNC "Senior Provider Contract Consultant" had written that "[a]ccording to the current agreement," LifeBrite Hospital "are allowed to bill lab services through the hospital agreement." (Doc. 240-5 at 4; see Doc. 240 ¶¶ 29-30.) The Senior Provider Contract Consultant subsequently confirmed her earlier assessment, writing on November 7 that "[t]he contract places no restriction on who they can or cannot provide a lab service to," (Doc. 240-7 at 2; Doc. 240 ¶ 33), and again on November 13 that "LifeBrite's hospital agreement does not exclude reference laboratory. . . . [T]he agreement allows them to file any lab, including reference lab, under the hospital agreement," (Doc. 240-5 at 2; Doc. 240 ¶ 35).

The LifeBrite Parties allege that these and other contemporaneous internal communications show BCBSNC's concern was for their bottom line rather than about suspected fraud. (See Doc. 240 ¶¶ 29-41.) According to the LifeBrite Parties, "[t]he purpose of BCBSNC's prepayment review was only to slow

- 6 -

the number of claims submitted by LifeBrite Hospital." (Id. ¶ 32.) They allege that "[t]he terms of BCBSNC's prepayment review required LifeBrite Hospital to submit all claims in paper copy along with all medical record documentation," (id.), and that BCBSNC "unilaterally started denying several Blue Card claims and refusing to process other claims" on the basis that "the claims should be sent to the State where the lab specimen was drawn," though its policies stated otherwise, (id. ¶¶ 36-37).

The reason BCBSNC provided to LifeBrite Hospital for the prepayment review was "the drastic and inexplicable spike in laboratory claims that have been submitted to [BCBSNC] in the recent months." (Id. ¶ 40; Doc. 240-10 at 2.) BCBSNC's internal communications and external reporting described an exponential increase in the number and amount of laboratory claims billed by LifeBrite Hospital between June 2017 and November 2017. (See Doc. 240-5 at 3 ("over $4.5 M since August and just pushed 11,000 claims out on 11/7"); Doc. 240-12 at 4 (reporting increase in monthly billing of certain laboratory codes from $1,112 and $613 in June and July 2017, respectively, to $304,487 and $595,572 in October and November 2017, respectively).) In investigatory case records, BCBSNC reported that the basis for the prepayment review was that LifeBrite Hospital "was

- 7 -

identified as having excessively billed laboratory codes," (Doc. 240-11 at 15; see Doc. 240 ¶ 43), and BCBSA's case notification categorized that basis as "Fraud type indicator: Excessive Charges," (Doc. 240-12 at 4; see Doc. 240 ¶¶ 44, 47).

In late November 2017, soon after BCBSNC "flagged" LifeBrite Hospital's laboratory claims for prepayment review, BCBSNC's SIU investigators notified BCBSA of this action. (Doc. 240 ¶ 43.) They reported that the reason for the flag was "Excessive Charges," (id.; Doc. 240-11 at 3) — specifically, that LifeBrite Hospital's laboratory "[b]illing has spiked drastically over the last three months" and identified a list of the "[h]ighest billed codes." (Doc. 240-11 at 15.) They also reported that LifeBrite Hospital was notified of the prepayment review via certified mail on November 7, 2017. (Id. at 16.) Through December 2017, BCBSNC's investigators provided updates on the prepayment review and their investigation to BCBSA. (See id. at 16–21.) BCBSA submitted a report relaying this information to the United States Office of Personnel Management, Office of the Inspector General ("OPM-OIG") on December 21. (Doc. 240 ¶ 47; Doc. 240-12.)

Meanwhile, discussions continued internally at BCBSNC about LifeBrite Hospital's billing and the effectiveness of the prepayment review "flag." (Doc. 240 ¶ 45.) In a December 8, 2017

- 8 -

email to a colleague, SIU Director Purnell wrote, "Unfortunately as you can see LifeBrite's November payments went up again in November. I am having my team follow up on whether our flag is functioning properly as it was placed mid-November and I would have expected it to have had an impact." (Doc. 240-13 at 2.) Further, Purnell and his colleague discussed how to effectuate "outreach" to BCBSA about LifeBrite's billing "scheme." (Id.; see Doc. 240 ¶ 45.) In mid-December, BCBSNC revised the prepayment review "flag" of LifeBrite Hospital "to include all CPT and revenue codes" — that is, to include both laboratory and non-laboratory service claims. (Doc. 240 ¶ 46; Doc. 240-11 at 19.) The prepayment review continued through March 2018, as BCBSNC continued to scrutinize LifeBrite Hospital's billing activity. (See Doc. 240-11 at 22-48.)

LifeBrite Hospital initiated this lawsuit against BCBSNC on March 9, 2018. (Doc. 1 ¶ 1; Doc. 5.) On April 6, 2018, BCBSA issued a "Provider Hold Code Request" regarding LBL — the parent company of LifeBrite Hospital's parent company, LBHG — requesting a flag for "all CPT/HCPCS codes" from LBL. (Doc. 240 ¶ 48; Doc. 240-14 at 2.) The request explained that BCBSNC SIU Director Purnell "received an email from John Houston (Anthem plan) advising [LBL] is under investigation with their plan, as Lifebrite Hospital and its affiliates are being investigated for

excessively billing of laboratory services." (Doc. 240-14 at 2; see Doc. 240 ¶ 48.)

A little over a month later, on May 17, 2018, BCBSNC terminated the Network Participation Agreement with LifeBrite Hospital. (Doc. 240 ¶ 49.) On June 5, 2018, BCBSA conveyed to OPM-OIG an update regarding the recently initiated legal action and flagged claims from the period of January through March, 2018. (Doc. 240-15 at 4; see Doc. 240 ¶ 50.)

BCBSNC SIU's investigators reported to BCBSA on their investigation into LBL on October 23, 2018.[2] (See Doc. 240 ¶ 52; Doc. 240-16 at 2-4, 14.) Noting that "[BCBSNC] is currently involved in litigation with [LifeBrite Hospital]," the report described LBL as "an independent clinical laboratory in Brookhaven, Georgia, [that] is associated by common ownership with [LifeBrite Hospital]." (Doc. 240-16 at 14.) Further, BCBSNC's investigators related:

> Investigation has shown that laboratory services that are being conducted at [LBL] (Georgia) are being billed through [LifeBrite Hospital] (a rural hospital in North Carolina). Many Members receiving laboratory services reside outside of North Carolina and have no association with the hospital. At some point after [LifeBrite Hospital] was placed on prepayment review, claims began to [be] submitted by [LBL]. [LBL] was subsequently placed on prepayment review on 04/07/2018.

---

[2] It appears that BCBSNC SIU began to investigate LBL on April 5, 2018, (see Doc. 240-18 at 3 ("case opened" on "4/5/2018"); Doc. 240 ¶¶ 52-53), the day before BCBSA issued the "Provider Hold Code Request" regarding LBL, (Doc. 240 ¶ 48).

(Id.) BCBSNC characterized the bases for the prepayment review flag of and investigation into LBL as "Excessive Charges" and "Misrepresent[ing] Location of Provider." (Id. at 3; Doc. 240 ¶ 52.) The LifeBrite Parties allege that BCBSNC also communicated to several North Carolina state government entities about its prepayment flags and investigations of LifeBrite Hospital and LBL. (Doc. 240 ¶ 53 (citing Docs. 240-17, 240-18).) The LifeBrite Parties further allege that internal BCBSNC communications from early February 2019 show that BCBSNC concluded that the LifeBrite Parties had not actually engaged in fraudulent billing practices. (See id. ¶ 54, 56; Doc. 240-19.)

At some point in 2018, BCBSNC undertook a broader effort to monitor and limit in-network healthcare providers' use of out-of-network laboratory services. (See Doc. 240 ¶ 59; Docs. 240-20, 240-21, 240-22, 240-23.) In January 2017, BCBSNC had announced that Avalon Healthcare Solutions ("Avalon"), a laboratory benefits manager, would become BCBSNC's "exclusive network for reference laboratory services" and that "BCBSNC [would] adopt Avalon's network of independent laboratories" beginning on March 1, 2017. (Doc. 240-20 at 2; see Doc. 240 ¶ 57.) According to the LifeBrite Parties, in 2018, BCBSNC and Avalon engaged in a "redirection campaign" through "Redirection Letters" to in-network healthcare providers using the services

- 11 -

of out-of-network labs that sought to dissuade those providers from doing so "through the flexing of BCBSNC's contractual right to terminate a healthcare provider's contract with BCBSNC." (Doc. 240 ¶¶ 57–60; see Doc. 240-21 at 5-12; Doc. 240-22.) The LifeBrite Parties allege that this "redirection campaign" targeted LifeBrite Hospital and LBL. (Doc. 240 ¶¶ 58–60.)

## II.  PROCEDURAL HISTORY

LifeBrite Hospital initiated this lawsuit in state court on March 9, 2018, (Doc. 1 ¶ 1; Doc. 5), and BCBSNC removed to federal court on April 13, 2018, (Doc. 1). LifeBrite Hospital alleged two causes of action, breach of contract and unjust enrichment, in its original complaint. (Doc. 5 at 2-3.) On May 16, 2018, BCBSNC answered and asserted counterclaims against LifeBrite Hospital. (Doc. 11.) LifeBrite Hospital moved to dismiss BCBSNC's counterclaims on June 6, 2018, (Doc. 15), and it moved to remand to state court on the same day, (Doc. 16). On June 27, 2018, BCBSNC filed a first amended answer and counterclaims, (Doc. 20), and LifeBrite Hospital moved to dismiss the first amended counterclaims on July 20, 2018, (Doc. 24). This court denied as moot LifeBrite Hospital's motion to dismiss counterclaims in light of BCBSNC's first amended counterclaims, (Text Order in Docket Entry dated 03/12/2019). On

- 12 -

March 30, 2020, this court granted LifeBrite Hospital's motion to remand the case to state court. (Doc. 41.)

On appeal by BCBSNC, (Doc. 42), the Fourth Circuit reversed this court's remand order on June 8, 2021. (Docs. 47, 48, 49.) On July 7, 2021, LifeBrite Hospital again moved to dismiss BCBSNC's first amended counterclaims, (Doc. 50), and this court granted in part and denied in part that motion on March 16, 2022, (Doc. 58). Following an initial pretrial conference hearing, (Doc. 62), the parties filed a Joint Rule 26(f) Report on November 18, 2022, (Docs. 63, 64), which was adopted by the Magistrate Judge on November 21, 2022, (Text Orders in Docket Entries dated 11/21/2022). Discovery began on November 21, 2022, and it was to be completed on September 25, 2023. (See Doc. 63 at 2, 4; Docket Entry 11/21/2022.)

Upon leave of the Magistrate Judge, (see Doc. 73; Text Orders in Docket Entries dated 03/15/2023), on March 17, 2023, BCBSNC filed a restated answer and second amended counterclaims, (Doc. 75), against LifeBrite Hospital and joined Counterclaim Defendants LifeBrite Hospital Group, LLC; LifeBrite Laboratories, LLC; Christian Fletcher; and Amber Fletcher, (id. at 12). Each Counterclaim Defendant filed its answer on April 11, 2023. (Docs. 81, 82, 83, 84, 85.) On July 17, 2023, the parties jointly moved to modify the scheduling order to extend

- 13 -

fact discovery and other deadlines. (Doc. 94 at 2.) This court granted the parties' joint motion on July 24, 2023, (Doc. 98), extending, <u>inter alia</u>, the fact discovery deadline to February 29, 2024, (<u>id.</u> at 2).

On December 22, 2023, LifeBrite Hospital and Christian Fletcher moved for leave to file an amended complaint and counterclaims, (Docs. 146, 147), attaching to the motion the proposed amended complaint and counterclaims, (Docs. 146-1, 147-1). The parties jointly moved to modify the scheduling order to further extend discovery on January 18, 2024, (Doc. 159 at 2). On February 27, 2024, following a hearing on these motions, this court granted the motion to amend, (Docs. 146, 147), and it granted in part the joint motion to modify the scheduling order, (Doc. 159), extending, <u>inter alia</u>, discovery through April 29, 2024. (Docket Entry 02/27/2024; Doc. 219.) LifeBrite Hospital and Christian Fletcher filed their first amended complaint and counterclaims on March 1, 2024. (Docs. 183, 185.)

BCBSNC moved to dismiss the first amended complaint and counterclaims of LifeBrite Hospital and Christian Fletcher on March 6, 2024. (Doc. 188.) Following hearings on the matter on April 30, 2024, (Docket Entry 04/30/2024; Doc. 203), and January 13, 2025, (Docket Entry 01/13/2025), this court granted in part and denied in part BCBSNC's motion to dismiss, (Doc. 230).

- 14 -

Specifically, this court: dismissed without prejudice Count III (UDTPA Violations) and Count V (Exemplary and Punitive Damages) of LifeBrite Hospital's and Christian Fletcher's first amended complaint, (id. at 2); dismissed Count II (Unjust Enrichment) and of the first amended complaint, (id.); and, with respect to Count IV (defamation/libel/slander) of the first amended complaint, this court dismissed all claims of libel per se and all claims of libel per quod except as to the statements and reports contained in Exhibits 11 and 16, (id.; see Docs. 185-7, 186-12).

On January 29, 2025, BCBSNC and LifeBrite Hospital separately filed competing motions to modify the scheduling order. (See Docs. 232, 233.) This court issued an order on February 12, 2025, (Doc. 234), establishing, inter alia, a deadline of March 12, 2025, for filing amended pleadings and a deadline of May 16, 2025, for the close of fact discovery, (id. at 2).[3]

LifeBrite Hospital and LBL filed a second amended complaint and counterclaims on March 12, 2025. (Docs. 238, 240.) On April 16, 2025, BCBSNC filed a motion to strike or in the alternative motion to dismiss Counts II and III of the second amended

---

[3] This court subsequently granted the parties' joint motion to extend discovery deadlines by three weeks, (Doc. 267), on May 20, 2025. (Doc. 269.)

complaint of LifeBrite Hospital and LBL, (Doc. 253), and a memorandum in support of the motion, (Docs. 254, 257.) LifeBrite Hospital and LBL filed a memorandum in opposition to the motion on May 7, 2025, (Docs. 263, 265), to which BCBSNC replied on May 22, 2025, (Docs. 274, 275.) A hearing on the motion was held on December 8, 2025. (Docket Entry 12/08/2025; Doc. 307.)

## III. <u>STANDARD OF REVIEW</u>

A motion pursuant to Rule 12(b)(6) challenges the legal sufficiency of the facts alleged in the complaint. <u>Francis v. Giacomelli</u>, 588 F.3d 186, 192 (4th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). To be facially plausible, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> When ruling on a motion to dismiss, a court must accept the complaint's well-pleaded factual allegations as true. <u>Id.</u> Further, a court must "draw all reasonable inferences in favor of the plaintiff." <u>Ray v. Roane</u>, 948 F.3d 222, 226 (4th Cir. 2020) (internal quotation marks and citation omitted).

- 16 -

Nevertheless, sufficient factual allegations must "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. Consequently, even given the deferential standard afforded to pleadings at the motion to dismiss stage, a court will not accept mere legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." Iqbal, 556 U.S. at 678.

## IV. ANALYSIS

### A. Defamation Claims

Count II of the second amended complaint alleges that BCBSNC defamed LifeBrite Hospital. (Doc. 240 ¶¶ 71-87.) "In North Carolina, the term defamation applies to the two distinct torts of libel and slander. In general, libel is written while slander is oral." Pierce v. Atl. Grp., Inc., 219 N.C. App. 19, 33, 724 S.E.2d 568, 578 (2012) (internal quotation marks and citations omitted).

#### 1. Slander

While LifeBrite Hospital purports to bring both libel and slander claims under Count II, (see Doc. 240 ¶¶ 72, 80), it bases its defamation action entirely upon written statements,

- 17 -

(see id. ¶¶ 42-56, 72-74; see also Docs. 240-11, 240-12, 240-16, 240-17, 240-18), and it fails to allege with sufficient particularity any oral statements that would serve as the basis for a slander claim, (see id.). "[A]llegedly slanderous remarks need not be repeated verbatim, but they must be alleged substantially in haec verba, or with sufficient particularity to enable the court to determine whether the statement was defamatory." Izydore v. Tokuta, 242 N.C. App. 434, 446, 775 S.E.2d 341, 349 (2015) (cleaned up) (citation omitted); see also Jolly v. Acad. Collection Serv., Inc., 400 F. Supp. 2d. 851, 861 (M.D.N.C. 2005) ("In pleading a cause of action for defamation, a plaintiff must recount the allegedly defamatory statement either verbatim or at least with enough specificity to allow the Court to decide if the statement is defamatory.").

Accordingly, this court finds that LifeBrite Hospital has failed to state a claim for slander, and it will dismiss Count II of the second amended complaint insofar as it alleges any such claim.

### 2. Libel

LifeBrite Hospital's libel claim against BCBSNC is premised upon written statements contained in documents attached as exhibits to the second amended complaint and referenced throughout that pleading. (See Doc. 240 ¶¶ 42-56, 72-74; Docs.

- 18 -

240-11, 240-12, 240-13, 240-14, 240-15, 240-16, 240-17, 240-18, 240-19.) LifeBrite Hospital previously alleged libel in Count IV of the first amended complaint and relied on many, though not all, of these same documents, and the statements therein, as the basis for the claim. (See Doc. 185 ¶¶ 42-54,75-92; Docs. 185-7, 185-8, 185-9, 185-10, 185-11, 185-12.) On BCBSNC's prior 12(b)(6) motion, (Doc. 188), and for the reasons stated on the record at the hearing on January 13, 2025, (see Docket Entry 01/13/25), this court already dismissed with prejudice all of LifeBrite Hospital's libel per se claims and all of its libel per quod claims except as to the statements and reports contained in Exhibits 11 and 16, (Docs. 185-7 and 185-12). (Doc. 230 at 2); see Fed. R. Civ. P. 41(b). As a consequence, LifeBrite Hospital is now precluded from resurrecting in its second amended complaint those libel per se and libel per quod claims that this court already dismissed. See Jones-Debnam v. Bellarose Nursing and Rehab Ctr., Inc., No. 20-cv-530, 2021 WL 6199587, at *2 (E.D.N.C. Mar. 23, 2021) ("Dismissals with prejudice under Rule 12(b)(6) are final adjudications that carry preclusive effect."); Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1471 (4th Cir. 1991) ("a dismissal under Rule 12(b)(6) is accorded res judicata effect"); Montana v. United States, 440 U.S. 147, 153 (1979) ("Under res judicata, a final

- 19 -

judgment on the merits bars further claims by parties or their privies based on the same cause of action.").

Accordingly, this court will dismiss Count II insofar as it attempts to reallege (a) libel per se or (b) libel per quod not based upon statements and reports contained in Exhibits 11 or 16, (Docs. 185-7, 185-12; Docs. 240-11, 240-16), or in documents that were not already adduced to support Count IV of the first amended complaint, (e.g., Doc. 240-17, 240-18, 240-19).

### 3.    **Remaining Libel Per Quod**

What remains of Count II of the second amended complaint is LifeBrite Hospital's allegation of libel per quod based on statements contained in Exhibits 11, 16, 17, 18, and 19, (Docs. 240-11, 240-16, 240-17, 240-18, 240-19). (See Doc. 240 ¶¶ 71–87.) BCBSNC contends that this remaining libel per quod claim should be dismissed because it is time-barred or based upon non-actionable statements. (Doc. 257 at 26.) LifeBrite Hospital responds by accusing BCBSNC of "trying to re-litigate an issue that it caused in avoiding its discovery obligations" and by reminding this court that it previously declined to dismiss as time-barred libel per quod based on Exhibits 11 and 16 and urging it not to "re-open that issue." (Doc. 265 at 32.)

As an initial matter, this court observes that it is not bound by its previous decision declining to dismiss the libel

- 20 -

per quod claim based on Exhibits 11 and 16. The Fourth Circuit has recognized that "denials of motions to dismiss remain open to trial court reconsideration, and do not constitute the law of the case." Krembel v. United States, 837 F. App'x 943, 950 (4th Cir. 2020) (cleaned up) (quoting Plotkin v. Lehman, 1999 WL 259669, at *1 (4th Cir. Apr. 30, 1999)); Columbia Gas Transmission, LLC v. Ott, 984 F. Supp. 2d 508, 523 (E.D. Va. 2013) ("[D]enial of a motion to dismiss remains subject to reconsideration until the Court enters final judgment in the case. Therefore, such a denial does not constitute 'the law of the case' . . . ."). Further, procedural context matters here. BCBSNC's present Rule 12(b)(6) motion comes in response to the filing of the second amended complaint. Young v. City of Mt. Ranier, 238 F.3d 567, 572, (4th Cir. 2001) ("[A]n amended pleading ordinarily supersedes the original and renders it of no legal effect." (internal quotation marks and citation omitted)). BCBSNC now reasserts the statute of limitations with new arguments, informed by new facts alleged in that new pleading, (see Doc. 257 at 26–30; Doc. 274 at 15–17), that directly pertain to the libel per quod claim, (see Doc. 240 ¶¶ 72–78, 111.a). Thus, it is in light of this context that this court reexamines the statute of limitations issue.

"The statue of limitations is an affirmative defense that may be raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim." United States v. Kivanc, 714 F.3d 782, 789 (4th Cir. 2013). At the motion to dismiss stage, "[a] court may dismiss a claim as barred by a statute of limitations if 'the relevant facts clearly appear on the face of the complaint.'" Paxton v. LVNV Funding, LLC, 2024 WL 4262743, at *1 (4th Cir. Sep. 23, 2024) (quoting Epcon Homestead, LLC v. Town of Chapel Hill, 62 F.4th 882, 885 (4th Cir. 2023). A defendant bears the burden of proving an affirmative defense. Fed. R. Civ. P. 8(c). Under North Carolina law, if the defendant shows that the statute of limitations has run, the burden shifts to the plaintiff to "show that its suit was commenced within the appropriate time from the accrual of the cause of action." Chase Dev. Grp. v. Fisher, Clinard & Cornwell, PLLC, 211 N.C. App. 295, 304, 710 S.E.2d 218, 224 (2011).

North Carolina law subjects defamation claims to a one-year statute of limitations. N.C. Gen. Stat. §§ 1-15(a), 1-54(3). A cause of action for defamation accrues on the date of publication of the defamatory words, regardless of whether or when the plaintiff becomes aware of the publication or the identity of the author. Philips v. Pitt Cnty. Mem'l Hosp. Inc., 222 N.C. App. 511, 526, 731 S.E.2d 462, 472 (2012) (quoting

- 22 -

<u>Gibson v. Mut. Life Ins. Co.</u>, 121 N.C. App. 284, 287, 464 S.E.2d 56, 58 (1996)). A publication is the communication or transmission of defamatory matter to a third person – that is, someone other than the person defamed. <u>Clark v. Clark</u>, 280 N.C. App. 384, 398, 867 S.E.2d 743, 754 (2021). "Generally, under North Carolina law, 'each publication' of a defamatory material is a 'different tort' and therefore 'the statute of limitations typically runs separately for each publication.'" <u>Hetzel v. ANC Healthcare, Inc.</u>, No. 23-cv-152, 2024 U.S. Dist. LEXIS 241642, at *12 (W.D.N.C. Aug. 6, 2024) (quoting <u>Cannon v. Peck</u>, 36 F.4th 547, 576 (4th Cir. 2022)), <u>report and recommendation adopted in</u>, 2025 U.S. Dist. LEXIS 54136 (Mar. 24, 2025). In other words, North Carolina law does not apply the "continuing wrong doctrine" such that a second publication of a defamatory statement tolls the statute of limitations for the first publication of the defamatory statement. <u>Johnson v. City of Raleigh</u>, No. 12-CV-210, 2013 U.S. Dist. LEXIS 93947, at *19 (E.D.N.C. Mar. 19, 2013).

Before turning to the allegedly defamatory statements to determine when they were published, it is necessary to settle when LifeBrite Hospital's libel <u>per quod</u> claim should be considered "filed" for the purposes of the statute of limitations. Relevant here is the relations-back doctrine. When,

- 23 -

as here, a party amends its pleadings pursuant to Rule 15(a)(2), the amendment shares "the filing date of the original complaint" if it "relates back" to that pleading. <u>Goodman v. Praxair, Inc.</u>, 494 F.3d 458, 466-67 (4th Cir. 2007). "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "A claim arises out of the same conduct, transaction, or occurrence if: (1) there is 'a factual nexus between the amendment and the original complaint,' and (2) the 'defendants had notice of the claim and will not be prejudiced by the amendment.'" <u>Cannon</u>, 36 F.4th at 576 (quoting <u>Grattan v. Burnett</u>, 710 F.2d 160, 163 (4th Cir. 1983)).

Here, this court is presented with a pair of nesting amendments: the second amended complaint, filed on March 12, 2025, (Docs. 238, 240); and the first amended complaint, filed on March 1, 2024, (Docs. 183, 185), after this court granted leave to do so on February 27, 2024, (Oral Order in Docket Entry 02/27/2024), on LifeBrite Hospital's motion for leave to amend for "good cause" pursuant to Rule 15(a)(2), which was filed on December 22, 2023, (Docs. 146, 147). This court finds that the libel <u>per quod</u> claim alleged in Count II of the second amended

complaint relates back to the first amended complaint, (Doc. 185). See Cannon, 36 F.4th at 576. However, the relations-back ends there: the defamation claims alleged in the first amended complaint do not relate back to the original complaint, (Doc. 5). See id.

Accordingly, the libel per quod claim in question relates back only so far as the date of filing of the first amended complaint. That date is February 27, 2024. "Under Rule 15 . . . an amended complaint is not actually 'filed' until the court grants 'leave' for the amendment." Angles v. Dollar Tree Stores, Inc., 494 F. App'x 326, 329 (quoting Murray v. Archambo, 132 F.3d 609, 612 (10th Cir. 1998)); Bottom v. Bailey, No. 12cv97, 2013 WL 431824, at *2–3 (W.D.N.C. Feb. 4, 2013) ("[T]he Fourth Circuit [has] held that a proposed amended complaint which is filed with the motion to amend is deemed filed as of the date the court grants the motion to amend." (citing Savilla v. Speedway SuperAmerica, LLC, 91 F. App'x 829, 831 (4th Cir. 2004))). This court granted LifeBrite Hospital leave to amend its pleadings and file the first amended complaint on February 27, 2024. (Docket Entry 02/27/2024; Docket Entry Oral Order 02/27/2024.)

Thus, February 27, 2024, is the date on which the first amended complaint and, through the doctrine of relations-back,

- 25 -

the defamation claims stated in Count II of the second amended complaint, are deemed to have been "filed." Accordingly, to be actionable, the libel per quod action in question must not have accrued earlier than one year before that date — that is, before February 27, 2023. See N.C. Gen. Stat. §§ 1-15(a), 1-54(3) (one year statute of limitations for defamation claims); Hernandez v. Caldwell, 225 F.3d 435, 439 (4th Cir. 2000) ("When a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period." (internal quotation marks and citation omitted)).

This court now turns to the issue of determining when the allegedly defamatory statements were published. As previously stated, LifeBrite Hospital's remaining libel per quod claim is premised upon allegedly defamatory statements contained in reports and documents in Exhibits 11, 16, 17, 18, and 19. (See Doc. 240 ¶¶ 71-87.) Exhibit 11 is a "report [that] identified LifeBrite Hospital as having been flagged for prepayment review" for "[e]xcessive charges." (Id. ¶ 43; see Doc. 240-11.) The report and statements in Exhibit 11 were initially published on November 28, 2017, when the report was submitted to BCBSA. (Id.) Exhibit 16 is another report to BCBSA identifying LBL and LifeBrite Hospital as under investigation for "Excessive

- 26 -

Charges" and "Misrepresent[ing] Location of Provider." (See Doc. 240 ¶ 52; Doc. 240-16 at 3-4.) The report and statements in Exhibit 16 were initially published on October 23, 2018. (Id.) Exhibit 17 is an email correspondence consisting of three messages between BCBSNC and officials in the North Carolina Office of the State Treasurer and North Carolina State Health Plan.[4] (See Doc. 240 ¶ 53; Doc. 240-17.) The first and second emails were sent — that is, published — on September 19, 2018, and the third email on September 20, 2018. (Doc. 240-17 at 2-3.) The factual allegations suggests that Exhibit 18 is a report that was transmitted as an attachment to or otherwise in conjunction with the emails of Exhibit 17, though the allegations do not make this point entirely clear. (See Doc. 240-18; Doc. 240 ¶¶ 53 ("This particular report identified the LifeBrite Parties as the subject of the meeting, based on the North Carolina Treasurer employee's highlighting.").) Accepting this suggestion as true, then the report and statements

---

[4] LifeBrite Hospital also alleges that Exhibit 17 represents communications with the North Carolina Attorney General, (Doc. 240 ¶ 53), however this allegation appears belied by the emails themselves, which list multiple senders and recipients with BCBSNC email addresses ("@bcbsnc.com"), N.C. State Treasurer email addresses ("@nctreasurer.com"), and State Health Care Plan email addresses ("shreports@compass.nctreasurer.com"), but does not list any sender or recipient with an email address identifiable as pertaining to the office of the North Carolina Attorney General, (see Doc. 240-17 at 2-3).

- 27 -

contained in Exhibit 18 were published when those emails were sent — September 19 and 20, 2018.[5] Finally, Exhibit 19 is an email correspondence consisting of two messages between BCBSNC employees that discuss LifeBrite Hospital. (Doc. 240 ¶ 54; Doc. 240-19.) The emails in Exhibit 19 were sent on January 31, 2019, and February 1, 2019. (Doc. 240-19 at 2-3.)

Based on these initial publication dates, the allegedly defamatory statements and reports contained in each of these exhibits appear to be time-barred, and so BCBSNC argues, (see Doc. 257 at 27-30). According to LifeBrite Hospital, however, these statements were republished to third parties after the respective initial dates of publication. (See Doc. 240 at ¶¶ 113, 116.) LifeBrite Hospital avers:

> One BCBSNC reports against LifeBrite Hospital was last updated on April 20, 2022 by a BCBSNC investigator. In fact, BCBSNC even resubmitted its report on April 20, 2022. Another report by BCBSNC against the LifeBrite Parties was last updated on March 10, 2022. Both these reports, and other communications, have been edited, revised, and supplemented throughout years. . . . In fact, one report identifies 373 edits, 1,358 views, 4 deletions, and logs numerous users and viewers, including many unknown viewers, occurring as recently as August 2023.

(Id. ¶ 113 (citations omitted) (citing to Docs. 240-11, 240-16).) BCBSNC maintains that the second amended complaint "does

---

[5] The report itself associates the relevant statements with earlier dates: "4/5/2018" and "11/6/2017," the "[d]ate [the] case[s] opened." (See Doc. 240-18 at 2-3.)

- 28 -

not plausibly allege republication on a date that would not be time-barred." (Doc. 257 at 29.)

The parties arguments implicate the "single publication rule." While the North Carolina courts have not addressed the "single publication rule," decisions by the Fourth Circuit and other district courts in North Carolina, as well as other circuit courts and the courts of a majority of states, persuade this court to apply the rule to the defamation claims presently before it. See Lokhova v. Halper, 995 F.3d 134, 142–47 (4th Cir. 2021); Hetzel, 2024 U.S. Dist. LEXIS 241642, at *12–13; Johnson, 2013 U.S. Dist. LEXIS 93947, at *12–17; Morrissey v. William Morrow & Co., 739 F.2d 962, 967 (4th Cir. 1984) ("The great majority of the States now follow the single publication rule." (internal quotation marks and citation omitted)); Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 615 (7th Cir. 2013) (collecting cases that show "[e]very state court that has considered the question applies the single-publication rule to information online"); see also, e.g., Oja v. United States Army Corps of Eng'rs, 440 F.3d 1122, 1129–34 (9th Cir. 2006); Shepard v. TheHuffingtonPost.Com, Inc., 509 F. App'x 556, 556 (8th Cir. 2013); In re Phila. Newspapers, LLC, 690 F.3d 161, 173–75 (3d Cir. 2012).

- 29 -

Under the single publication rule, "any one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." <u>Hetzel</u>, 2024 U.S. Dist. LEXIS 241642, at *12 (cleaned up) (quoting Restatement (Second) of Torts § 577A (1977)). In deciding to apply the single publication rule to defamation claims under Virginia law, the Fourth Circuit described the application of the rule and its underlying policy justification:

> The single publication rule "permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons." <u>Katz v. Odin, Feldman & Pitlleman, P.C.,</u> 332 F. Supp. 2d 909, 918 (E.D. Va. 2004). Pursuant to the single publication rule, "subsequent distribution of a defamatory statement may continue to increase plaintiff's compensable damages," but the subsequent distribution "does not create independent actions or start the statute of limitations running anew." <u>Id.</u> (citing <u>Zuck v. Interstate Publ'g Corp.,</u> 317 F.2d 727, 729-30 (2d Cir. 1963)). . . . The single publication rule aims to "avoid the overwhelming multiplicity of lawsuits that could result from defamatory statements contained in mass publications such as newspapers and magazines." <u>Armstrong v. Bank of Am.,</u> 61 Va. Cir. 131, 2003 WL 1960685, at *2 (2003). This underlying rationale has led other courts to observe "the Internet's greater reach comes with an 'even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants.'" <u>Pippen v. NBCUniversal Media, LLC,</u> 734 F.3d 610, 616 (7th Cir. 2013) (quoting <u>Firth v. State,</u> 98 N.Y.2d 365, 747 N.Y.S.2d 69, 775 N.E.2d 463, 466 (N.Y. 2002)).

<u>Lokhova</u>, 995 F.3d at 142.

Republication is an exception to the single publication rule. See id. at 142-43; Hetzel, 2024 U.S. Dist. LEXIS 241642, at *13. That is, where there are "separate aggregate publications on different occasions," then each of those separate instances of aggregate publication may constitute a separate, actionable instance of defamation. Hetzel, 2024 U.S. Dist. LEXIS 241642, at *13 (quoting Restatement (Second) of Torts § 577A cmt. d (1977)). Examples of "separate aggregate publications on different occasions" include where "the same defamatory statement is published in the morning and evening editions of a newspaper" or "a rebroadcast of the defamation over radio or television or a second run of a motion picture on the same evening." Id (quoting Restatement (Second) of Torts § 577A cmt. d (1977)). In such cases, "the publication reaches a new group and the repetition justifies a new cause of action." Id. (quoting Restatement (Second) of Torts § 577A cmt. d (1977)).

However, in applying the single publication rule and the republication doctrine to internet-mediated communications, courts have been specific in distinguishing what actions rise to the level of republication and what do not. For example, in Lokhova, the Fourth Circuit held that "a mere hyperlink, without more, cannot constitute republication," 995 F.3d at 143, and

agreed with the Third Circuit that "[i]f each link or technical change were an act of republication, the statute of limitations would be retriggered endlessly and its effectiveness essentially eliminated," id. (internal quotation marks omitted) (quoting In re Phila. Newpapers, 690 F.3d at 175); see also, Johnson, 2013 U.S. Dist. LEXIS 93947, at *21 (applying the single publication rule to internet postings and finding "no indication that the allegedly defamatory material [had] been altered or republished at any point during the three-year period between the initial publication and initiation of [the] lawsuit").

Here, LifeBrite Hospital asserts that instances of republication save its libel per quod claim from the statute of limitations. (See Doc. 240 at ¶¶ 113, 116.) BCBSNC contends that this is not the case. First, with respect to the statements in Exhibits 17, 18, and 19, BCBSNC argues that LifeBrite Hospital fails to plausibly allege any instance of republication after they were initially published. (See Doc. 257 at 28; Doc. 274 at 15.) This court agrees. LifeBrite Hospital makes broad, conclusory allegations that "BCBSNC updated these disparaging reports, and continued its communications defaming the LifeBrite Parties," (Doc. 240 ¶ 116), and that "[u]pon information and belief, this disparagement has continued throughout this lawsuit," (id. ¶ 53). However, Lifebrite specifically alleges

- 32 -

and argues republication only with respect to the reports and statements contained in Exhibits 11 and 16, (Docs. 240-11, 240-16). (See Doc. 240 ¶ 113; Doc. 265 at 32; Doc 307 at 28:13-29:20.) It makes no such specific allegations or arguments about the statements in Exhibits 17, 18, and 19, (Docs. 240-17, 240-18, 240-19). Nor can it, based on those exhibits; their contents establish the occurrence of their initial publication, but evince no indication of subsequent publication — that is, of republication. (See Docs. 240-17, 240-18, 240-19.) Accordingly, this court finds that any defamation claim based upon the statements contained in these exhibits is time-barred.

Second, with respect to the statements in Exhibits 11 and 16, BCBSNC argues that even accepting as true LifeBrite Hospital's allegations of republication thereof, LifeBrite Hospital fails to plausibly allege a republication that would not be time-barred. (See Doc. 257 at 27-30; see also Doc. 274 at 16; Doc. 307 at 26:15-28:5.) This court agrees. The report contained in Exhibit 16 shows that it was "[l]ast [u]pdated" on "3/10/2022." (See Doc. 240-16 at 2; see also Doc. 240 ¶ 113.) Further, the report records the date of each entry or update of information, text, or documentation. (See Doc. 240-16 at 14-32.) The latest recorded date of such activity is "3/10/2022," associated with the entry of the note "[p]lan decision made to

- 33 -

close case, no further investigation being done." (Id. at 27.) Thus, even accepting that the allegedly defamatory statement contained in Exhibit 16 were republished after the initial publication date of the report, the factual allegations establish that no republication occurred later than March 10, 2022.

Exhibit 11, (Doc. 240-11), presents a somewhat more complicated picture, but this court's conclusion is the same. LifeBrite Hospital alleges that the report contained in Exhibit 11 "was last updated on April 20, 2022 by a BCBSNC investigator" and that it was "resubmitted" on that same day. (Doc. 240 ¶ 113.) Exhibit 11 confirms these allegations: the report states that it was it was "[l]ast updated" on "4/20/2022." (See Doc. 240-11 at 2.) This date corresponds to the final "Activity Log" entry of the report, dated "04/20/2022," that states: "Plan decision made to close the case. Provider continues to remain on prepayment review, however no additional action will be taken from the plan SIU. Should the Legal team need any information, Blue Cross NC SIU remains available to assist." (Id. at 82.) Thus, LifeBrite Hospital's factual allegations establish that the last update to the report occurred on April 20, 2022, when a note was added describing BCBSNC's decision to "close the case" and to take "no additional actions" on it. (See id.; Doc. 240

- 34 -

¶ 113.) In other words, as of April 20, 2022, no further substantive changes or additions were to be made to this report on a "closed" case; and, in fact, none were, as the last recorded update to the report was on that day. (See Doc. 240-11 at 2, 82; Doc. 240 ¶ 113; see also Doc. 307 at 27; Doc. 274 at 16.)

LifeBrite Hospital attempts to muddy the waters. LifeBrite Hospital points to certain entries in the "History" section of report that indicate that the report was "viewed" at several points after April 20, 2022, with the latest of those views on August 23, 2023. (See Doc. 240 ¶ 113; Doc. 240-11 at 133–36). Such mere views do not amount to republication. See Lokhova, 995 F.3d at 142–43; Johnson, 2013 U.S. Dist. LEXIS 93947, at *19–20; Hetzel, 2024 U.S. Dist. LEXIS 241642, at *12–13. However, LifeBrite Hospital argues that among the recorded "views" of the report on August 23, 2023, are certain entries redacted by BCBSNC. (See Doc. 240 ¶ 113; Doc. 240-11 at 134.) LifeBrite Hospital speculates that these redacted entries may represent actions that constitute republications. (See Doc. 240 ¶ 113.) However, the report makes clear that this redacted portion of the history section represents nothing more than mere views or technical changes. By comparing the "History" section with the content of the rest of the report, it is apparent that the only

- 35 -

thing that the "History" section records that is not reflected elsewhere is minor technical activity. (Compare Doc. 240-11 at 133-82; with id. at 2-132.) Furthermore, the "Activity Log[s]" in the "Activities" section of the report documents all the substantive textual additions or changes, (see id. at 14-82), and the last such "Log" is the final update on April 20, 2022, (id. at 82).[6] Beyond speculation, LifeBrite Hospital alleges no other facts, even following discovery, that might plausibly support a conclusion that the statements at issue were republished after April 20, 2022.

Accordingly, this court finds that the factual allegation of the second amended complaint, including those documents incorporated therein by reference and attachment as exhibits, clearly establish that no publication or republication of any

---

[6] The content of the report strongly suggests that the post-April 20, 2022 actions to which LifeBrite Hospital points as possible republications are, in fact, views or technical changes directly related to the present litigation. An "Activity Log" update on "01/06/2022" observes that "[l]itigation is ongoing," (Doc. 240-11 at 81), and the final update on "04/20/2022" advises that "[s]hould the Legal team need any information, [BCBSNC's Special Investigations Unit] remains available to assist," (id. at 82). Further, LifeBrite Hospital alleges that it served BCBSNC with discovery requests seeking Exhibit 11, among other documents, in February 2023, and that BCBSNC produced Exhibit 11 in October 2023. (Doc. 240 ¶ 110.) Thus, it is only reasonable to infer that that any "views" and other technical actions in August 2023 were related to the litigation and, specifically, discovery, rather than to substantive changes or additions to the report itself. (See Doc. 240-11 at 133-36.)

allegedly defamatory statement contained in Exhibits 11, 16, 17, 18, and 19 occurred before February 27, 2023. Therefore, LifeBrite Hospital's remaining libel per quod claim is barred by the statute of limitations.

### 4. Equitable Tolling

LifeBrite Hospital argues in the alternative that this court should toll the statute of limitations on equitable grounds. (See Doc. 240 ¶ 102.) "Equitable tolling has long been considered an extraordinary remedy in this circuit, and litigants face a considerable burden to demonstrate that it applies." CVLR Performance Horses, Inc. v. Wynne, 792 F.3d 469, 476 (4th Cir. 2015). The Fourth Circuit has advised that "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent." Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000). "To qualify for equitable tolling, [a plaintiff] must show that (1) they diligently pursued their rights, but (2) and extraordinary circumstance prevented them from timely filing their claim." CVLR Performance Horses, 792 F.3d at 476; see also Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 203 F. Supp. 3d 608, 613–14 (M.D.N.C. 2016).

This court does not find that Lifebrite Hospital qualifies for equitable tolling. The course of discovery during this

- 37 -

litigation, including delays caused by both parties' objections and motions, does not constitute an "extraordinary circumstance" such that this court should "invo[ke] equity to relieve the strict application the statute of limitations" to LifeBrite Hospital's defamation claims. Harris, 209 F.3d at 330; see Delcid v. Isabella, No. 20-cv-3167, 2022 WL 17342048, at *2 (D. Md. Nov. 30, 2022) ("[O]rdinary litigation delay is not considered an 'extraordinary circumstance' warranting equitable tolling." (quoting Schilling v. Schmidt Baking Co., No. 16-cv-2498, 2018 WL 3520432, at *7 (D. Md. July 20, 2018)). This court declines Lifebrite Hospital's request for equitable tolling.

\* \* \*

For the reasons discussed above, this court will dismiss Count II of the LifeBrite Parties' second amended complaint, (Doc. 240 ¶¶ at 71-87).

**B. UDTPA Claims**

In Count III of the second amended complaint, the LifeBrite Parties claim that BCBSNC violated North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. (Doc. 240 ¶¶ 88-96.) Section 75-1.1 prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). Section 75-16 provides a private right of

- 38 -

action and treble damages for violations of Section 75-1.1. N.C. Gen. Stat. § 75-16. "[T]o prevail on a claim under the UDTPA, the plaintiff must show (1) an unfair method of competition or an unfair or deceptive act or practice, (2) in or affecting commerce, (3) that proximately caused injury to the plaintiff." CPI Sec. Sys., Inc. v. Vivint Smart Home, Inc., 145 F.4th 390, 400 (4th Cir. 2025) (emphasis in original); Myers v. Broome-Edwards, 294 N.C. App. 364, 367, 903 S.E.2d 381, 384 (2024).

"Unfair methods of competition" and "unfair or deceptive acts or practices" have been recognized as distinct bases of liability under the UDTPA. See CPI Sec. Sys., 145 F.4th at 401 (stating that "the statute plainly proscribes '[u]nfair methods of competition' in addition to 'unfair or deceptive acts or practices'" and distinguishing their respective required elements); Curtis B. Pearson Music Co. v. Everitt, 368 F. App'x 450, 455 (4th Cir. 2010) ("Unfairness and deception have been identified as distinct bases for liability under the UDTPA."). While there is no precise definition of "unfair methods of competition" as used in the UDTPA, it is synonymous with "unfair competition" and encompasses "conduct which a court of equity would consider unfair" — that is, conduct of which the "fair or unfair nature . . . is to be judged by viewing it against the background of actual human experience and by determining its

- 39 -

intended and actual effects upon others." Edmundson v. Am. Motorcycle Ass'n, Inc., 7 F. App'x 136, 151 (4th Cir. 2001) (internal quotation marks omitted) (quoting McDonald v. Scarboro, 91 N.C. App. 13, 18, 370 S.E.2d 680, 684 (1988)); Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 439 (4th Cir. 2010). Similarly, the conduct that constitutes an "unfair or deceptive act or practice" is a "somewhat nebulous concept, and depends on the circumstances of the case." SmithKline Beecham Corp. v. Abbott Lab'ys, No. 15-CV-360, 2017 WL 1051123, at *11 (M.D.N.C. Mar. 20, 2017) (cleaned up) (quoting ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 472 F.3d 99, 122–23 (4th Cir. 2006)).

The UDTPA generally covers five broad categories of conduct: (1) unfair conduct, (2) deceptive misrepresentations, (3) certain per se violation of the statute, (4) anti-competitive conduct, and (5) breaches of contract occurring under aggravating circumstances. JTH Tax LLC v. CMB Tax Serv., LLC, No. 21-cv-22, 2022 WL 673264, at *8 (E.D.N.C. Mar. 7, 2022) (quoting Sparks v. Oxy-Health, LLC, 134 F. Supp. 3d 961, 997–98 (E.D.N.C. 2015)); Exclaim Mktg., LLC v. DirecTV, LLC, 134 F. Supp. 3d 1011, 1022 (E.D.N.C. 2015), aff'd, 674 F. App'x 250 (4th Cir. 2016); see also Matthew W. Sawchak & Kip D. Nelson, Defining Unfairness in "Unfair Trade Practices", 90 N.C. L. Rev.

2033, 2042-50 (2012) (discussing these categories of UDTPA claim and collecting cases). "Conduct is 'unfair' when it 'offends public policy . . . [or] is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" Exclaim Mktg., 134 F. Supp. 3d at 1022 (quoting Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007)). Conduct constitutes "deceptive misrepresentation" if "it has the capacity or tendency to deceive the average person." Id. Per se violations of the UDTPA are "established upon proof of a statutory or regulatory violation or the commission of certain torts." Sparks, 134 F. Supp 3d at 997. "Conduct is 'anti-competitive' where it amounts to an unfair use of market power to harm the competitive process and thereby harm consumers." Exclaim Mktg., 134 F. Supp. 3d at 1022. With respect to all five categories of claims, the UDTPA "only applies where egregious or aggravating circumstances are proved." Id. (citing Dalton v. Camp, 353 N.C. 647, 657, 548 S.E.2d 704, 711 (2001)). With respect to breach of contract, "unfairness or deception either in the formation of the contract or in the circumstances of its breach may establish the existence of substantial aggravating circumstances." JTH Tax, 2022 WL 673264, at *9 (cleaned up) (quoting SciGrip, Inc. v. Osae, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020)).

- 41 -

The LifeBrite Parties allege that BCBSNC engaged in both "unfair methods of competition" and "unfair or deceptive acts or practices." (Doc. 240 ¶¶ 89-90.) They specifically allege that BCBSNC engaged in "unfair methods of competition" or "unfair competition" by undertaking a "pressure campaign . . . accomplished through its Redirection Letters" to "pressure healthcare providers to cease ordering lab tests from the LifeBrite [P]arties, and to use [BCBSNC]'s preferred laboratories." (Id. ¶¶ 90, 95-96.) They also specifically allege that BCBSNC engaged in "unfair and deceptive acts" by "misrepresent[ing] the LifeBrite Parties' conduct to third parties" to "deceive others in the industry to believe that the LifeBrite Parties were the bad actors." (Id. ¶¶ 89, 93-94.) The latter is the same allegation that served as the basis for their UDTPA claim in the first amended complaint ("FAC"), (see id. ¶¶ 89, 93-94; Doc. 185 ¶¶ 68-74), a claim which this court previously dismissed without prejudice, (Doc. 230 at 2). BCBSNC argues that the LifeBrite Parties' UDTPA claim, whether based on the "pressure campaign" or the alleged misrepresentation, should be dismissed. (Doc. 257 at 8-9.) This court agrees.

1. **"Pressure Campaign"**

The first basis for the LifeBrite Parties' UDTPA claim is the alleged "pressure campaign" by BCBSNC. According to the

- 42 -

LifeBrite Parties, BCBSNC engaged in "unfair competition" by "pressur[ing] healthcare providers to cease ordering lab tests from the LifeBrite [P]arties, and to use its preferred laboratories" instead. (Doc. 240 ¶ 95.) The LifeBrite Parties allege that this "pressure campaign was accomplished through [BCBSNC's] Redirection Letters," (id.), by which BCBSNC sought to "flex[] [it's] contractual right to terminate a healthcare provider's contract with BCBSNC" in order to "influence the provider to not request labwork from labs like [LBL] for lab tests," (id. ¶ 57).

The LifeBrite Parties allege the general course of this "pressure campaign" as the following. BCBSNC contracted with a non-party laboratory benefits manager, Avalon, to "identify healthcare providers using 'unapproved' labs for lab tests." (Id. ¶ 58) On behalf of BCBSNC, Avalon "would send a healthcare provider who ordered labwork from an independent lab . . . a 'Redirection Letter.'" (Id. ¶ 58 (emphasis omitted).) The content of that letter included statements that "[t]he purpose of this letter is to remind your practice to utilize in-network labs in all instances when clinically appropriate in order to comply with the terms of your contract with [BCBSNC]," and "[f]ailure to comply with your contract may result in financial recoveries, impacts to reimbursement rates, and/or termination

- 43 -

from [BCBSNC] networks." (Id. (quoting Doc. 240-21 at 7).) Then, "Avalon would follow up by sending a more severe letter." (Id. ¶ 59.) According to the LifeBrite Parties, "[u]pon information and belief, providers who ordered lab tests from [LBL] were specifically targeted and sent these Redirection Letters"; and, "upon information and belief, as a direct result . . . providers ceased ordering lab tests from [the LifeBrite Parties]." (Id. ¶ 60.)

BCBSNC contends that the LifeBrite Parties' UDTPA claim based on the alleged "pressure campaign" fails for two reasons: first, the LifeBrite Parties do not allege acts that are deceptive or unfair such that they amount to unfair competition prohibited by the UDTPA, (Doc. 257 at 16–17); second, the LifeBrite Parties fail to plausibly allege injury or proximate causation. (Id. at 23–24.) In response to BCBSNC's first assertion, the LifeBrite Parties assert that their factual allegations show BCBSNC "threatening any healthcare providers who do business with the LifeBrite Parties." (Doc. 265 at 20.) They contend this was deceptive or unfair because "it would be within a provider's rights to order labwork from the in-network LifeBrite Hospital," and because the "threats" represented BCBSN's "attempt[] to control the provider's rightful exertion of its rights under its contract with [BCBSNC] in an unethical,

- 44 -

unscrupulous, and oppressive manner, which likely affected consumers in that it narrowed the available options for labs performing a patient's labwork." (Id. at 28.) In response to BCBSNC's second assertion, the LifeBrite Parties argue they established injury and proximate cause by alleging "that providers who sent samples and ordered tests from the LifeBrite Parties were threatened with termination and those threats worked: the test orders stopped coming, as did the revenue associated with the lab tests." (Id. at 28 (citing Doc. 240 ¶¶ 60, 95-96).)

This court doubts that BCBSNC's "pressure campaign" by "Redirection Letters," as alleged by the LifeBrite Parties, constitutes actionable conduct under the UDTPA. "The exercise of contractual rights does not typically give rise to a UDTPA claim." Bayer Cropscience LP v. Albermarle Corp., No. 14CV-412, 2015 WL 13849994, at *3 (E.D.N.C. July 7, 2015) (collecting cases). Absent sufficiently aggravating circumstances, "a defendant's conduct in exercising perceived rights and remedies under a contractual agreement with another party, even if allegedly contrary to the terms of the agreement, does not form the basis for a UDTPA claim." Taylor v. United States, 89 F. Supp. 3d 766, 773 (E.D.N.C. 2014) (citing PCS Phosphate Co. v. Norfolk S. Corp., 559 F.3d 212, 224-25 (4th Cir. 2009)). The

- 45 -

facts alleged by the LifeBrite Parties show that the pressure exerted through the Redirection Letters was aimed at ensuring providers complied with the terms of their contracts with BCBSNC. The letters state exactly that: "It is . . . required under [BCBSNC]'s Network Provider Agreement[] to use the services of in-network laboratory providers," (Doc. 240-21 at 9), and "this letter is to remind your practice to utilize in-network labs in all instances when clinically appropriate in order to comply with the terms of your contract with [BCBSNC]." (Id. at 9; Doc. 240 ¶ 58.) Further, the LifeBrite Parties' admit that use of in-network laboratories is a term of BCBSNC's contracts with providers. (See Doc. 265 at 28 (characterizing a provider's ordering labwork from in-network labs as a "rightful exertion of its rights under its contract with [BCBSNC}"); Doc. 240-2 at 5 (contract term requiring LifeBrite Hospital "assist with the transfer of the Member locally within the Provider Network" for "professional services, hospital, or other institutional services, or supplies, outside of the scope of services that [LifeBrite Hospital] provides" (emphasis added).) Similarly, the LifeBrite Parties admit that it was "BCBSNC's contractual right to terminate a healthcare provider's contract with BCBSNC." (Doc. 240 ¶ 57; see Doc. 265 at 17.)

- 46 -

It is unclear how reminding a contracting party of its obligations under a contract and informing them of possible remedies for breach of those obligations constitutes unfair competition. See Taylor, 89 F. Supp. 3d at 773; PCS Phosphate, 559 F.3d at 224-25 (threats of termination or breach alone do not violate UDTPA); see also Med. Diagnostic Lab'ys, LLC v. Health Care Serv. Corp., 772 F. App'x 637, 640, 642 (10th Cir. 2019) (holding that where certain providers received letters from Blue Cross Blue Shield of Oklahoma "reiterating the contractual provisions that allow out-of-network referrals only with preauthorization" and warning that unauthorized out-of-network referrals might to lead contract termination, the letters were "an assertion of a contractual obligation" and "enforcing contractual obligations" that did not constitute Oklahoma tortious interference).

This court cannot conclude that BCBSNC's conduct, as alleged by the LifeBrite Parties, is contrary to public policy. North Carolina law and regulations anticipate and allow health insurers such as BCBSNC to distinguish between in-network and out-of-network providers and to require use of in-network providers. See, e.g., N.C. Gen. Stat. § 58-50-30(a1)(1) ("In the case of plans that require the use of network providers as a condition of obtaining benefits under the plan or policy, the

- 47 -

policyholder, insured, or beneficiary must choose a provider of

the services within the network"); id. § 53-50-30(g) ("Any

health maintenance organization . . . or insurer governed by

Articles 1 through 67 of this Chapter that offers coverage

through a network plan may condition participation in the

network on satisfying written participation criteria, including

credentialing, quality, and accessibility criteria."); 11 N.C.

Admin. Code 20.0101(b)(6)-(7) (2025) (defining "network

provider" as "any health care provider participating in a

network utilized by a network plan carrier," and defining

"network plan carrier" as "an insurer, health maintenance

organization, or other entity acting as an insurer . . . that

provides reimbursement or provides or arranges to provide health

care services and uses increased copayments, deductibles, or

other benefit reductions for services rendered by non-network

providers to encourage members to use network providers.").

Further, health insurers are expected to articulate this

distinction in their provider contracts. See, e.g., 11 N.C.

Admin. Code 20.0201(a), -.0202(16) (2025) (requiring that "[a]ll

contracts between network plan carriers and health care

providers" contain provisions addressing "[t]he provider's

obligations to comply with the carrier's utilization management

programs, . . . quality management programs, and provider

sanctions programs"). In other words, it is unclear how BCBSNC's actions — distinguishing between in-network and out-of-network laboratories and requiring that in-network providers refer to in-network laboratories — are contrary to the public policy of this state.[7]

Even if the LifeBrite Parties had sufficiently alleged the unfairness or deceptiveness of BCBSNC's "pressure campaign," their UDTPA claim would still fail because they do not plausibly allege proximate causation. See Bumpers v. Cmty. Bank of N. Va., 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013) (requiring a plaintiff to show "the act proximately caused injury to plaintiff" to make out a prima facie UDTPA claim). The LifeBrite Parties factual allegations on this element are generalized and conclusory. They do not point to any instance where BCBSNC actually sent a specific provider a "Redirection Letter" because that provider had used the LifeBrite Parties nor to an instance when a specific provider actually ceased using LifeBrite Parties

---

[7] The LifeBrite Parties assert that BCBSNC's "pressure campaign" "harmed consumers in that it lessened the availability of labs who could perform a consumer's labwork, and narrowed [the] consumer's options." (Doc. 240 ¶ 95.) However, they fail to support this assertion with any specific factual allegations showing "lessened . . . availability" or "narrowed . . . options" for consumers and connecting it to the "Redirection Letters." Nor do the LifeBrite Parties point to anything suggesting that such an effect would necessarily be contrary to public policy.

because it received a "Redirection Letter." (See Doc. 240 ¶¶ 57–60, 95.) Instead, they make such allegations only generally and upon "information and belief." (See id. ¶¶ 60, 95.) Or, they couch the allegations in modal or auxiliary verbs and phrases of exemplification: "Avalon, on behalf of BCBSNC, would send a healthcare provider who ordered labwork from an independent lab, such as [LBL] or LifeBrite Hospital, a letter," (id. ¶ 58 (emphasis added)); "Avalon would follow up by sending a more severe letter," (id. ¶ 59 (emphasis added)); and "Avalon would also provide to BCBSNC lab usage statistics, expressly identifying [LBL] as a target," (id. ¶ 60 (emphasis added)). Such language imports generality or equivocation. See Would, Webster's Third New International Dictionary (1986) (defining "would" as "used in an auxiliary function to express plan or intention," "disposition or inclination," "custom or habitual action," or "probability or presumption in past or present time"); see also Hemphill v. Horne, LLP, Nos. 24-CV-74, 24-CV-178, 2025 WL 837007, at *5 (S.D. Miss. Mar. 10, 2025) (stating that plaintiffs' "reliance on modal verbs of possibility to plead their allegations underscores" that they "are only speculating").

The LifeBrite Parties' attempt to connect the alleged "pressure campaign" to an injury they suffered is further

undercut by their inconsistent or contradictory factual allegations. The LifeBrite Parties characterize the Redirection Letters as pressuring providers to only use "approved" or "preferred" labs and not to use "unapproved" or "not preferred" or "independent" labs. (See Doc. 240 ¶¶ 57–59, 94; see also Doc. 265 at 27.) However, the Redirection Letters direct providers to use "in-network" or "contracted" or "participating" labs and not to use "out-of-network" or "non-contracted" labs. (See Doc. 240-21 at 7–10; Doc. 240-22 at 2–3.) The difference in terminology is significant. The Redirection Letters contain dates that show they are from around July 2017 and May 2018. (See Doc. 240-21 at 9–10 (describing the enclosed laboratory list as "[c]urrent as of July 1, 2017"); Doc. 240-22 at 2–3 (list "[c]urrent as of May 1, 2018").) Throughout 2017 and up until May 17, 2018, LifeBrite Hospital was an "in-network," "contracted," or "participating" laboratory services provider of BCBSNC's network. (See Doc. 240 ¶¶ 2, 25, 49, 60; see also Doc. 265 at 28 (stating "LifeBrite Hospital was in network . . . [and] it would be within a provider's rights to order labwork from the in-network LifeBrite Hospital").) In other words, though the LifeBrite Parties' terminological sleight-of-hand appears intended to obscure this fact, the Redirection Letters urge providers to use exactly the

- 51 -

category of laboratories of which LifeBrite Hospital was a part.[8] This court does not see how such "pressure" proximately caused injury to the LifeBrite parties.

Thus, for the reasons discussed above, this court doubts that the "pressure campaign," as alleged by the LifeBrite Parties, constitutes "unfair competition" actionable under the UDTPA. Even if it did, however, this court finds that LifeBrite Parties have failed to plausibly allege that BCBSNC proximately caused injury to the LifeBrite Parties through the alleged "Redirection Letters."

### 2. <u>Misrepresentation</u>

The second basis for the LifeBrite Parties' UDTPA claim is the alleged misrepresentations by BCBSNC. In Count III of the

---

[8] The LifeBrite Parties also contend that the Redirection Letters pressured providers not to use LifeBrite Hospital's laboratory services by providing as an enclosure a list of labs that did not include LifeBrite Hospital. (<u>See</u> Doc. 240 ¶ 59; Doc. 265 at 27.) Because the lists enclosed in the attached Redirection Letters are redacted, it is not possible for this court to determine if LifeBrite Hospital is included therein. (<u>See</u> Doc. 240-21 at 10; Doc. 240-22 at 3-4.) However, even accepting that LifeBrite Hospital is not included on the enclosed lists, such exclusion does not plausibly show pressure to not use LifeBrite Hospital. The Letters direct providers to "verify other participating labs by visiting our provider directories found on www.bcbsnc.com," (Doc. 240-22 at 3), or "refer to [BCBSNC]'s provider directories (found on www.bcbsnc.com) to view the most current information," (Doc. 240-21 at 9). In other words, rather than direct providers to only use those labs on the enclosed list, the letters recommend the use of the full provider directories found online.

second amended complaint, the LifeBrite Parties claim that BCBSNC sought to "weaken the LifeBrite Parties ability to pursue the sums owed by BCBSNC, and to create financial stress to the LifeBrite Parties," by "misrepresent[ing] the LifeBrite Parties' conduct to third parties" to "deceive others in the [healthcare] industry to believe that the LifeBrite Parties were . . . bad actors." (Doc. 240 ¶ 93.) Specifically, the LifeBrite Parties aver that "BCBSNC spread the allegation that the LifeBrite Parties were engaged in fraud," (id. ¶ 55), by conveying in reports to BCBSA and governmental entities that BCBSNC suspected the LifeBrite Parties of "Excessive Charges," (id. ¶¶ 43, 47, 50, 52; see also Doc. 240-11 at 3; Doc. 240-12 at 4; Doc. 240-15 at 4; Doc. 240-16 at 3, 14), and "Misrepresent[ing] Location of Provider," (Doc. 240-16 at 3; Doc. 240 ¶ 52); and that "LifeBrite Hopsital and its affiliates are being investigated for excessively billing of [sic] laboratory services, (Doc. 240-14; see Doc. 240 ¶¶ 48, 53; Doc. 240-18 at 3). According to the LifeBrite Parties, these statements were misrepresentations because "BCBSNC knew and was internally discussing how the LifeBrite Parties were not even suspected of committing fraud." (Doc. 240 ¶ 54 (emphasis omitted) (citing Doc. 240-19 at 2).)

A claim under the UDTPA based on an alleged misrepresentation "require[s] a plaintiff to demonstrate

- 53 -

reliance on the misrepresentation in order to show the necessary proximate cause." Bumpers, 367 N.C. at 88, 747 S.E.2d at 226; Johnson v. Lendlease (US) Pub. P'ship LLC, No. 21-CV-188, 2022 WL 2447091, at *15 (E.D.N.C. July 5, 2022). To do so, a plaintiff must establish: (1) "actual reliance" — "the plaintiff . . . affirmatively incorporated the alleged misrepresentation into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether"; and (2) "reasonable reliance" — "the plaintiff could [not] have discovered the truth of the matter through reasonable diligence." Bumpers, 367 N.C. at 89-90, 747 S.E.2d at 227 (internal quotation marks and citations omitted). Moreover, "Rule 9(b) applies to unfair and deceptive trade practices claims based on alleged misrepresentations." Johnson, 2022 WL 2447091, at *15.

BCBSNC contends that insofar as the LifeBrite Parties' UDTPA claim is based on alleged misrepresentations, the claim fails because the LifeBrite Parties do not sufficiently allege facts establishing reliance on the misrepresentations. (Doc. 257 at 10.) In response, the LifeBrite Parties do not dispute they have failed to allege reliance. Instead, they argue that they need not do so because their claim "arises from a business seeking to harm another through its speech and conduct" and

- 54 -

"reliance does not play a part" with respect to conduct-based UDTPA claims. (Doc. 265 at 11-12.) The LifeBrite Parties assert that their independent tort claim of libel per quod and their allegations of deceptive and unfair acts by BCBSNC constitutes the "conduct" that forms the basis of the UDTPA claim. (Id. at 15.) The LifeBrite Parties further argue that Rule 9(b)'s heightened pleading requirements do not apply because "this part of the UDTPA claim does not 'sound in fraud'" — that is, "[t]he UDTPA claim here does not involve detrimental reliance nor deceptive representations, but unfair acts." (Id. at 29 (quoting CBP Res., Inc v. SGS Control Servs., Inc., 394 F. Supp. 2d 733, 739 (M.D.N.C. 2005).) This court is not persuaded by the LifeBrite Parties' arguments.

The LifeBrite Parties cannot rely upon the "conduct" to which they refer. As previously discussed, this court has determined that LifeBrite Hospital's libel per quod claim is time-barred. Thus, no such independent tort claim survives to form the basis for their UDTPA claim. See CPI Sec. Sys., Inc. v. Vivint Smart Home, Inc., No. 20-CV-504, 2021 WL 5225634, at *3-4 (W.D.N.C. Nov. 9, 2021) (holding a dismissed defamation claim cannot serve as an independent basis for a UDTPA claim), aff'd, 145 F.4th 390 (4th Cir. 2025). Also discussed previously is this court's finding that the LifeBrite Parties' "pressure campaign"

- 55 -

based UDTPA claim fails because they have insufficiently alleged proximate causation. Thus, their allegations of BCBSNC's actions "threatening any healthcare providers who do business with the LifeBrite Parties," (see Doc. 265 at 20), fail to support their UDTPA claim. Accordingly, the only basis that remains for the LifeBrite Parties' UDTPA claim is their allegation that "BCBSNC misrepresented the LifeBrite Parties' conduct to third parties," (Doc. 240 ¶ 93; see Doc. 265 at 20).

Further, this court is skeptical of the LifeBrite Parties' attempt to recast their UDTPA claim to lighten their pleading burden. The LifeBrite Parties now assert that they "based their unfair competition component of the UDTPA claim" on the theory that BCBSNC "disparag[ed] the LifeBrite [P]arties in an effort to cut off their revenue and destroy their business," (Doc. 265 at 20),[9] and that "this part of the UDTPA claim does not sound in fraud" and "does not involve detrimental reliance nor deceptive representations, but unfair acts," (id. at 29 (internal quotation marks omitted)). However, the LifeBrite Parties expressly allege otherwise in the second amended complaint:

> BCBSNC's violations of the UDTPA are based in fraudulent conduct. Its purpose was to deceive others in the

---

[9] The LifeBrite Parties assert that the "unfair competition component of the UDTPA claim" is also based on "threatening any healthcare providers who do business with the LifeBrite Parties." (Doc. 265 at 20.) This is a rephrasing of the alleged "pressure campaign," which this court examined above.

- 56 -

industry to believe that the LifeBrite Parties were the bad actors . . . . Further, BCBSNC sought to exert pressure indirectly through its deceptive acts, which affected third parties' relationship with the LifeBrite Parties. . . . BCBSNC misrepresented the LifeBrite Parties' conduct to third parties, all the while, BCBSNC internally admitted that the LifeBrite Parties' conduct was permitted . . . .

(Doc. 240 ¶ 93 (emphasis added).) Additionally, they specifically allege that the unfair competition component of their UDTPA claim was based on the "Redirection Letters" to providers, not BCBSNC's representations to BCBSA or other insurers. (Id. ¶ 95.) They allege: "BCBSNC engaged in deceptive and unfair acts amounting to unfair competition in its conduct in pressuring healthcare providers to only use BCBSNC's preferred laboratories. BCBSNC's pressure campaign was accomplished through its Redirection Letters, causing revenue to LifeBrite Hospital and [LBL] to diminish." (Id. (emphasis added).) In other words, the LifeBrite Parties' argument in their opposition brief mismatches the allegations of their second amended complaint.

"In assessing the sufficiency of the pleadings, a reviewing court need not consider new allegations or theories raised in opposition to a defendant's dispositive motion." Firewalker-Fields v. Hill, No. 19cv626, 2021 U.S. Dist. LEXIS 142990, at *4 (E.D. Va. July 28, 2021); see Faulconer v. Centra Health, Inc., 808 F. App'x 148, 154–55 (4th Cir. 2020); Telles v. SeaWorld

- 57 -

Parks & Ent. LLC, No. 20cv6, 2020 WL 5351037, at *4 (E.D. Va. Sep. 3, 2020). "[N]otice pleading is designed to provide defendants with fair notice of the plaintiffs' claims and the ground upon which those claims rest. . . . [D]espite the liberal pleading rules outlined by the Supreme Court, plaintiffs may not raise new claims without amending their complaints after discovery has begun." Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008); Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009). Further, a plaintiff cannot introduce new allegations or new facts in an opposition to a defendant's motion to dismiss. Battlefield Builders, Inc. v. Swango, 743 F.2d 1060, 1063 (4th Cir. 1984); Telles, 2020 WL 5351037, at *4; Travelers Indem. Co. of Conn. v. Lessard Design, Inc., 321 F. Supp. 3d 631, 639 (E.D. Va. 2018).

Here, the LifeBrite Parties attempt to replead their deceptive misrepresentation UDTPA claim as an unfair competition UDTPA claim.[10] This attempt comes only in their opposition to

---

[10] The LifeBrite Parties also attempt to replead their deceptive misrepresentation UDTPA claim as a per se violation. However, as previously discussed, they cannot because they fail to establish the necessary independent statutory violation or common law tort claim. See Sparks, 134 F. Supp. 3d at 997 ("[P]er se violations of § 75-1.1 [are] established upon proof of a statutory or regulatory violation or the commission of certain torts[.]" (citation omitted)).

- 58 -

BCBSNC's motion to dismiss, despite the fact that this court has already twice granted the LifeBrite Parties leave to amend their pleadings. Moreover, this attempt comes long after discovery had begun in this case. It is this type of "surprise switcheroo" that the Federal Rules of Civil Procedure and our precedents proscribe. See Jackson v. Gautreaux, 3 F.4th 182, 189 (5th Cir. 2021) (refusing to consider a "surprise switcheroo" where a plaintiff alleged that a sheriff "failed to adequately train his officers to avoid excessive force" but then argued for the first time in opposition to summary judgment that the sheriff "failed to adequately train his officers to deal with mentally unstable individuals" (emphasis in original)); Cloaninger, 555 F.3d at 336 (refusing to consider a plaintiff's "new claim[],"where plaintiff had originally alleged "malicious prosecution based on the resisting arrest charge," but then, for the first time in opposition to summary judgment, "assert[ed] that the malicious prosecution claim is based on [the defendants'] failed attempt to have him involuntarily committed"). Thus, to the extent that the LifeBrite Parties' argument constitutes a "de facto amendment" of their second amended complaint, this court refuses to consider it. See Faulconer, 808 F. App'x at 154 (internal quotation marks omitted) (quoting Chessie Logistics Co. v. Krinos Holdings, Inc., 867 F.3d 852, 860 (7th Cir. 2017)).

- 59 -

Even if the LifeBrite Parties' recasting of their deceptive misrepresentation UDTPA claim was not a "de facto amendment," it would fail nonetheless for lack of plausibly alleged causation. Accepting, arguendo, that they need not plead reliance to establish proximate causation because the claim does not sound in fraud,[11] they must still establish that the alleged disparagement by BCBSNC proximately caused their injury. See CPI Sec. Sys., 145 F.4th at 401 (holding that where a N.C. UDTPA claim "does not sound in fraud but rather in other traditional common-law torts, like tortious interference with contract and unfair competition," the claim "do[es] not have as an element the plaintiff's reliance on the defendant's lies," and "the plaintiff need only show that the unfair competition proximately caused its injuries"). The LifeBrite Parties contend that "[BCBSNC] disparaged the LifeBrite Parties by telling third parties they were engaged in fraud, breach of contract, and a 'scheme,'" (Doc. 265 at 21), and that this "disparagement to

---

[11] If "this part" of their UDTPA claim "does not sound in fraud," as the LifeBrite Parties now argue, (Doc. 265 at 29 (internal quotation marks omitted)), then the "discovery rule" does not apply to the accrual of the claim, despite the LifeBrite Parties' assertions to the contrary, (see id. at 23; see also Doc. 240 ¶ 102). The North Carolina Supreme Court has held that the "discovery rule" only applies to fraud claims or claims that sound in fraud, including UDTPA claims. See Taylor v. Bank of Am., N.A., 385 N.C. 783, 788-89, 898 S.E.2d 740, 745-56 (2024); Shephard v. Ocwen Fed. Bank, FSB, 361 N.C. 137, 141-42, 638 S.E.2d 197, 200 (2006).

- 60 -

third parties led to a decrease in the LifeBrite Parties'
revenue," (id. at 20–21 (citing Doc. 240 ¶¶ 5, 65, 90)).[12]
However, the second amended complaint contains no well-pleaded
factual allegations that a third party to whom BCBSNC
"disparaged" the LifeBrite Parties subsequently took an action
that harmed the LifeBrite Parties revenue because of those
disparaging statements. Rather, the LifeBrite Parties offer only
conclusory statements like "BCBSNC's . . . tortious actions have
severely harmed the LifeBrite Parties, irreparably damaging
them, and destroying their ability to operate in the healthcare
industry," (Doc. 240 ¶ 6; see also id. ¶ 5); "BCBSNC's
accusations . . . caused the LifeBrite Parties pecuniary loss in
the form of damage to their business and its income," including
"subsequent losses of revenue and reimbursements of claims by
BCBS Affiliates and other insurers, as well as the loss of
revenue attributable to other third parties ceasing doing

---

[12] The LifeBrite Parties' citation appears to contain
typographical errors. Paragraphs 65 and 90 of the second amended
complaint are unrelated to the assertion — that the
"disparagement . . . led to a decrease in the LifeBrite Parties'
revenue" — for which they are cited as support, (Doc. 265 at 20–
21). Paragraph 65 alleges, "[t]he claims submitted by the
Hospital were properly submitted to BCBSNC pursuant to the
policies and procedures contained in the Blue Card Program,
including Sections 5.1 and 5.8." (Doc. 240 ¶ 65.) And paragraph
90 alleges, "[t]he conduct of BCBSNC described herein
constitutes unfair methods of competition in or affecting
commerce in violation of N.C. Gen. Stat. § 75-1.1." (Id. ¶ 90.)

business with the LifeBrite Parties," (id. ¶ 80); and "[a]s a result of the false and defamatory accusations published by BCBSNC, LifeBrite Hospital's relationships with other insurers, healthcare providers, customers of the LifeBrite Parties, and other [sic] have been undermined," (id. ¶ 83; see also id. ¶ 3). This court does not accept as true such unsupported and conclusory statements. See Iqbal, 556 U.S. at 678; Francis, 588 F.3d at 193.

Finally, this new "disparagement"-based theory of "unfair competition" would fail for yet another reason: the LifeBrite Parties do not allege "conduct that a court of equity would consider unfair." See Universal Furniture Int'l, 618 F.3d at 439 (internal quotation marks omitted). The factual allegations that form the basis of this claim — what the LifeBrite Parties characterize as "disparagement to third parties," (Doc. 265 at 20-21) — are BCBSNC's statements to BCBSA and "governmental authorities," (Doc. 240 ¶ 42), that LifeBrite Hospital or the LifeBrite Parties had been flagged for prepayment review or were being investigated for "excessive charges," (id. ¶¶ 43, 47, 52), and "excessively billing . . . laboratory services," (Doc. 240-14 at 2; Doc. 240-18 at 2-3; see Doc. 240 ¶¶ 48, 53), and that "[e]xcessive [c]harges" are a "[f]raud type indicator," (Doc. 240-15 at 4; Doc. 240-12 at 4; see Doc. 240 ¶¶ 44, 50). (See

- 62 -

Doc. 240 ¶¶ 93-94 (focusing claim on statements about the LifeBrite Parties "[b]illing a high volume of claims").) This court does not find these statements to be "unethical, oppressive, unscrupulous or, substantially injurious to consumers," to "offend[] public policy," or to have "the capacity or tendency to deceive an average person." Exclaim Mktg., 134 F. Supp. 3d at 1022 (internal quotation marks and citations omitted).

BCBSNC's statements regarding "[e]xcessive [c]harges" or "excessively billing" can be reasonably understood to convey no more than that LifeBrite Hospital was charging or billing a much greater amount or number than it had previously done or was expected to do. See Excessive, Webster's Third New International Dictionary (1986) (defining "excessive" as "exceeding the usual, proper, or normal," "very large, great or numerous," or "greater than usual"); see also Excessive, Black's Law Dictionary (6th ed. 1990) (defining "excessive" as "[g]reater than what is usual or proper"). The LifeBrite Parties allege no facts to suggest their charges or billing had not significantly increased. Rather, their undisputed factual allegations show that LifeBrite Hospital's laboratory billing increased exponentially over the course of only a few months beginning around August 2017. (Doc. 240 ¶¶ 27-29 (alleging that "the Hospital continued and expanded

- 63 -

upon the Hospital's laboratory outreach program and urine toxicology lab testing" and that an "uptick in laboratory claims result[ed] from LifeBrite Hospital's expansion of the laboratory outreach program")); Doc. 240-12 at 4 (recording LifeBrite Hospital's laboratory monthly billing in 2017: $1,112 in June, $613 in July, $53,582 in August, $196,514 in September, $304,487 in October, $595,572 in November, $182,707 in December); Doc. 240-15 at 5 (same).) In other words, BCBSNC's statements describe what the facts demonstrate: a rapid increase in laboratory charges or billing by LifeBrite Hospital that far exceeded what the rural hospital had historically charged.

Further, the LifeBrite Parties do not explain why BCBSNC should not have identified this rapid increase as a concern or investigated it to confirm or allay that concern. They do not allege that "excessive billing" such as this is not a "fraud type indicator." That is, something that shows the probable presence or existence of conduct categorizable as fraud. See Indicator, Webster's Third New International Dictionary (1986) (defining "indicator" as "one that indicates"); Indicates, Webster's Third New International Dictionary (1986) (defining "indicates" as "to point out or point to or toward with more or less exactness," "to show the probable presence or existence or nature or course of" or "be a fairly certain sign or symptom

- 64 -

of"); <u>Type</u>, Webster's Third New International Dictionary (1986) (providing the relevant definition of "type": "a group or category exhibiting such type" or "a particular kind, class, or group"). In fact, LifeBrite Parties' allegations appear to acknowledge that excessive charges or billing is a known sign or symptom of fraudulent conduct. (<u>See</u> Doc. 240 ¶ 44 ("The term 'excessive charges' is a loaded one, as it is a 'fraud type indicator.'") (quoting Doc. 240-12 at 4).)

Seeking to show unfairness or deceptiveness, the LifeBrite Parties attempt to suggest that BCBSNC was not actually concerned the excessive charges were indicative of fraud at the time they made the "disparaging" statements. They point to a passage in an internal BCBSNC email that states, referring to LifeBrite Hospital, ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████ (Doc. 240-19 at 2.) The LifeBrite Parties assert that this language shows "BCBSNC knew and was internally discussing how the LifeBrite Parties were not even suspected of committing

- 65 -

fraud."[13] (Doc. 240 ¶ 54 (emphasis omitted).) This court finds the email's language to be ambiguous; however, even accepting the LifeBrite Parties' interpretation, this court does not find it can reasonably infer that BCBSNC was not concerned that the rapid increase in billing indicated potential fraud at the time it stated as much. The quoted email was sent on February 1, 2019, (Doc. 240-19 at 2), over a year after BCBSNC flagged and began investigating the rapid increase in LifeBrite Hospital's billing, and approximately six months after BCBSNC terminated its contract with LifeBrite Hospital. The language in the email may reflect internal knowledge or discussion in February 2019, after BCBSNC's investigation of the excessive charges, but it cannot be reasonably interpreted as reflecting such knowledge of discussion in late 2017, when it had only begun to investigate.

Therefore, this court finds that the LifeBrite Parties fail to plausibly allege that BCBSNC's "disparagement to third parties" were unfair or deceptive. As discussed previously, this court also finds that the LifeBrite Parties fail to plausibly allege that BCBSNC's "disparagement to third parties"

---

[13] BCBSNC contests the LifeBrite Parties' interpretation of this language. BCBSNC contends that the email's language "says that LifeBrite was not suspected of committing fraud against any [BCBSNC] members; rather LifeBrite's fraud involved a nationwide conspiracy to defraud [BCBSNC] and other Blue Plans." (Doc. 257 at 14.)

proximately caused injury to the LifeBrite Parties. Moreover, this court finds that the LifeBrite Parties attempt to recast their deceptive misrepresentation UDTPA claim as an unfair competition UDTPA claim constitutes improper "de facto amendment" of their second amended complaint, and it finds that the LifeBrite Parties fail to plausibly allege reliance as required to make out a deceptive misrepresentation UDTPA claim.

## V.    CONCLUSION

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Defendant Blue Cross and Blue Shield of North Carolina's Motion to Strike or in the Alternative Motion to Dismiss Counts II and III of LifeBrite Hospital Group of Stokes, LLC's and LifeBrite Laboratories, LLC's Second Amended Complaint, (Doc. 253), is **DENIED IN PART AND GRANTED IN PART.**

**IT IS ORDERED** that the motion to strike is **DENIED.**

**IT IS ORDERED** that the alternative motion to dismiss is **GRANTED.** Counts II and III of LifeBrite Hospital Group of Stokes, LLC's and LifeBrite Laboratories, LLC's Second Amended Complaint and Counterclaims, (Docs. 238, 240), are **DISMISSED.**

This the 30th day of March, 2026.

_____
United States District Judge

- 67 -